UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SENECA JONES | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  4:16-CV-1282 |
| | § | |
| TUBAL-CAIN HYDRAULIC | § | |
| SOLUTIONS, INC., TUBAL CAIN | § | |
| INDUSTRIES, INC., TUBAL-CAIN | § | |
| HOLDINGS, LLC, TUBAL-CAIN | § | |
| MARINE SERVICES, INC., TUBAL- | § | |
| CAIN INDUSTRIAL SERVICES, INC., | § | |
| TUBAL-CAIN GAS FREE SERVICES, | § | |
| INC., TUBAL-CAIN RENTALS, INC. | § | |
| TUBAL-CAIN MARINE SERVICES - | § | |
| DEVALL FLEET, INC., and TUBAL- | § | |
| CAIN GAS FREE SERVICES- | § | |
| DEVALL FLEET, INC. | § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully submitted,


By:   /s/    Robert W. Schmidt

CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
(512) 346-7077
(512) 342-0007 (Fax)
schmidt@crewsfirm.com
Robert W. Schmidt
State Bar No. 17775429
Joe K. Crews
State Bar No. 05072500


ATTORNEYS FOR PLAINTIFF

THE ESTEFAN FIRM, P.C.
Ron Estefan
State Bar No. 00785851
2306 Mason Street
Houston, Texas 77006
(713) 333-1100
(713) 333-1101 (fax)
ron@ronestefanlaw.com

TABLE OF CONTENTS

I.  SUMMARY OF THE ARGUMENT ............................................................... 1

II.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ......................... 2

III.  STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT ............................... 3

IV.  STANDARD OF REVIEW ..................................................................... 4

V.  STATEMENT OF FACTS ...................................................................... 5

A.      Supervisor Hulsey Hired Mr. Jones And Had The Authority to Hire, Fire And Take Other Tangible Employment Actions. ........................................................ 5

B.      Supervisor Hulsey And Other Tubal Cain Hydraulics Employees Regularly Called Mr. Jones a "Nigger" and Created An Intensely Hostile Work Environment. .......................... 6

C.      Supervisor Hulsey Had A Documented History Of A "Lack of Leadership" And Bad Judgment. ................................................................................ 12

D.      Racial Harassment Continues After Termination of Supervisor Hulsey. ....................... 13

E.      Tubal Cain Rehires Supervisor Hulsey, Gives Him A Raise, And Withholds This Information From The EEOC. ........................................................... 14

F.      EEOC Finds Constructive Termination, Discrimination and Hostile Work Environment. 15

G.      Tubal Cain Fails To Preserve Relevant Evidence. ........................................... 15

H.      The Tubal Cain Entities Combined Business and Labor Functions and Operated as an "Integrated Enterprise/Joint Employer." ...................................................... 17

        1.      The Tubal Cain Entities Have Overlapping Family Ownership and Directorships. 17

        2.      Tubal Cain Industries and Tubal Cain Marine/Gas Free Funded Tubal Cain Hydraulics. ........................................................................... 19

        3.      Tubal Cain Industries Officer And Employee Debbie Van Huis Had No Legal Relation to Tubal Cain Hydraulics But Participated in Weekly/Bi-Weekly Hydraulics Management Meetings. ............................................................. 19

        4.      The Tubal Cain Entities, Including Tubal Cain Hydraulics, Shared Integrated Timekeeping, Payroll, Tax Reporting, Accounting, Bill Paying, Invoicing, Email, Websites, Mail Collection, Marketing, And Human Resource Functions Among The Entities. ........................................................................... 21

        5.      Tubal Cain Industries Provided and Oversaw Human Resources Functions For Tubal Cain Hydraulics, Including Employee Policies and Procedures and Employee Terminations. ......................................................................... 23

6.      Tubal Cain Industries Had Oversight And Was Directly Involved In Tubal Cain Hydraulics Human Resources At The Time Of And In Connection With The "Seneca" Lynching Drawings. ............................................................................. 26

7.      The Tubal Cain Entities Had Woefully Inadequate Practices And Policies Regarding Employment Discrimination. ............................................................ 29

8.      Tubal Cain Presented No Evidence To Support Its Affirmative Defense of "Failure To Mitigate Damages." ....................................................................................... 31

VII.  ARGUMENT AND AUTHORITIES ................................................................................. 32

A.      The Uncontested Facts Establish As A Matter of Law That Defendants Constructively Terminated Mr. Jones' Employment and Tubal Cain is Strictly Liable. .......................... 32

1.      Because Defendants Constructively Discharged Plaintiff, The *Ellerth/Faragher* Affirmative Defense Is Not Applicable. ................................................................ 32

2.      Uncontested Facts Establish That Tubal Cain Constructively Terminated Plaintiff. 33

3.      Supervisor Hulsey Was A Supervisor Who Had Authority To Take Tangible Adverse Employment Actions. ............................................................................. 36

B.      Defendants Subjected Plaintiff To A Hostile Work Environment. ................................... 38

C.      Although Not Relevant, The *Ellerth/Faragher* Affirmative Defense Also Fails On The Uncontested Facts As A Matter of Law. ............................................................................ 39

D.      Defendants Are Liable For The Outrageous Harassment Of Mr. Jones Because They Operated As An Integrated Enterprise/Joint Employer. .................................................... 42

E.      Defendants' Failure to Mitigate Affirmative Defense Must Be Dismissed Because There Is No Evidence Of An Essential Element That Substantially Equivalent Employment Was Available. ........................................................................................................................... 46

VIII.  CONCLUSION ................................................................................................................. 48

EXHIBITS ..................................................................................................................................... 49

CERTIFICATE OF SERVICE ...................................................................................................... 51

TABLE OF AUTHORITIES

Cases

*Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 167-68 (5th Cir. 2008)........................ 36

*Alcoa, Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017) ........................................... 45

*Alvarado v. Shipley Donut Flour & Supply Co.*, 526 F. Supp. 2d 746, 757-60 (S.D. Tex. 2007) 40

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) 4, 5

*Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 480 (5th Cir. 2008)..................................... 34

*Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).............................................................. 5

*Bell v. Ingalls Shipbuilding, Inc.*, 207 F.3d 657, at *1 (5th Cir. 2000)...................... 36, 41

*Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005)................... 4, 5

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)................................. 35

*Brown v. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) ............................... passim

*Bryant v. FMC Techs. Inc.*, 2010 U.S. Dist. LEXIS 96948 *; 2010 WL 3701576, (S.D. Tex. (Houston) September 16, 2010)................................................................ 44

*Buckingham v. Booz Allen Hamilton, Inc.*, 64 F. Supp. 3d 981, 984-85 (S.D. Tex. 2014) (Ellison, J.)................................................................ 50

*Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d. 489, 505 (5th Cir. 1982) ................................................................ 45

*Casiano v. AT&T Corp.*, 213 F.3d 278 (5th Cir. 2000) ............................. 33, 34, 42, 54

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ......... 4

*Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008) ............................................... 5

*Delph v. Dr. Pepper Bottling Co. of Paragould*, 130 F.3d 349, 357 (8th Cir. 1997) ................. 37

*EEOC v. Rock-Tenn Servs. Co.*, 901 F. Supp. 2d 810, 825 (N.D. Tex. 2012)...................... 36, 41

*EEOC v. Teleservices Mktg. Corp.*, No. 4:04cv75, 2006 U.S. Dist. LEXIS 35478, at *14 (E.D. Tex. 2006)................................................................ 45

*Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997)................................................ 35

*Fennell v. Marion Indep. Sch. Dist.*, 963 F. Supp. 2d 623, 645 (W.D. Tex. 2013)............... 36, 41

*Garcia v. Harris County*, No. H-16-2134, 2019 U.S. Dist. LEXIS 3144, at *4 (S.D. Tex. 2019) 50

*Gonzalez v. Smith Int'l, Inc.*, 899 F. Supp. 2d 622, 641 (S.D. Tex. 2010) ................... 37

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)....... 37, 40

*Hegler v. Bd of Educ.*, 447 F.2d 1078, 1081 (8th Cir. 1971).......................................... 49

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 464 (5th Cir. 2012).......................... 34

*Huffman v. City of Conroe*, No. H-07-1964, 2009 U.S. Dist. LEXIS 10040, 2009 WL 361413, at *13 n.37 (S.D. Tex. Feb. 11, 2009)................................................................ 50

*Jones v. Delta Towing LLC*, 512 F. Supp. 2d 479, 486-87 (E.D. La. 2007)................... 43

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) ................... 5

*Little v. Tech. Specialty Prods. LLC*, No. 4:11-CV-717, 2014 U.S. Dist. LEXIS 34839, at *6-7 (E.D. Tex. 2014) ................................................................ 5, 51

*Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341-46 (11th Cir. 1999).......................... 44

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)........................................ 41

*Migis v. Pearle Vision Inc*., 135 F.3d 1041, 1045 (5th Cir. 1998)................................ 48

*Moore v. Celerity Logistics*, No. 1:09-CV-0272-BBM-GGB, 2009 U.S. Dist. LEXIS 137687, at *7 (N.D. Ga. 2009) ............................................................................................................ 44

*National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 116, n. 10 (2002) ...... 33, 42

*Paulissen v. MEI Technologies, Inc.*, 942 F. Supp. 2d 658, 677 (S.D. Tex. 2013) ..................... 50

*Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009)............................................ 36

*Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)...................................................................................................................................... 5

*Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 677 (7th Cir. 1993)................................................ 37

*Rodriguez v. City of Houston*, 250 F.Supp. 2d 691, 702-703 (S.D. Tex. 2003) .......................... 43

*Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990) *cert. denied*, 498 U.S. 987 (1990) ............................................................................................................................................ 49

*Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999)..................................................... 34

*Skidmore v. Precision Printing & Packaging Inc*., 188 F.3d 606, 617 (5th Cir. 1999)............... 47

*Sparks v. Griffin*, 460 F.2d 433, 443 (5th Cir. 1972)....................................................... 49, 50, 51

*Storr v. Alcorn State Univ.,* No. 3:15-CV-618-DPJ-FKB, 2017 U.S. Dist. LEXIS 128079, at *12 (S.D. Miss. 2017) ................................................................................................................ 50

*Trevino v. Celanese Corp.*, 701 F.2d 397, 403 (5th Cir. 1983) ............................................. 44, 45

*United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) ...................... 5

*United States v. Dial*, 542 F.3d 1059, 1059 (5th Cir. 2008) ....................................................... 50

*Vance v. Ball State Univ.*, 570 U.S. 421, 424, 133 S. Ct. 2434, 2439 (2013)...................... passim

*Vaughn v. Sabine Cty.*, 104 F. App'x 980, 984 (5th Cir. 2004) ................................................... 49

*Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359-60 (11th Cir. 1994) ......................... 44

*Vital v. Nat'l Oilwell Varco*, No. H-12-1357, 2014 U.S. Dist. LEXIS 141594 at *71, 2014 WL 4983485, (S.D. Tex. (Houston) 2014) .................................................................................... 37

*Wallace v. Texas Tech University*, 80 F.3d 1042, 1049 n.9 (5th Cir. 1996)............................... 41

*West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003)................................. 49, 50

*Williamson v. City of Houston*, 148 F.3d 462, 466 (5th Cir. 1998) ..................................... 34, 43

*Willis v. Roche Biomedical Labs.*, 61 F.3d 313, 315 (5th Cir. 1995) ........................................... 4

Rules

Fed. R. Civ. P. 56(a) ....................................................................................................................... 4

## I.  SUMMARY OF THE ARGUMENT

This is an employment discrimination case brought under Title VII of the Civil Rights Act and 42 U.S.C. §1981.  Although typically motions for summary judgment are brought by defendants, Plaintiff Seneca Jones brings this motion because internal company documents and testimony from Defendants establish that Tubal-Cain Hydraulic Solutions, Inc. ("Tubal Cain Hydraulics"), acting together with other the other Tubal Cain Defendants, subjected Mr. Jones to outrageous racial discrimination and  constructively terminated his employment.

While working at Tubal Cain Hydraulics,[1] Mr. Jones' supervisor, Brent Hulsey, (and other employees) repeatedly called Mr. Jones a "nigger" and "boy" on a daily basis and made obscenely offensive "nigger jokes."[2]   In spite of Mr. Jones complaining about this outrageous racist harassment to Supervisor Hulsey, it continued.

The racist behavior escalated to threats of physical violence when Mr. Jones discovered a drawing representing his own lynching, done in the style of the game "hangman" with "Seneca" written beneath a hanging figure.  Employees were passing around photographs of the lynching drawing among themselves.  When Mr. Jones reported the lynching drawing and photos to Supervisor Hulsey, he took no action and told Mr. Jones to "toughen up" and get a "thicker skin." Only after Mr. Jones went above Supervisor Hulsey's head did Tubal Cain take action.  Moreover,

---

[1] Throughout this brief, Plaintiff identifies Tubal Cain Hydraulics as the entity at which Plaintiff worked and also refers to other Tubal Cain entities specifically depending on the facts. This is done for purposes of clarity.  As set forth in this motion, Defendants were interrelated in numerous respects and operated as an integrated enterprise/joint employer.  Plaintiff expressly does not waive this or any other legal arguments by the references in this motion to specific Defendants relating to specific facts.

[2] Facts in this introduction are supported in the Statement of Facts by citations to specific evidence.

1

even after Supervisor Hulsey and another employee were terminated, the harassment continued. Another "Seneca" lynching drawing appeared and Mr. Jones' tire was slashed at work.  Mr. Jones determined he could no longer work in an environment where his physical and psychological safety were in real danger, and was effectively "constructively discharged."

Notably, even though Defendants represented to the EEOC that they had terminated Supervisor Hulsey, approximately a year later Defendants *rehired* Supervisor Hulsey and gave him a $20,000 a year raise, but kept that fact from the EEOC.  The EEOC investigated and issued a "cause" Determination against Tubal Cain, finding racial discrimination, constructive termination, and a hostile work environment.  Plaintiff has brought suit against Defendants under Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq*., and.

Importantly, Tubal-Cain Hydraulics is part of a group of interrelated family-owned companies.  Internal Tubal Cain documents, emails, and testimony from corporate representatives and the companies' owners establish that the Tubal Cain entities shared human resources services, payroll, accounting, bill paying, invoicing, centralized mail collection and review, the same email addresses, website, and computer IT services, and more.  The companies operated as an "integrated enterprise" or "joint employer" and are jointly liable for the outrageous discriminatory actions directed against Mr. Jones.

## II.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This case was filed in May, 2016.  Defendant Tubal Cain Hydraulics filed bankruptcy in October 2017.  The case was stayed for all parties until the stay was lifted[3] and a new scheduling order was entered in January of this year.  This is a motion for partial summary judgment on

---

[3] Since the stay was lifted, the Tubal Cain Hydraulics bankruptcy proceeding has closed and all property of the estate (there was none) was abandoned.  *See In Re: Tubal−Cain Hydraulic Solutions, Inc.,* Case No: 17-35630, United States Bankruptcy Court, Southern District Of Texas.

2

liability and on the affirmative defense of failure to mitigate damages, leaving damages and attorneys' fees to be decided by the Court.   Discovery in the case is near completion, with Defendants still needing to produce a privilege log, additional outstanding documents, and continue to work with Plaintiff on searching for documents as required by this Court's Order (Doc. No. 64)  on Plaintiff's Motion to Compel (Doc. No. 56-2).  This case is set for a bench trial on November 18, 2019, with the final pretrial conference on November 12, 2019.

### III.  STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

1.       Internal company documents and testimony from Defendants' own witnesses establish that a Tubal Cain supervisor, Brent Hulsey, condoned and took no action to stop outrageous racist conduct, including the threat of lynching Mr. Jones.  Plaintiff also has presented compelling and uncontested evidence that Supervisor Hulsey and other employees called him a "nigger" on essentially a daily basis.  Given these uncontested facts, has Plaintiff established as a matter of law that Defendants are liable for race discrimination, including Plaintiff's constructive termination and/or a hostile work environment?

2.       Internal company documents and testimony from Defendant establish that Defendants operated as an integrated enterprise/joint employer.  Has Plaintiff established as a matter of law that the Tubal Cain Defendants are jointly liable in this case because they constituted an integrated enterprise/joint employer?

3.       Defendants have pled that Plaintiff Mr. Jones failed to mitigate his damages, however, Defendants have presented no evidence on an essential element of that affirmative defense:  that other comparable positions were available.  Has Plaintiff established as a matter of law that Defendants cannot prevail on the affirmative defense of failure to mitigate damages?

3

## IV.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)   Importantly, "the mere existence of some factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be genuine and material." *Willis v. Roche Biomedical Labs.*, 61 F.3d 313, 315 (5th Cir. 1995). Material facts are those whose resolution "might affect the outcome of the suit under the governing law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it need not negate the elements of the nonmoving party's case. Fed. R. Civ. P. 56(a); *Willis*, 61 F.3d at 315 (citing *Celotex*, 477 U.S. at 322-23); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. However, "[i]f the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)).

Once the moving party has met its burden, the nonmoving party must come forward with specific evidence and articulate precisely how it supports its claim. *Baranowski v. Hart*, 486 F.3d

4

112, 119 (5th Cir. 2007). Simply resting on the allegations in the pleadings will not suffice. Neither will this burden be satisfied "by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).   In deciding a summary judgment motion, the court must draw all reasonable inferences in the light most favorable to the nonmoving party, and it cannot make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Anderson*, 477 U.S. at 255; *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## V.   STATEMENT OF FACTS

### A.   Supervisor Hulsey Hired Mr. Jones And Had The Authority to Hire, Fire And Take Other Tangible Employment Actions.

Defendant Tubal Cain Hydraulics, and specifically Supervisor Hulsey, hired Mr. Jones to work as a hydraulic mechanic on or about February 6, 2012.   **Exhibit 1,** Jones Employment Documents, New Hire Packet p. D 00001. Internal Tubal Cain Hydraulics documents clearly show that Supervisor Hulsey had the authority to hire and fire.   The "New Hire Packet" for Mr. Jones states; "Person Authorizing Employment:   Brent Hulsey".   *Id.* The employer's portion of Mr. Jones' employment application states: "Hired by: Brent Hulsey . . . Conditional Offer Made by: B H . . . Supervisor:  Brent Hulsey." *Id.*, p. D 00038.   Employee Termination Reports also show Supervisor Hulsey authorizing terminations:   "AUTHORIZATION: Supervisor's Signature (or Designee):  [signed] B Hulsey . . . Name (printed): Brent Hulsey . . . Title: Shop Supervisor." **Exhibit 2,** Funderburke/Ferguson Termination Documents, p. D 753, 755.   In Tubal Cain's response to the charge of discrimination Mr. Jones would later file, Tubal Cain confirmed and represented to the EEOC that Hulsey was in fact a supervisor at Tubal Cain Hydraulics.   **Exhibit 3,** EEOC Response First.   COO Villarreal was also Tubal Cain Hydraulics' designated Rule

30(b)(6) corporate representative for certain matters and testified that Supervisor Hulsey remained Shop Supervisor until Hulsey's termination, had authority to give disciplinary write ups, which he did on several occasions, set schedules and determine how many hours per week employees worked, and tell people not to come into work.   **Exhibit 4**, David Villarreal Corporate Representative Deposition, p. 98, line 7 – p. 99, line 22, P 135, line 15 – p. 140, line 1.[4]

**B.**   **Supervisor Hulsey And Other Tubal Cain Hydraulics Employees Regularly Called Mr. Jones a "Nigger" and Created An Intensely Hostile Work Environment.**

The workplace environment at Tubal Cain Hydraulics was permeated with racial and racist hostility towards the only two minority employees who worked in the shop and field:  Mr. Jones, who is African-American, and a coworker, Mark Martinez, who is Hispanic.  **Exhibit 5,** Mark Martinez Deposition, p. 51, line 21 – p. 52, line 3.  **Exhibit 6,** Mark Martinez Declaration.  For example, Tubal Cain employees regularly made racial comments to Coworker Martinez relating to him being Hispanic.  Ex. 5, Martinez Depo, p. 74, line 14 – p. 75, line 5, p. 129, line 25 – p. 131, line 20; Ex. 6, Martinez Dec. ¶ 4.  Tubal Cain employees called him a "sorry ass Mexican mother fucker," a "Beaner," and made jokes and comments to him about "Mexicans" cooking beans, putting lots of "Mexicans" in a truck, and other offensive racist comments.  *Id.*  Tubal Cain employees used to call Coworker Martinez "China" or "China man" and made derogatory comments because they thought he looked Chinese or Phillipino.  *Id.*  They called him "a short little Phillipino faggot."  *Id.*

---

[4] Contrary to the internal Tubal Cain documentation which show Supervisor Hulsey hiring and firing employees, COO Villarreal claimed that Supervisor Hulsey did not have the ability to hire or terminate and that only Villarreal and President Alex Neer had the ability to hire and fire. *Id.*  COO Villareal testified, however, that he relied on Supervisor Hulsey for information and gave his recommendations weight because he did not work with the shop or field employees on day to day basis. *Id.*

In March 2012, Tubal Cain employees took Coworker Martinez' hard hat and with a permanent magic marker drew penises and testicles on it, imitated Chinese writing and symbols, the words and wrote words on it calling him a "cock sucker" and that he "sucked dick." *Id.* Ex. 6, Martinez Depo, p. 42, line 7 – 21, p. 44, line 14 -  p. 132, line 9 – p. 135, line 20.  Coworker Martinez had to wear the hard hat with the obscene and racist drawings and markings because it was supposedly the only hard hat that the company had. Ex. 6, Martinez Depo, p. 134, line 20 – p. 135, line 20.  Supervisor Hulsey knew about the hard hat and saw Martinez wearing it. *Id.* To Martinez's knowledge, Supervisor Hulsey did nothing about the situation. *Id.* It was ultimately reported by another crew member to Tubal Cain management over Supervisor Hulsey, including COO Villareal. *Id.* p. 44, line 17 – p. 45, line 5; p. 131, line 21 – p. 135, line 21. Tubal Cain documents confirm Coworker Martinez' testimony, including that the employees wrote "Ching Chow" on the hard hat.   Ex 2, Funderburke/Ferguson Termination Documents.   After it was reported above Supervisor Hulsey, one of the employees was written up for the incident and two other employees, Jeremy Funderburke and Jeremy Ferguson, were terminated because they had previously been given a "verbal" when they had engaged in the "same type of offense" cutting "penis shapes out of metal." *Id.* at p. D 584.  Another employee, Ian Brown, was written up and suspended for three days.  **Exhibit 7,** Brown Disciplinary Documents, D 589.  No one from Tubal Cain ever told Coworker Martinez, Mr. Jones or the other employees about what had been done to address the situation or to let the other employees know it was not acceptable to engage in this sort of behavior. Ex. 5,  Martinez Depo, p.135, lines 14 – 20; **Exhibit 8,** Jones Declaration.

Beyond the discriminatory treatment of Mr. Martinez, Tubal-Cain employees, including Supervisor Hulsey, repeatedly called Mr. Jones a "nigger" and "boy" and targeted him with outrageous, offensive racial harassment on a near daily basis, including making obscenely

offensive "nigger jokes."   Ex. 6, Martinez Declaration; Ex. 8, Jones Declaration.   Although the racist comments were so frequent and common place it was impossible to list all of them, Mr. Martinez recalled Tubal Cain employees making racist "jokes" such as "What do niggers and Christmas lights have in common?   They both hang from porches and barely half of them work" and "What do you call 100 niggers buried up to their heads for 100 yards long and 50 yards across? Afro turf."   Ex. 6, Martinez Declaration.   Supervisor Hulsey and numerous other employees including Ian Brown, Aaron Funderburke, called him "nigger" and made demeaning racial jokes and comments daily, often many times a day.   **Exhibit 9,** Seneca Jones Deposition, p. 42, line 12 – p. 43, line 7; p. 48, line 22 – p. 49, line 13; p. 52, line 3 – p. 53, line 8, p. 58, line 4 – p. 60, line 24.   The constant racist taunting and harassment was humiliating and intensely painful for Mr. Jones to the point where he considered suicide.   Ex. 9, Jones Depo, p. 121, line 16 – p. 122, line 12.

Mr. Jones complained about and opposed the racial harassment to Supervisor Hulsey on many occasions.   **Exhibit 54**, Charge of Discrimination; Ex. 8, Jones Declaration.   In spite of Mr. Jones' complaints, the racist comments continued.   *Id.* Supervisor Hulsey heard the employees make racially offensive jokes and comments in Mr. Jones' presence and did not object or stop the comments or take other corrective action. To the contrary, Hulsey joined in and made racially offensive comments and jokes himself.   *Id.*; Ex. 6, Martinez Depo, p. 125, line 23 – p. 128, line 3. On a frequent basis during throughout the time of Mr. Jones' employment, Supervisor Hulsey would call Mr. Jones a "nigger" and say things such as "come here my nigger.   You're my nigger." *Id.* at p. 126, line 23 – p. 127, line 17. Supervisor Hulsey would also speak with a "hillbilly accent" and say "Come here, boy. I need you over here."   *Id.*   As Mr. Martinez testified:

Q. Those are the kind of things that were going on there?

8

A. And those were the kind of things that were going on there. And it was -- I mean, it was done by Brent Hulsey, Come here my -- come here, my nigger.  You're my nigger.

I'll say, Dude, how many times you want to call this dude out of his name? I mean, this -- you know his name. You hired him. You've seen his ID. You see what his ID's name so call him by his name. His name's not nigger.

*Id.* at p. 127, lines 7-17.  It should be noted that Mr. Jones does not use the words "nigger" or "nigga," does not allow his children to use those words, and has disciplined them if they do.   Ex. 9, Jones Depo, p. 53, lines 1 – 24. Tubal Cain employees calling Mr. Jones a "nigger" was not a joke to Mr. Jones.  *Id.* p. 52, line 21 – p. 53, line 24.

Left unchecked and in spite of Mr. Jones's complaints, the racist remarks and comments escalated to threats of physical violence.  In late June, 2012, Tubal Cain employees drew a picture of a stick figure being hung with the word "Seneca" underneath, in the style of the game "hangman."  Ex. 6, Martinez Dec.*,* **Exhibit 10,** Matt Hoffman Deposition, p. 57, line 1 - p. 58, line 14; Ex. 4, Corp Rep Villarreal Depo., p. 83, line 9 – p. 85, line 5; p. 87, line 8 – p. 88, line 14.

**Exhibit 11**, "Seneca" Lynching Drawing.  COO Villareal and Matt Hoffman, Director of Quality and HSE, both readily testified that the drawing represented the "lynching" of Mr. Jones.[5]  Ex. 4, Corp Rep Villarreal Depo., p. 84, line 16 – p. 85; Ex. 10, Hoffman Depo, p. 57, line 1 – p. 57, line 8.  Tubal Cain Hydraulics employees passed photographs of the drawing along to other employees. Ex. 6, Martinez Dec.*,* Ex. 4, Corp Rep Villarreal Depo., p. 83, line 9 – p. 85, line 5; p. 87, line 8 – p. 88, line 14.  Mr. Jones discovered the drawing on a "white board" that was inside of a "box

---

[5]The owner of Tubal Cain Hydraulics and the other Tubal Cain entities, Edward Van Huis III, testified he thought the drawing was immature, but wasn't sure if the it had racial connotations. **Exhibit 12**, Edward Van Huis Deposition, p 75, line 16 – 76, line 14.  Similarly, Mr. Van Huis' wife, Debbie Van Huis, who served as the primary person handling human resource functions for Tubal Cain Industries and performed human resources functions for the various Tubal Cain entities also could not state whether the drawing/picture had racial connotations.  **Exhibit 13**, Debbie Van Huis Deposition, p. 140, line 14 – p. 142, line 19.

truck" used at Tubal Cain.  Ex. 9, Jones Depo, p. 78, lines 7 – 23.  When Mr. Jones reported the

hanging/lynching drawing and photos to his Supervisor Hulsey, Hulsey did not do anything about

it and told Mr. Jones words to the effect he needed to toughen up and get a thicker skin. Ex. 10,

Hoffman Depo., p. 58, lines 1-14.   As COO Villarreal, Tubal Cain's designated corporate

representative, testified:

> . . . And -- and so it was reported to Brent, who was then our shop supervisor, and
> he didn't deal with it appropriately.  He tried to explain the -- explain the -- the
> game. Tried to kind of, you know, sweep it under the -- minimize the -- the
> significance of it, or how Seneca was feeling about it.  And -- and just kind of let it
> go. Didn't report it to -- in this case Tim. Didn't report it to me.
> . . . And then, we thought that the way that Brent dealt with the situation was
> inappropriate as a supervisor.  And -- and he was, in fact, sort of condoning that
> sort of joking and behavior . . .

Ex. 4, Corp Rep Villarreal Depo, p. 87, line 22 – p. 88, line 14.  Mr. Jones testified that Supervisor

Hulsey just laughed and told him it was a joke.  Ex. 9, Jones Depo., p. 81, line 25 – p. 82, line 5.

Tubal Cain only took action after Mr. Jones reported the situation to upper management and to a

director above Supervisor Hulsey, Tim Dimmick.  Ex. 4, Corp Rep Villarreal Depo, p. 88, line 5-

20; Ex. 9, Jones Depo, p. 81, line 19 – 82, line 18.  Director Dimmick conducted an investigation

into the matter and later, in response to Mr. Jones' charge of discrimination, wrote a report stating

that "BJ [Mr. Jones' nickname] was a loyal, motivated employee," confirming the lynching

drawing concerning Mr. Jones.  **Exhibit 14**, Dimmick EEO Report; Ex. 4, Corp Rep Villarreal

Depo, p. 87, line 8 -10.  The company terminated two employees involved with the lynching

drawing – Supervisor Hulsey and Ian Brown, who had previously been written up for the racial

harassment of Mr. Martinez.[6]  **Exhibit 15**, Hulsey Termination Report; Ex. 7, Brown Discipline

---

[6] COO Villarreal testified that there was "drama" around the terminations. Ex. 4, Villarreal
Corp Rep Depo, p. 102, line 2 – p. 104, line 14.  Brown became argumentative during the
discussion, raised his voice, refused to leave, went back into the shop and said "fuck you" to
Dimmick.  *Id.* Ex. 7, Brown Discipline Docs.

Docs.  A third employee, Aaron Boddie, was also involved but had quit a few days before the incident.  **Exhibit 16**, Boddie Termination Report.  Defendants changed the rehire status on Mr. Boddie's employment paperwork to "not recommended for reassignment in the future."  *Id.*[7]

Although Mr. Jones complained about and opposed the use of the word "nigger" and other racial harassment to Supervisor Hulsey, he did not go above Supervisor Hulsey's head and report the harassment to someone higher until the lynching drawing.  Tubal Cain repeatedly emphasized that employees should follow the "chain of command" and report problems to their supervisor. Ex. 9, Jones Depo, p. 48, lines 6 – 9; Ex. 8, Jones Dec.  Mr. Jones was also afraid that if he went above Supervisor Hulsey, he would be targeted, get in trouble or be retaliated against.  Ex. 8, Jones Dec.  Coworker Martinez testified that Supervisor Hulsey had a "clique" of employees that he protected and that going up against Hulsey was not an option:

> Q: . . . I believe . . .the lawyer for Tubal-Cain, asked you, you know, did you ever say anything to Brent or pose this to Brent. You know, say stop doing that to Brent. And you said, No, I didn't. Can you explain why you didn't?
> A. Because I'm the -- I'm a new employee there.  And if you retaliate against his little clique, then you're gone. You're part of his -- you're not his friend or you're not, in other words, kissing his ass, then you're gone.
> Q. You're going up against your supervisor --
> A. Yeah. You're going against your supervisor out of something. I mean, it's -- you're the new employee, or you're causing problems, there's the door.  I have a family to support.

Ex. 5, Martinez Depo., p. 128, lines 5 – 20.  Moreover, as discussed below, Tubal Cain's own employee policies emphasized that employees should follow the direction of their supervisor and did not require employees to report discrimination to anyone specific or report above their supervisors' heads.  With the support and encouragement of Coworker Martinez, Mr. Jones

---

[7] Although COO Villareal testified that after terminating the employees, he had a discussion with employees in the shop to tell them this sort of behavior was unacceptable and would not be tolerated, both Mr. Jones and Mr. Martinez testified that such a meeting never happened.  Ex. 9, Jones Depo., p. 99, lines 5- 23; Ex. 5, Martinez Depo, p. 97, lines 11-21.

reported the racial harassment above Supervisor Hulsey's head when it involved an actual and real threat to his personal safety. Ex. 6, Martinez Declaration.

## C.    **Supervisor Hulsey Had A Documented History Of A "Lack of Leadership" And Bad Judgment.**

While Tubal Cain Hydraulics claims it was unaware that Supervisor Hulsey made racist comments and jokes to Mr. Jones, the company's internal documents show that before he was terminated, Supervisor Hulsey had a documented history of bad judgment and leadership.  **Exhibit 17**, Hulsey Disciplinary Write Ups.  A write-up for Supervisor Hulsey by Hulsey's supervisor, Mr. Dimmick, dated May 24, 2012, states that Hulsey "had to be asked 3 times to write up a subordinate employee on 16 May.  This is the second time this employee has been written up for this behavior." *Id.*  The write-up also states that Supervisor Hulsey "showed a lack of leadership" and "did not show leadership" on several specific occasions.  *Id.*  Further, the write-up states "[o]ver the last week there has been an overall lack of leadership shown for what is expected for the Shop Supervisor. . . .There is either a lack or unwillingness to provide the proper direction during the morning meetings."  *Id.* The write up also stated "Brent needs to step to the leadership and responsibilities expected of the Shop Field Supervisor. . . . Employee is currently being evaluated for fitness in the current job assignment."  *Id.*

A second, undated write-up for Supervisor Hulsey stated "Employee demonstrated an [sic] complete lack of leadership skill" by confronting company President Neer about bonuses in a morning meeting in front of subordinate employees.  *Id.*

The final termination write-up for Supervisor Hulsey written by Mr. Dimmick after the lynching drawing and concurrent with his termination cited numerous serious issues with Hulsey, including:

Continued demonstration of poor attitude, leadership and exercising poor judgment as evidenced by the following:

1.      Exercising poor judgment when removed from your supervisory position: (a) *Removed and/or destroyed company paperwork and electronic records from your office and company laptop computer.*
. . .
3.      Failing to cooperate with management during the transition and hiring of a new Director of Technical Services.
. . .
6.      *Failure to report incident involving misconduct with a junior employee that resulted in creating a 'hostile' work environment.*

*Id.* (Emphasis added.)  <u>Importantly, in spite of their obvious relevance and responsiveness to Plaintiff's discovery requests, Defendants withheld this document discussing the "'hostile' work environment," the other Hulsey disciplinary documents in Exhibit 17, and numerous other clearly relevant documents and did not produce until after Plaintiff's Motion to Compel.</u>

**D.      <u>Racial Harassment Continues After Termination of Supervisor Hulsey.</u>**

Even after the termination of Supervisor Hulsey and Brown, the racial harassment continued.  Approximately two days later, Mr. Jones found a second hangman drawing on another box truck and Mr. Jones' tire was slashed at work.[8]  Ex. 8, Jones Depo, p. 104, line 12 – p. 105, line 16, **Exhibit 18**, Tire Photo.  Mr. Jones spoke with his mother about the situation, was afraid for his safety, and believed someone wanted to hurt him.  Ex. 8, Jones Depo, p. 109, line 23 – 25, p. 110, line 22 – p. 11, line 18.  Mr. Jones decided he could no longer work in an environment where his physical and psychological safety were in danger and did not return to work at Tubal Cain.  *Id.*

---

[8] Tubal Cain denies knowledge of the second hangman or that Mr. Jones' tire was slashed. It is not necessary for the purposes of summary judgment to prove these facts, however, because as discussed herein, the other facts acknowledged by Tubal Cain are sufficient to establish liability.

Mr. Jones' fear for his safety because of the Tubal Cain employees was well-founded. Mr. Martinez continued working for Tubal Cain after Mr. Jones' constructive discharge. Approximately six months later while on an assignment for Tubal Cain in Odessa, several Tubal Cain Hydraulics employees violently threatened Mr. Martinez. Ex. 5, Martinez Depo, p. 152, line 2 – p. 156, line 12. While Mr. Martinez was out on a job, the employees kicked open the door of the room that Martinez was staying in. *Id.* The employees took all of his personal belongings – clothes, shoes, a DVD player, and television – and threw them on the ground outside. *Id.* Mr. Martinez and his supervisor drove up to the scene in a company pick up. *Id.* The employees were jumping on Mr. Martinez's possessions, spitting on them and urinating on them. *Id.* Mr. Martinez stayed in the truck with the doors locked, while his coworkers yelled at him, including racial slurs like calling him a "Chinese cock sucking motherfucker" and saying "we know how you got your position and how you got your lead position by sucking dick." *Id.* One of the employees, Gordon Hare, came to the truck telling Mr. Martinez to unlock the door, that "I'm going to whoop your ass," and that "if you don't get out, I'm going to break the window." *Id.* Mr. Martinez was afraid he was going to be beaten up and did not get out of the truck. *Id.* The employees involved walked off the job and quit Tubal Cain. *Id.* Internal Tubal Cain Hydraulics employment records and emails are consistent with Mr. Martinez's testimony. **Exhibit 19**, Martinez Odessa Documents.[9]

## E. Tubal Cain Rehires Supervisor Hulsey, Gives Him A Raise, And Withholds This Information From The EEOC.

In spite of Supervisor Hulsey's outrageous racial discrimination, condoning of the lynching drawing, and horrible, documented employment record at Tubal Cain Hydraulic, the company

---

[9] Although clearly relevant to this case and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff filed his Motion to Compel.

rehired Hulsey approximately a year later, in 2013. **Exhibit 53**, Hulsey Rehire.[10]  In fact, when he was rehired, *Tubal Cain gave Hulsey a raise of approximately $20,000.00 petir year compared to what he was making before, now paying him $70,000.00*.  *Id.* Moreover, even though Defendants had represented to the EEOC that they had no tolerance for Supervisor Hulsey's behavior and had terminated him because of his deliberate indifference to the lynching situation, Tubal Cain kept the fact that they had rehired Hulsey from the EEOC.  *See* EEOC File for Jones Charge of Discrimination, P00001 – 224.[11]

**F.      EEOC Finds Constructive Termination, Discrimination and Hostile Work Environment.**

The EEOC investigated and issued a "cause" Determination against Tubal Cain, finding racial discrimination, a hostile work environment, and the constructive termination of Mr. Jones as a result of the horrible conditions at Tubal Cain.  **Exhibit 20**, EEOC Determination**.**

**G.      Tubal Cain Fails To Preserve Relevant Evidence.**

Tubal Cain did not look for or preserve relevant emails or the email accounts of COO Villarreal, Mr. Dimmick (who investigated the lynching drawing), or Supervisor Hulsey, the three most important witnesses and employees of Tubal Cain relating to this litigation.  **Exhibit 55**, Defendant's Supplemental Interrogatory Responses at p. 11, Rog 12; Ex. 4, Corp Rep Villarreal Depo, p. 149, lines 20 - 25, p. 156, line 23 – p. 159, line 1.  Tubal Cain also did not preserve the email account of Safety Director Hoffman who wrote Tubal Cain Hydraulics' response to Mr. Jones' amended Charge of Discrimination. Ex. 55, Defendant's Supplemental Interrogatory Responses at p. 11, Rog 12.  Tubal Cain Hydraulics acknowledges that the email accounts of these

---

[10]Although clearly relevant to this case and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff filed his Motion to Compel.

[11] Because of its volume, the EEOC file, is not attached.  Plaintiff hereby offers to submit the file to the Court if so requested.

key employees "which may include relevant emails," were lost and not preserved. *Id.* Tubal Cain also failed to look for and preserve text messages even though `employees used text messages as part of their jobs. Ex. 4, Corp Rep Villareal Depo., p. 16, lines 8-17; **Exhibit 21**, David Agnew Corporate Representative Deposition, p. 64, lines 17 - p. 66, line 1.[12] Defendants' failure to locate and preserve emails and text messages was in spite of the fact that:

(1) Tubal Cain was put on clear notice of this potential litigation and *specifically directed by the EEOC to preserve evidence* within two weeks after the hanging/lynching situation after Mr. Jones filed a Charge of Discrimination. **Exhibit 23**, Notice of First Charge.

(2) Tubal Cain was again put on notice by the EEOC in August/September 2013 to preserve evidence relating to this matter when Mr. Jones filed an Amended Charge of Discrimination. **Exhibit 24,** Notice of Amended Charge.[13]

---

[12] Tubal Cain Hydraulics designated David Agnew as its Rule 30(b)(6) representative on certain topics for certain time periods. Mr. Agnew had never been a Tubal Cain Hydraulics employee, but had been employed by both Tubal Cain Industries and Tubal Cain Holdings. Ex. 21, Corp Rep Agnew Depo, p. 20, lines 4 – 19. In spite of only being employed by Tubal Cain Industries and Holdings, Agnew was Tubal Cain Hydraulics' representative on efforts records retention policies and what was done by Tubal Cain Hydraulics to locate and preserve records relating to this lawsuit and "[t]he relationship between Tubal-Cain entities in this lawsuit, including the ownership and financial control, human resources/labor relations, management, business operations, and any other business conduct/relations of each entity and between the entities." *Id.* at p. 17, lines 20 – p. 21, line 1; **Exhibit 22**, Second Amended Corporate Rep Depo Notice. Agnew's testimony was limited to the periods of time in which COO Villarreal was not employed by Tubal Cain Hydraulics, before June 2011 and after February, 2013. *Id.*

[13] The *two* notices received by Tubal Cain from the EEOC stated prominently:

**Section 1602.14 Preservation of records made or kept.** .... Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge,* for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action

16

(3) In 2013 Tubal Cain searched for and *used emails to defend itself* before the EEOC. **Exhibit 25**, EEOC Defensive Use of Emails.  Thus, at that time Tubal Cain knew that emails would be an important part of this case and used selected emails as part of their defense to Mr. Jones' claims.

(4) The owner and president of Tubal Cain Industries and Hydraulic Solutions, Edward Van Huis III, testified that he had been involved with litigation several times, and that he knew it was important to preserve *all* evidence relating to potential litigation, including emails and text messages, and not just evidence that is favorable to the company.  Ex. 12**,** Edward Van Huis Depo, p. 96, line 5 - p. 97, line 9.

(5) COO Villarreal testified that he regularly used email "everyday" as a part of his job. Ex. 4, Corp Rep Villarreal Depo, p. 16, lines 2-7.  For the email accounts of employees that apparently were preserved, there are numerous emails relating to employment performance, terminations, as well as mundane employment matters.

**H.    The Tubal Cain Entities Combined Business and Labor Functions and Operated as an "Integrated Enterprise/Joint Employer."**

**1.    The Tubal Cain Entities Have Overlapping Family Ownership and Directorships.**

Tubal-Cain Hydraulic Solutions, the entity that ostensibly employed Mr. Jones, is part of a sophisticated group of interrelated companies with common ownership and directorships by the Van Huis family, which operated the companies an "integrated enterprise" or "joint employers." Edward Van Huis III ("Mr. Van Huis" or "Ed Van Huis") is a businessman who founded Tubal

---

is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

Ex. 23, Notice of First Charge, Ex. 24, Notice of Amended Charge (emphasis original in both).

Cain Industries in Vidor, Texas in 1981.  **Exhibit 26**, Hydraulics Employee Handbook, p. D 274; Ex. 12, Ed Van Huis Depo, p. 22, lines 7 – 8; p. 102, line 23 – p. 103, line 1. Tubal Cain Industries is an industrial steel fabrication company "at the forefront of steel fabrication technology." **Exhibit 27,** Industries Profile.   It has employed as many as 92 employees.  Ex. 12, Ed Van Huis Depo, p. 22, lines 18 – 22.

In 2005, Mr. Van Huis formed Tubal Cain Marine Services, Inc. ("Tubal Cain Marine") with his wife, Debbie Van Huis, and son, Edward Van Huis IV ("Eddie Van Huis").  *Id.* p. 25, lines 8 -10; **Exhibit 28**, Tubal Cain Org Charts.  In approximately 2007, Mr. Van Huis then formed Tubal Cain Gas Free, also with Debbie and Eddie Van Huis.  Ex. 12, Ed Van Huis Depo, p. 25, lines 12-13; Ex. 28, Tubal Cain Org Charts.

Mr. Van Huis formed Tubal Cain Hydraulic Solutions on February 9, 2010 with Alex Neer. Ex. 12, Ed Van Huis Depo, p. 25, line 24 – p. 26, line 8; **Exhibit 29**, Alex Neer Declaration; **Exhibit 30**, Tubal Cain Entities SOS Records.  Mr. Van Huis was the official president and principal owner/investor of Tubal Cain Hydraulics, and Mr. Neer served as the acting President. Ex. 29, Neer Dec.; Ex. 12, Ed Van Huis Depo, p. 53, lines 7-12.

Mr. and Mrs. Van Huis together with their sons, Eddie, Timothy and Jonathon Van Huis, are all officers or directors of Tubal Cain Marine, Tubal Cain Gas Free, and Tubal Cain Holdings. Ex. 30, Tubal Cain Entities SOS Records.  Debbie Van Huis was an employee of Tubal Cain Industries.  Ex. 13, Debbie Van Huis Depo, p. 10, lines 6-22.  Eddie Van Huis was President and an employee of Tubal Cain Marine. *Id.* at p. 103, line 15-21; **Exhibit 31**, Email re TCHS Board of Directors Meeting.  Timothy and Jonathon Van Huis were employees of Tubal Cain Industries (and possibly other Tubal Cain entities).  **Exhibit 32**, TC Employee List. *None of the Van Huis*

*family were employees or officers of Tubal Cain Hydraulic Solutions, with the exception of Mr.*
*Van Huis, who was its official president.* **Exhibit 51,** Hydraulics Employee Lists.

After Mr. Jones' employment, Mr. Van Huis together with various family members formed
Tubal Cain Devall Fleet, Inc., Tubal Cain Industrial Services, Inc., Tubal Cain Holdings, LLC and
various other entities.  Ex. 30, Tubal Cain Entities SOS Records.  The Van Huis family recently
sold all of the assets of Tubal Cain Marine, Gas Free Services, Industrial Services, and Marine
Services Devall Fleet.  Ex. 21, Agnew Depo, p. 8, lines 18 – p. 9, line 16.  At the time of its sale,
Tubal Cain Marine had approximately 200 employees that became employed by VLS as part of
the sale.  Ex. 21, David Agnew Corp Rep Depo, p. 10, line 21 – p. 11, line 3.

2.    **Tubal Cain Industries and Tubal Cain Marine/Gas Free Funded Tubal Cain**
      **Hydraulics.**

Tubal Cain Hydraulics was funded by Tubal Cain Industries and Tubal Cain Gas Free (a
division of  Tubal Cain Marine), as well as a line of credit guaranteed by Mr. Van Huis.  Ex. 21,
Agnew Corp Rep Depo, p. 139, lines 21- p. 140, line 6, p. 181, line 6 – p. 183, line 3.  In fact,
Tubal Cain Industries provided several hundred thousand dollars of funding to Tubal Cain
Hydraulics.  *Id.* at p. 181, line 19 – p. 182, line 7.[14]  Tubal Cain Gas Free also provided several
hundred thousand dollars in funding to Tubal Cain Hydraulics.  *Id.* at p. 182, 1ine 8-24.

3.    **Tubal Cain Industries Officer And Employee Debbie Van Huis Had No Legal**
      **Relation to Tubal Cain Hydraulics But Participated in Weekly/Bi-Weekly**
      **Hydraulics Management Meetings.**

Tubal Cain Industries had significant involvement with and control over Tubal Cain
Hydraulics.  Both Mr. Van Huis and Debbie Van Huis went approximately weekly or every other

---

[14] In his deposition, Mr. Van Huis was asked if Tubal-Cain Industries had ever paid any
expenses or debts for Tubal-Cain Hydraulics and he swore "No."  Ex. 12, Ed Van Huis Depo. p.
122, lines 15-20.

week to the offices of Tubal Cain Hydraulic Solutions to attend business meetings with Hydraulics

management employees.  Ex. 12**,** Ed Van Huis Depo., p. 60, line 12 - p. 65, line 21.  Mr. and Ms.

Van Huis would spend approximately two to three hours at Hydraulics.  *Id.* at p. 61, lines 3 – 6.

Both Mr. Van Huis and Debbie Van Huis would join in on business meetings with Hydraulics

management employees.  *Id.* at p. 63, lines 11 – 15.  Tubal Cain Hydraulics management would

tell Mr. and Mrs. Van Huis about the important things going on in the business.  *Id.*  p. 65, lines 3

– 9.  The meetings were informal and a variety of topics would be covered, including employee

issues such as hiring and firing employees, finding qualified employees, marketing, and the

company's website.  *Id.* at p. 64, line 1 – p. 67, line 21.  Debbie Van Huis participated in business

meetings and contributed in areas such as employee policies and practices and human resources.

*Id.*; Ex. 29, Neer Declaration.  If Debbie Van Huis heard something in the meeting she didn't like,

she might speak about it in the meeting or talk about it later with Mr. Van Huis.  Ex. 12, Ed Van

Huis Depo, p. 65, lines 15 – 21.  Mr. Van Huis included Debbie Van Huis on emails and forwarded

her a detailed end of quarter agenda in 2012 for a business meeting discussing new employee hires,

listing current personnel, the status of current projects and business prospects.  **Exhibit 33,** Emails

to DVH Re Business Meeting.[15]   Again, Debbie Van Huis was an employee and officer of Tubal

Cain Industries and a director of Tubal Cain Marine, Gas Free, and other entities, but she was *not*

an employee, officer or director of Tubal Cain Hydraulics.[16]

---

[15] Although clearly relevant to this case and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

[16] In her deposition, when asked about her involvement with Tubal Cain Hydraulic Solutions and its employees, Ms. Van Huis was emphatic that "I wasn't involved in the [Hydraulics] business." Ex. 13, Debbie Van Huis Depo., p. 73, lines 6-14, p. 125, lines 3-10. Ms. Van Huis described her interactions with the employees at Tubal Cain Hydraulics as minimal and generally involved "exchanging pleasantries." *Id.* at p. 71, line 20 - 72, line 11, p. 75, line 11 - 14, p. 76, line 2- p. 77, line 1, p. 118, line 21 - p. 119, line 20.   Ms. Van Huis could not recall exchanging any emails with Tubal Cain employees (although she said it was possible).  *Id.* at p.

4.    **The Tubal Cain Entities, Including Tubal Cain Hydraulics, Shared Integrated Timekeeping, Payroll, Tax Reporting, Accounting, Bill Paying, Invoicing, Email, Websites, Mail Collection, Marketing, And Human Resource Functions Among The Entities.**

In addition to Tubal Cain Industries employee and officer Debbie Van Huis participating in Tubal Cain Hydraulics' weekly/biweekly management meetings, Tubal Cain Industries regularly interacted and worked with Tubal Cain Hydraulics as part of an informal, unwritten agreement and performed numerous functions and services for Tubal Cain Hydraulics on essentially a daily basis.  Ex. 21**,** Agnew Corp Rep Depo, p. 157, lines 17 – 25.  Tubal Cain Hydraulics received assistance and services provided by Tubal Cain Industries regarding financial matters, such as paying bills, accounting services, and also on employee matters, like payroll, employee policies, handbooks and forms, and employee health insurance. Ex. 29, Neer Declaration.

Tubal Cain Industries was integrated with Tubal Cain Hydraulics and performed services for Hydraulics including collecting and overseeing the entry of employee personnel information (Ex. 21, Corp Rep Agnew Depo, p. 141, line 16 – p. 142, line 2); maintaining records of Hydraulics employees for calculating and paying wages, including keeping the time, importing it into an accounting system, preparing payroll checks (*id.* p. 123, lines 5-8); paying all bills for Hydraulics (*id.*); preparing and providing Hydraulics with monthly financial statements (*id.* p. 119, line 20 – p. 120, line 5); providing detailed project reports (*id.* p. 123, lines 12-25); preparing W-2s for Hydraulics employees and reporting the information to the IRS (*id.* p. 96, line 14- 25, p. 121, line 13- p. 122, line 1); overseeing and providing information for the preparation of Hydraulics' income

---

72, line 18 - 25, p. 78, lines 2-8, 150, line 19-22.  Ms. Van Huis was also emphatic that *she never* attended or participated in any of the weekly/bi weekly business meetings with Mr. Van Huis and Tubal Cain Hydraulics management.  I*d.* at p. 117, line 20 - p. 120, line 20.  Her testimony is contradicted by the clear, unequivocal testimony of both her husband and President Neer.

tax returns (*id.* p. 125, lines 4-17); selecting and purchasing accounting and time-keeping software for Hydraulics (*id.* p. 128, lines 10- p. 130, line 21); training employees on software and payroll procedures and software (*id.* p. 136, line 8 - 137, line 17); and may have performed criminal background checks on selected employees (like Mr. Jones) (*id.* p. 150, line 1 - 17).

Importantly, Tubal Cain Industries received and reviewed all incoming mail of Tubal Cain Hydraulics and all the Tubal Cain entities who each had a post office box in Beaumont.  Ex. 12, Ed Van Huis Depo, p. 101, line 12 – 17.

Tubal Cain Industries also provided Tubal Cain Hydraulics with IT support, website support and email services.  Ex. 21, Agnew Corp Rep Depo, p. 159, lines 2-7.  Tubal Cain Industries also provided general IT support services for Tubal Cain Hydraulics' computers.  *Id.* at p. 159, lines 2-7.  Tubal Cain Hydraulics employees and Tubal Cain Industries' employees shared the same email address, e.g:

| | |
|---|---|
| David Villarreal: | David.Villarreal@tubal-cain.com |
| Alex Neer: | Alex@tubal-cain.com |
| Brent Hulsey: | Brent.Hulsey@tubal-cain.com |
| Matthew Hofmann: | Matt.Hofmann@tubal-cain.com |
| Ed Van Huis: | Ed@tubal-cain.com |
| Debbie Van Huis: | Debbie@tubal-cain.com |
| Jonathan Van Huis: | Jonathan@tubal-cain.com |
| Tim Van Huis: | Tim@tubal-cain.com |
| Linda Vollene: | Linda@tubal-cain.com |
| Carla Watson: | Carla@tubal-cain.com |

**Exhibit 34**, L'Auberge Meeting Emails; **Exhibit 35,** EEOC Response Second; Ex. 43, Email Re Lisa Neer Performance.  Tubal Cain Hydraulics shared an email exchange server with Tubal Cain Industries that was kept at the Tubal Cain Industries headquarters in Vidor, Texas, and that was used by all the Tubal Cain entities.  Ex. 21, Agnew Depo.,  p. 49, line 21 – p. 50, line 13.  Tubal Cain Industries set up and managed the website for Tubal Cain Hydraulics and all Tubal Cain entities, and all the entities shared the same website address.  *Id.* at p. 44, line 23 - p. 46, line 12.

Moreover, there are literally *thousands of pages of emails* sent in 2012 alone between Tubal Cain Hydraulics, Tubal Cain Industries, and Tubal Cain Marine employees showing the interconnected, intertwined nature of the businesses.  *See e.g.* D 1033 – D 3498.[17]  The emails cover all manner of employment and business matters, including employee expense reimbursements, employee child support payments and withholdings, payroll, delivery and mailing of employee paychecks, employee travel costs and scheduling, employee credit cards, employee insurance, ebank deposits, petty cash, employee per diems, employee social security numbers, employee return of company uniforms, Tubal Cain Hydraulics job costs, and payments of invoices and incoming revenue.  *Id.*

Tubal Cain Industries, Marine, and Hydraulics worked together on sales and marketing.  In addition to sharing a common website address, Tubal Cain Hydraulics and COO Villareal created a sales presentation/meeting agenda for Tubal Cain Hydraulics that was circulated among the various entities.  **Exhibit 36**, TCHS Sales Presentation.[18]  The presentation begins with "Tubal Cain Companies" and prominently features Tubal Cain Industries and Tubal Cain Marine. The Hydraulics presentation states "We are supported by the Tubal-Cain family of companies," and notes "Accounting and IT support is provided by Tubal-Cain Industries."  *Id.*

**5.**   **Tubal Cain Industries Provided and Oversaw Human Resources Functions For Tubal Cain Hydraulics, Including Employee Policies and Procedures and Employee Terminations.**

In addition to performing and directing Tubal Cain Hydraulics' employee payroll, Tubal Cain Industries and Debbie Van Huis were involved in and oversaw other aspects of Tubal Cain

---

[17] Due to the volume, Plaintiff has not attached these as an exhibit but offers to submit them to the Court if so desired.

[18] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

Hydraulics human resources functions, including providing Hydraulics with its employee policies and procedures. **Exhibit 37**, Debbie Van Huis Email re Handbook. The employee policies Tubal Cain Industries and Mrs. Van Huis provided to Tubal Cain Hydraulics were identical to those of Industries, and simply replaced the name "Tubal Cain Industries" with "Tubal Cain Hydraulic Solutions." Ex. 4**,** Villareal Depo., p. 57, line 22 - p. 58, line 17 ; Ex. 26, Hydraulics Employee Handbook; **Exhibit 38**, Industries Employee Handbook. The policies provided by Tubal Cain Industries included Industries' very limited policies and practices regarding discrimination. *Id.* The policies also included Tubal Cain Industries' policies regarding employee discipline. *Id.* In 2010 after Tubal Cain Hydraulics was incorporated, Mrs. Van Huis emailed Hydraulics administrative assistant Neer telling her to review the policies that Mrs. Van Huis provided to her and that if she felt any changes need to be made, to advise her of those changes. Ex. 36, DVH Email re Handbook. Tubal Cain Hydraulics made no changes and adopted the employee policies and handbook provided to it by Tubal Cain Industries. Ex. 26, Hydraulics Employee Handbook; Ex, 38, Industries Employee Handbook. Mr. Van Huis also provided Hydraulics with "Tubal Cain Industries, Inc. Operating Procedure" on training employees and supervisors on how and when to delegate work projects. **Exhibit 39,** TCI Delegation Procedures.[19]

Regarding employee discipline and counseling, for at least approximately a year, *Supervisor Hulsey*, ostensibly a Tubal Cain Hydraulics employee, *was disciplined using an "Employee Counseling Form" from Tubal Cain Industries with "Tubal Cain Industries, Inc.['s]" name and logo, not Hydraulics, on the form.* Ex. 17, Hulsey Discipline Docs. Similarly, an "Incident Report" concerning Supervisor Hulsey was written up on a form with the name *"Tubal*

---

[19] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

*Cain Industries, Inc.," not Hydraulics, on the form* regarding an accident and "corrective action" Hulsey was to receive.   *Id.*

Tubal Cain Industries also provided Tubal Cain Hydraulics with other key employment forms, including a "New Hire Packet" that is nearly identical to the one completed by Mr. Jones at Hydraulics.  **Exhibit 40**, TCI New Hire Packet;[20] Ex. 1, Jones Employment Docs; Ex. 21, Agnew Depo., p. 132, line 15- p. 133, line 9; p. 146, lines 1-20.  Included in both new hire packets for the two companies was an identical mandatory arbitration agreement for employees that inextricably linked together all Tubal Cain entities and Mr. Van Huis:

> This Agreement is binding upon the employees of [Tubal-Cain Ind., Inc./Hydraulics Solutions] and any other corporate entity or partnership in which [Tubal-Cain Industries, Inc./Hydraulic Solutions] or Edward John Van Huis, IH has an ownership interest in or a controlling interest.

*Id.*  Tubal Cain Hydraulics also used the exact same "Employee Termination Report" form as Tubal Cain Industries for recording employee terminations.   **Exhibit 41**, TCI Termination Report;[21] Ex. 16, Hulsey Termination Report.  The Tubal Cain Hydraulics termination form (like the Industries termination form) includes the following statement:

> I understand that if I am currently covered by the *Tubal-Cain Industries Health Plan*, and if I want to continue my coverage, I must complete the Group Health Benefits Right to Continuation Notice (COBRA Notice) which will be sent to me by Hydraulic Solutions. . .

*Id.* (emphasis added).   Tubal Cain Hydraulics and Tubal Cain Industries also used the same employee discipline and counseling forms.   **Exhibit 52**, Industries Counseling Form; Ex. 17, Hulsey Discipline Docs.

---

[20] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

[21] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

Tubal Cain Industries and Mrs. Van Huis were also involved in and consulted with Tubal Cain Hydraulics about potential employee terminations. In late January 2011, Administrative Assistant Lisa Neer sent an email to Debbie Van Huis and Mr. Van Huis with the subject "Drama Heaven for 2011." **Exhibit 42**, Potential Termination Email. [22] The email informs Mr. and Mrs. Van Huis of a "potential termination of late" that had been the subject of discussion, stating:

> I just wanted to let you know I spoke with Alex this evening to check on the status of the potential termination of late. I have the paperwork drawn up to an extent. Alex will write up the synopsis of events which I will include on the report. I can scan it to Exodus, but it won't have a supervisor's signature on it until Matthew or Alex returns. Once that is done, I will rescan it. I will also go ahead and process him through the State of TX New Hires and Terminations. I believe Jake has a credit card and keys to be returned. I will also get his Cobra forms ready to send certified mail.

*Id.*

Mr. Van Huis included (bcc) Debbie Van Huis and a Tubal Cain Industries accounting employee, Carla Watson, on an email sharply criticizing the performance, pay and capabilities of Tubal Cain Hydraulics employee Lisa Neer, who assisted with Hydraulics with human resources functions and payroll. **Exhibit 43**, Email Re Lisa Neer Performance.[23] Mrs. Van Huis and other Tubal Cain Industries employees had access to Tubal Cain Hydraulics employee personal information and forms. **Exhibit 44**, Email re Exodus/Forms. [24]

**6.** **Tubal Cain Industries Had Oversight And Was Directly Involved In Tubal Cain Hydraulics Human Resources At The Time Of And In Connection With The "Seneca" Lynching Drawings.**

---

[22] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

[23] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

[24] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

26

The complete integration in all respects of Tubal Cain Hydraulics with Tubal Cain Industries and the other Tubal Cain entities was evident at the time of the specific events that led to the hostile work environment and constructive termination of Mr. Jones. *Less than one week after* the "Seneca" lynching drawing was brought to light and Supervisor Hulsey was terminated, COO Villareal sent an email relating to the internal business operations of Tubal Cain Hydraulics to Mr. Van Huis, copied to Debbie Van Huis at Tubal Cain Industries, as well as her sons, Eddie Van Huis, President of Tubal Cain Marine, and Timothy and Jonathan Van Huis, Tubal Cain Industries employees. Ex. 34, L'Auberge Meeting Emails.[25]  All were officers or members of the board of directors for Tubal Cain Marine and Tubal Cain Gas Free. **Exhibit 45**, Tubal Cain Entity Officers. *None were employees, board members or had any other legal relationship with Tubal Cain Hydraulics*, other than Mr. Van Huis. *Id.*  The email subject was "Outline of TCHS Brief for Board of Director's Meeting" and concerned an upcoming gathering and retreat of Tubal Cain entity management at the "L'Auberge Casino and Resort" in Louisiana.  Ex. 34, L'Auberge Meeting Emails.  COO Villarreal put forth an outline to cover Tubal Cain Hydraulics' 2012 fiscal year to be presented to the "Board" – apparently the Van Huis family – even though none (except for Mr. Van Huis) had any legally recognized relationship to Hydraulics or right to be privy to such information.  *Id.*  The topics included "Challenges & Issues," "Changes to Compensation Packages," "Review of Benefits," and "Enhance our Professional Image."  *Id.*

*Just one week after* the "Seneca" lynching drawing was brought to light and Supervisor Hulsey was terminated, Tubal Cain Industries employee Debbie Van Huis emailed COO Villarreal about updating their employee policy handbook and redistributing it and the arbitration agreement

---

[25] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

to employees every year. **Exhibit 46**, Emails Re Updating Handbook.[26] COO Villareal responded that Hydraulics was updating theirs and that he would send it to Mrs. Van Huis for her review. *Id.*

*Just two weeks after the "Seneca" lynching drawing came to light and the termination of Supervisor Hulsey*, Debbie Van Huis sent an email to President Neer and COO Villareal with the subject of "Questions" specifically concerning HR matters. **Exhibit 47,** DVH HR "Questions" Email.[27] The email was copied to Mr. Van Huis, as well as her sons, Eddie Van Huis of Tubal Cain Marine, and Timothy and Jonathan Van Huis, Tubal Cain Industries employees and members of the board of directors for Tubal Cain Marine and Tubal Cain Gas Free. Ex. 45, Tubal Cain Entity Officers. In the email she asked Tubal Cain Hydraulics management to explain to her and the others in the Van Huis family (who were employees and directors of other Tubal Cain entities, with no relationship to Hydraulics) "What is the criteria [at Hydraulics] for being at a Supervisor Level?" Ex. 47, HR "Questions" Email. She also asked Tubal Cain Hydraulics' management to explain the company's annual employee review rating system. *Id.* COO Villareal responded to the entire Van Huis family providing an employment evaluation form and listing some of the official duties of Hydraulics' supervisors at the "lowest level of management." *Id.*

*Approximately three weeks after the "Seneca" lynching drawing came to light and the termination of Supervisor Hulsey*, Ms. Van Huis sent an email to COO Villareal forwarding him the notice received in the mail from the TWC stating that Mr. Jones had applied for unemployment. **Exhibit 48**, DVH Jones Unemployment Email.[28] The notice from the TWC for Mr. Jones included

---

[26] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

[27] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

[28] Although clearly relevant and responsive to Plaintiff's discovery requests, Defendants did not produce these documents until after Plaintiff's Motion to Compel.

a statement of "Reason No Longer Employed" and said "Quit for racial remarks and threats from the company and from neglect of my direct or helping me in this situation.  Even Dave Villarreal." *Id*.  In Mrs. Van Huis' email, Ms. Van Huis counseled COO Villarreal on how to handle Mr. Jones' application for unemployment, stating "I would advise getting statements from fellow employees to have on file for this one."  *Id*.

Regarding the exact charge of discrimination at the heart of this lawsuit, Tubal Cain Hydraulics' employee, Safety Director Hoffman, included Debbie Van Huis on Tubal Cain's response to the amended Charge of Discrimination in September 2013.  Ex 35**,** EEOC Response Second.

### 7.   The Tubal Cain Entities Had Woefully Inadequate Practices And Policies Regarding Employment Discrimination.

Although all of the Tubal Cain entities worked together on human resources matters and shared resources, the Tubal Cain policies and practices concerning discrimination were abysmal. Debbie Van Huis, who helped the Tubal Cain entities with HR functions, had not had attended any training seminars relating to HR matters in 15 years or more and had no "schooling" in HR.  Ex. 13, Debbie Van Huis Depo, p. 22, line 10 – p. 23, line 16.  She had no formal training in discrimination laws and just learned about them on her own.  *Id*. at p. 27, lines 13 – 22.  Tubal Cain Industries had no employee training on discrimination.  *Id*. at p. 49, line 14 – p. 50, line 14. Tubal Cain Industries also provided no formal training for supervisors on discrimination. *Id*. at p. 48, line 15 – p. 52, line 1.

Following the lead of Tubal Cain Industries, Tubal Cain Hyrdraulics did not have an HR manager and COO Villareal was the primary person at Tubal Cain Industries who handled HR matters.  Ex. 4, Corp Rep Villarreal Depo, p. 35, line 20 – p. 36, line 5 .  He had no formal training in HR.  *Id*. at p. 55, line 20 – p. 56, line 6 .  Like Tubal Cain Industries, Tubal Cain Hydraulics

provided no training to staff on HR issues and no formal training (courses or lectures) to employees on discrimination.  *Id.* at p. 68, line 13 – p. 69, line 4 .  Supervisor Hulsey had no formal training on human resources.  *Id.* at p. 75, lines 12 – 14 .  COO Villarreal did not know if Mr. Dimmick, who investigated the "Seneca" lynching drawing, had any training in human resources. *Id.* 86, lines 4 – 10 .

The Tubal Cain entities policies on discrimination were minimal.  The policies consisted of standard boilerplate language that the companies do "not discriminate in employment opportunities or practices on the basis of race, color, religion, sex, national origin, age, disability, or any other characteristic protected by law."  Ex. 25, Hydraulics Handbook at D 277.  They also stated:

> Any employees with questions or concerns about any type of discrimination in the workplace are encouraged to bring these issues to the attention of their immediate supervisor or any individual in management. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment."

*Id.  See also* Ex. 38, Industries Employee Handbook and **Exhibit 49**, Marine Employee Handbook. Other than a reference to a supposed "affirmative action" program, there were no other policies regarding race discrimination.

Employment policies generally, and specifically for like Tubal Cain's are put in place to make sure there are guidelines that are understood by both the employees and the employer.  Ex. 13, Debbie Van Huis Depo, p. 58, line 5 – 19.  Ex. 21 Agnew Corp Rep Depo, p. 111, lines 4-11. Employment policies help both employees as well as supervisors and management.  *Id.*  Tubal Cain's discrimination policies, which are supposed to provide guidance to supervisors, do not state what Tubal Cain actually does when an employee reports discrimination.  Ex. 26, Hydraulics Handbook; Ex. 21, Corp Rep Agnew Depo, p. 110, line 19 – p. 113, line 4; Ex. 38, Industries

Employee Handbook, Ex. 49, Marine Employee Handbook.  They do not state that Tubal Cain

will conduct an investigation or who will look into the matter when a complaint of discrimination

is made.  *Id*.  The policies do not state or give guidance on how a complaint of discrimination is to

be investigated, including whether investigations and interviews should be conducted privately or

in a group setting, obtaining or preserving records for an investigation, or provide time lines for

responding to a complaint of discrimination.  *Id*.

Importantly, the policies do not *require* an employee to report discrimination but rather

state that employees with questions and concern "are encouraged" to report them.  *Id.*  Moreover,

the policies do not require employees to report discrimination concerns to a specific person, but

rather say that issues may be brought "to the attention of their immediate supervisor *or* any

individual in management." *Id.* The first substantive page of the policies, before the discrimination

policies, emphasizes the importance of the employee's supervisor:

### YOU AND YOUR SUPERVISOR

Questions about your job, pay, benefits, relations with your associates, policies, and procedures or the operation in general should be directed toward management. Look to your supervisor for guidance and seek their help when you encounter difficulties. Cooperation and communication with your supervisor will promote a mutually beneficial work environment.

Employees must follow the directions of their supervisor. Management is responsible for directing your work throughout your shift, evaluating your performance, providing instruction and guidance in your job, and taking any disciplinary action that may be necessary. Disrespect for either your supervisor or management will not be tolerated and will be cause for discharge.

*Id.*  (Emphasis original).

### 8.    Tubal Cain Presented No Evidence To Support Its Affirmative Defense of "Failure To Mitigate Damages."

Defendants pled the affirmative defense of "failure to mitigate damages" in the Answer

filed in this case.  (Doc. No. 36)  Plaintiff conducted a Rule 30(b)(6) deposition and identified as

a topic "Any (and all) facts supporting or relating to the affirmative defense that Mr. Jones failed

to mitigate his damages or failed to use reasonable diligence to obtain substantially equivalent

employment after his employment at Tubal Cain/TCHS terminated."   Defendants' designated

corporate representative on this topic testified:

> Q. . . . Do you know of any jobs that were substantially equivalent to what Mr.
> Owens had -- Mr. Jones had --
> A.  Owens --
> Q. -- that Mr. Jones did not apply for and could have received?
> A.··I'm -- I'm unaware of -- of any job -- I mean, I'm unaware of what he would
> have done or what the hydraulic market was for jobs and all that.··I'm -- I'm
> unaware of that.
> . . .
> Q.··Okay.··Okay.··So you don't have evidence today of jobs that he should have
> applied for?
> A.··No, I don't have evidence of what he would have done. . . .
> . . .
> Q. You don't have evidence of jobs that Mr. Jones should have applied for that
> were substantially equivalent to what he did at Hydraulic Solutions?
> A.··I do not.
> Q.··Do you have evidence of jobs that were substantially equivalent to what he did
> at Hydraulic Solutions that he could have obtained that were, again, substantially
> equivalent to what --
> A.··I do not.

Ex. 21, Corp Rep Agnew Depo, p. 187, line 10 – p. 188, line 25.

## VII.  ARGUMENT AND AUTHORITIES

**A.**   **The Uncontested Facts Establish As A Matter of Law That Defendants Constructively Terminated Mr. Jones' Employment and Tubal Cain is Strictly Liable.**

**1.**   **Because Defendants Constructively Discharged Plaintiff, The *Ellerth/Faragher* Affirmative Defense Is Not Applicable.**

The Fifth Circuit sexual harassment[29] case of *Casiano v. AT&T Corp*., 213 F.3d 278 (5th

Cir. 2000) provides an excellent "roadmap" for analyzing cases involving unlawful discrimination

---

[29] Claims based upon racial harassment are reviewed under the same standards as those used in sexual harassment claims. *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 116, n. 10 (2002)

and harassment by a supervisor.[30]   Initially, if an employee was subjected to an "adverse employment action" in connection with a claim of harassment by a supervisor (whether sexual harassment, race harassment, etc.), the employer is vicariously liable.  *Id.* at 283.  The Supreme Court reiterated this principal in *Vance v. Ball State Univ.*, 570 U.S. 421, 424, 133 S. Ct. 2434, 2439 (2013), holding that "[i][f the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."[31]   Moreover, in such cases, the employer *cannot assert* the affirmative defense relating to an employer's preventative measures established in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).   A constructive discharge is considered an "adverse employment action" in supervisor harassment cases.  *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 480 (5th Cir. 2008).  If there is a tangible nexus between a constructive discharge and the harassment, the constructive discharge is considered a "tangible employment action" that precludes an employer from asserting the *Ellerth/Faragher* defense to vicarious liability.  *Id.*

### 2.    Uncontested Facts Establish That Tubal Cain Constructively Terminated Plaintiff.

---

[30] The District Court in *Casiano* created a flow chart that is extremely helpful in illustrating how to analyze harassment cases involving a supervisor and when the *Ellerth/Faragher* defense may apply.  See **Exhibit 50**, *Casiano* Flow Chart.

[31] In addition to vicarious liability as discussed in *Vance*, *Ellerth/Faragher*, *Casiano*, Defendants may also liable under a negligence theory.  "As an initial matter, an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment." *Vance*, 133 S. Ct. at 452 (2013).  Where an employer knew or should have known of harassment and failed to take prompt remedial action, the employer is liable for the harassment. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 464 (5th Cir. 2012); *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999); *Williamson v. City of Houston*, 148 F.3d 462, 466 (5th Cir. 1998).  Because Plaintiff has established as a matter of law vicarious liability and liability for a hostile work environment, Plaintiff does not address Defendants' negligence in this motion.

To prove a constructive discharge, a "plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (*citing Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997)).   In determining whether a reasonable employee would feel compelled to resign, courts may consider various factors, including (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].   *Id.*

In this case, the uncontested facts establish that Tubal Cain constructively discharged Mr. Jones.  Defendants acknowledge that a drawing of a hanging figure with "Seneca," Mr. Jones' first name representing the "lynching" of Mr. Jones was found and was passed around among employees.  Tubal Cain Hydraulics' designated corporate representative, COO Villarreal, as well as Safety Director Hoffman both readily acknowledged that the drawings/pictures represented the "lynching" of Mr. Jones.  Ex. 4, Corp Rep Villarreal Depo, p. 84, line 16 – p. 85 ; Ex. 10, Hoffman Depo, p. 57, line 1 – p. 57, line 8.  Moreover, Defendants acknowledged that Supervisor Hulsey took no action and essentially condoned the lynching drawing, telling Mr. Jones to toughen up and get a thicker skin.  Ex. 4, Corp Rep Villarreal Depo, p. 87, line 22 – p. 88, line 14 .  Ex. 10, Hoffman Depo., p. 58, lines 1-14.  Additionally, to date Defendants have not contested or offered any evidence contesting that Supervisor Hulsey and other Tubal Cain employees repeated called Mr. Jones a "nigger."  *See e.g* Ex. 3, EEOC Response First, Ex. 35, EEOC Response Second.  Defendants' own internal documents establish that the use of racial slurs at the workplace occurred in connection with the "hard hat" incident involving Coworker Martinez.    Ex 2,

34

Funderburke/Ferguson Termination Documents (offensive drawings and "Ching Chow" written on hard hat).

Supervisor Hulsey's condoning of the drawing that clearly represented the lynching of Mr. Jones is strong evidence supporting a constructive discharge. *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (concluding that evidence that African-American plaintiff's co-workers repeatedly displayed a noose and threatened violence qualifies as "egregious for purposes of constructive discharge"). Numerous courts have recognized the obvious:  images of or references to nooses, lynching or the hanging of African-Americans is outrageous and unacceptable. "Just as the word 'nigger' operates as an abhorrent form of intimidation and harassment, so too does the imagery of a noose." *EEOC v. Rock-Tenn Servs. Co.*, 901 F. Supp. 2d 810, 825 (N.D. Tex. 2012) (*citing Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 167-68 (5th Cir. 2008)). "It goes without saying that nooses are symbols of racial hate, reminders of a not-so-distant time when vigilantes and mobs lynched African-Americans." *Fennell v. Marion Indep. Sch. Dist.*, 963 F. Supp. 2d 623, 645 (W.D. Tex. 2013) (citing *Bell v. Ingalls Shipbuilding, Inc.*, 207 F.3d 657, at *1 (5th Cir. 2000) (unpublished) at *1 (noting that nooses "evoke the image of race-motivated lynching"). "Accordingly, harassment involving nooses is particularly severe and especially harmful." *Id.* (*citing Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1506-10 (11th Cir. 1989), *abrogated on other grounds by Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

Similarly, numerous courts have found that the pervasive use of the word "nigger," especially if it continues after complaints (as in the present case), supports a finding of constructive discharge. *Vital v. Nat'l Oilwell Varco*, No. H-12-1357, 2014 U.S. Dist. LEXIS 141594 at *71, 2014 WL 4983485, (S.D. Tex. (Houston) 2014) (Rosenthal, J.) (*citing Delph v. Dr. Pepper*

*Bottling Co. of Paragould*, 130 F.3d 349, 357 (8th Cir. 1997); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 677 (7th Cir. 1993) (finding that the pervasive use of the word "nigger" was "aggravated discrimination" sufficient to support a constructive-discharge claim); *Gonzalez v. Smith Int'l, Inc.*, 899 F. Supp. 2d 622, 641 (S.D. Tex. 2010) (denying summary judgment on a constructive-discharge claim when record evidence showed coworkers and supervisors referred to Hispanic employees, including the plaintiff, as "fucking Mexicans," "beaners," "wetbacks," and "niggers"); see also EEOC Decision No. 71-909, 3 Fair Empl. Prac. Cas. (BNA) 269 (1970) (supervisor habitual reference to black employees as "niggers" would have made the resignation of the charging party, who was white, a constructive discharge under Title VII.)

As the EEOC concluded in its Determination, Mr. Jones was clearly subjected to outrageous discrimination and threats to his personal safety working that would make any reasonable employee feel compelled to resign.  He has presented uncontested facts establishing his constructive discharge and summary judgment should be granted.

**3.** **Supervisor Hulsey Was A Supervisor Who Had Authority To Take Tangible Adverse Employment Actions.**

Defendants may argue that Supervisor Hulsey was not a "supervisor" at the time of the "Seneca" lynching drawings and/or that Supervisor Hulsey did not have the power to hire and fire and thus, they are not vicariously liable for the actions of Supervisor Hulsey.  In *Vance v. Ball State Univ.*, 570 U.S. 421, 424, 133 S. Ct. 2434, 2439 (2013), the Supreme Court held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim."

In the case at hand, Defendants' corporate representative testimony and position statement submitted to the EEOC confirm that Supervisor Hulsey was considered a supervisor up until the time he was terminated.  Ex. 4, COO Villarreal Corp Rep Depo, p. 98, line 7 – p. 99, line 22, p.

36

135, line 15 – p. 140, line 1.[32]  *See also* Ex. 3, EEOC Response First (referring to Hulsey as a "supervisor").  Additionally, Defendants' internal company documents clearly show Supervisor Hulsey had the power to hire and fire, which are "tangible employment actions."  *See* Section IV(a), *infra*; Ex. 1**,** Jones Employment Documents, New Hire Packet ("Hired by: Brent Hulsey"; Ex. 3, Funderburke Ferguson Termination Documents (Termination Authorization: "Brent Hulsey").

In his deposition, COO Villarreal claimed that Supervisor Hulsey did not have the ability to hire or terminate and that only Villarreal and President Alex Neer had the ability to hire and fire.  However, he also testified that he relied on Supervisor Hulsey for information and gave his recommendations weight because he did not work with the shop or field employees on day to day basis.  As the Supreme Court held in *Vance,* "[I]f an employer does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee.  Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Vance,* 570 U.S. at 447 (citations omitted)*.*

Moreover, COO Villareal testified that Supervisor Hulsey had authority to set schedules and determine how many hours per week employees worked, and tell people not to come into work.  A reduction in hours which results in a loss of pay constitutes an adverse employment

---

[32] Contrary to the internal Tubal Cain documentation which show Supervisor Hulsey hiring and firing employees, COO Villarreal claimed that Supervisor Hulsey did not have the ability to hire or terminate and that only Villarreal and President Alex Neer had the ability to hire and fire. *Id.* COO Villareal acknowledged, however, that he relied on Supervisor Hulsey for information and gave his recommendations weight because he did not work with the shop or field employees on day to day basis. *Id.*

action. *See Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 260 (5th Cir. 1999) *aff'd en banc*, 213 F.3d 209 (5th Cir. 2000); *Turner v. Se. Freight Lines, Inc.*, No. 3:14CV347TSL-JCG, 2015 U.S. Dist. LEXIS 87212, at *10-11 (S.D. Miss. 2015) (citing numerous cases that reduction in hours which results in loss of pay may constitute adverse employment action).

The evidence establishes as a matter of law that Supervisor Hulsey had the authority to take tangible adverse employment actions and his harassment and the harassment he condoned resulted in the constructive termination of Mr. Jones.  Under such facts, Defendants are vicariously liable, no affirmative defenses are applicable, and summary judgment should be granted.

### B.     Defendants Subjected Plaintiff To A Hostile Work Environment.

The elements of a hostile work environment claim under Title VII and Section 1981[33] are: "(1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment."  *Walker v. Thompson*, 214 F.3d 615, 625-26 (5th Cir. 2000).  In determining whether a working environment is hostile or abusive, all circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id. citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993).  The Fifth Circuit has held that "discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive[34] to alter the

---

[33] The Fifth Circuit applies the same elements to Section 1981 discriminatory-treatment claims as it does to Title VII claims. *See Barkley v. Singing River Elec. Power Ass'n*, 433 Fed. Appx. 254, 259 (5th Cir. 2011).

[34] While in this case the racially hostile conduct was both severe and pervasive, a plaintiff must establish that the alleged harassment was *either* severe *or* pervasive, but need not prove it was both.  *Alvarado v. Shipley Donut Flour & Supply Co.*, 526 F. Supp. 2d 746, 757-60 (S.D. Tex. 2007), *citing Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

conditions of the victim's employment and create an abusive working environment that violates Title VII." *Id.* (*citing Wallace v. Texas Tech University*, 80 F.3d 1042, 1049 n.9 (5th Cir. 1996)).

As with constructive discharge, numerous courts have held that the presences of images of nooses, lynching or the hanging of African-Americans create a hostile work environment.  *EEOC v. Rock-Tenn Servs. Co.*, 901 F. Supp. 2d at 825; *Fennell,* 963 F. Supp. 2d at 645. *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d at 1506-10.  Similarly, repeated the use of the word "nigger" and other racially offensive terms creates a hostile work environment. *Walker*, 214 F.3d at 619-22 (inflammatory racial epithets, including "nigger" and "little black monkey"); *Brown v. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) ("unlike certain age-related comments which  we have found too vague to constitute evidence of discrimination, the term 'nigger' is a universally recognized opprobrium, stigmatizing African-Americans because of their race").

While most hostile work environment summary judgment cases are brought by Defendants, in this case, Defendants do not contest that the "Seneca" lynching drawing and Supervisor Hulsey's condoning of this threatening, inflammatory racist behavior.  Additionally, the fact that Supervisor Hulsey and other employees regularly used term "nigger" in connection with Mr. Jones is apparently not contested and is supported not only by Mr. Jones' testimony, but by that of Coworker Martinez as well as Tubal Cain's internal documents showing the use of racial slurs. Thus, Mr. Jones has established a hostile work environment as a matter of law.

**C.      Although Not Relevant, The *Ellerth/Faragher* Affirmative Defense Also Fails On The Uncontested Facts As A Matter of Law.**

Defendants pled the affirmative defense that Mr. Jones failed to reasonably take advantage of "preventative or corrective opportunities" provided by Tubal Cain.[35]   As noted above, this defense is inapplicable and cannot apply if it is found that Tubal Cain constructively discharged Mr. Jones.  *Casiano*, 213 F.3d at 283.  In such a case, there is no need to proceed with Plaintiff's hostile work environment claim.  To the extent the defense is applicable to Plaintiff's hostile work environment claim, the defense is also not supported by the uncontested facts in this case.[36]

The *Ellerth/Faragher* defense consists of two essential elements.  An employer must prove: (1) that it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities offered by the employer or to avoid harm otherwise.  *Faragher*, 118 S.Ct. at 2279. Because it is an affirmative defense, Defendants bear the burden of proving both elements.  *Id.*

While Defendants must prove both elements, Defendant will not be able to prove the second element as a matter of law.[37]   As discussed above in the Statement of Facts, Defendants' discrimination reporting procedure simply "encouraged" but did not require employees to report concerns of discrimination to management.  Moreover, Defendants' policies explicitly provided two options for raising concerns: bring them to their immediate supervisor *or* any individual in

---

[35]Hostile work environment claims based upon racial harassment are reviewed under the same standards as those used in sexual harassment claims.  *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 116, n. 10 (2002)

[36] The *Ellerth/Faragher* defense is also not applicable to coworker harassment.  *Derouen v. Carquest Auto Parts, Inc.*, 275 F.3d 42 No. 01-30369, 2001 U.S. App. LEXIS 32005 (5th Cir. Sep. 24, 2001).

[37] Defendant will not be able to establish the first element of the defense (that it exercised reasonable care to prevent and correct promptly any harassing behavior) for several reasons, including that Defendants' policies and practices concerning discrimination and responding to discrimination were completely inadequate.  Additionally, Plaintiff on many occasions complained about the harassment to Supervisor Hulsey, who failed to correct it.  *See e.g. Jones v. Delta Towing LLC*, 512 F. Supp. 2d 479, 486-87 (E.D. La. 2007) (issue of fact where plaintiff complained several times before employer took corrective action).

management. Ex. 26, Hydraulics Handbook at D 277; *see also* Ex. 38, Industries Employee

Handbook and Ex. 49, Marine Employee Handbook.  As held in *Rodriguez v. City of Houston*,

250 F.Supp. 2d 691, 702-703 (S.D. Tex. 2003), "if the employer provides alternate procedures for

reporting harassment, then an employee is deemed to have acted reasonably if she takes advantage

of any one of them." (Citations omitted.)  In *Williamson v. City of Hous.*, 148 F.3d 462, 466-67

(5th Cir. 1998), the court rejected an employer's argument that an employee was required to report

harassment to management above her supervisor, in spite of employee policy language to that

effect that is far more explicit than that of Tubal Cain's.  The *Williamson* court held:

> When an organization designates a particular person or persons to receive
> harassment complaints, it sends a clear signal that those persons have the authority
> to accept notice of harassment problems. In *Faragher* and *Ellerth*, the Supreme
> Court emphasized that the primary objective of Title VII is to prevent
> discrimination from occurring, and that the statute 'is designed to encourage the
> creation of antiharassment policies and effective grievance mechanisms.'  To allow
> employers to escape liability when, as here, the complainant has followed the
> employer's policy for reporting harassment would undermine goals."

*Id.*  In the case at hand, COO and designated representative Villarreal testified that Mr. Jones

reported the "Seneca" lynching drawing to Supervisor Hulsey, who took no action and essentially

told Mr. Jones to "toughen up" and "get a thicker skin."  Defendants will no doubt argue that after

Plaintiff went above Supervisor Hulsey's head, COO Villarreal and Director Dimmick took action.

That action was "too little, too late." Based solely on Defendants' own testimony and company

records, *Faragher/Ellerth* defense fails as a matter of law.  Moreover, Plaintiff testified he reported

and objected to the racist use of the word "nigger" multiple times directly to his supervisor,

Supervisor Hulsey.  Unless contested by proper evidence, Plaintiff's testimony further supports

that he complied with Defendants' policies.  Plaintiff respectfully moves for summary judgment

on this affirmative defense.

**D.**     **Defendants Are Liable For The Outrageous Harassment Of Mr. Jones Because They Operated As An Integrated Enterprise/Joint Employer.**

"The Fifth Circuit has determined that '[t]he term 'employer' as used in Title VII of the Civil Rights Act was meant to be liberally construed.'" *Bryant v. FMC Techs. Inc.*, 2010 U.S. Dist. LEXIS 96948 *; 2010 WL 3701576, (S.D. Tex. (Houston) September 16, 2010) (Hoyt, J)  (citing *Trevino v. Celanese Corp.*, 701 F.2d 397, 403 (5th Cir. 1983).[38]  In light of this liberal construction, the Fifth Circuit "[draws] upon theories and rules developed in the related area of labor relations in determining when separate business entities are sufficiently interrelated for an employee whose Title VII rights have been violated" to file a claims against both entities. *Trevino*, 701 F.2d at 403.[39] The factors considered in determining whether distinct entities constitute an integrated enterprise and thus may be held liable are: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *Id.* at 403-04. The Fifth Circuit and other courts applying this standard in Title VII and related cases have often focused particularly on the second factor: centralized control of labor relations. *Id.* at 407.  However, "no one of the factors is controlling . . . nor need all criteria be present."  *Alcoa, Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017) *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d. 489, 505 (5th Cir. 1982).

---

[38] "Where there are closely interrelated companies, it may not always be immediately apparent to the plaintiff who his or her 'employer' is for purposes of Title VII and Section 1981 liability." *Moore v. Celerity Logistics*, No. 1:09-CV-0272-BBM-GGB, 2009 U.S. Dist. LEXIS 137687, at *7 (N.D. Ga. 2009) (*Citing Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341-46 (11th Cir. 1999)(discussing single and integrated enterprise employers); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359-60 (11th Cir. 1994) (discussing joint employer concept)) "Consequently, the term 'employer' is to be "accord[ed] a liberal construction." *Id.* (*citing Lyes*, 166 F.3d at 1341).

[39] In *Johnson v. Crown Enterprises, Inc.*, the Fifth Circuit adopted the Title VII *Trevino* four-factor test for § 1981 claims. 398 F.3d 339 (5th Cir. 2005).

In *EEOC v. Teleservices Mktg. Corp.*, No. 4:04cv75, 2006 U.S. Dist. LEXIS 35478, at *14 (E.D. Tex. 2006) the court denied a motion for summary judgment on the issue of integrated enterprise/joint employers where, as with Tubal Cain Hydraulics and Tubal Cain Industries, the same individual ran payrolls for both corporate defendant entities, which included keeping personnel records, tracking time, filing quarterly and annual tax reports and producing weekly salary paychecks.   Just as in *EEOC v. Teleservices,* at Tubal Cain Hydraulics and Tubal Cain Industries, two companies shared the same policy manual and the same individual participated in making policy changes at both companies.   Just as in *EEOC v. Teleservices,* Tubal Cain Hydraulics designated as one of its official, Rule 30(b)(6) corporate representatives an individual who had never been employed by Hydraulics, but rather was an employee of Tubal Cain Industries and Tubal Cain Holdings.   In *EEOC v. Teleservices*, the companies shared the same insurance plans. In the case at hand, Tubal Cain Hydraulics received support from Tubal Cain Industries regarding insurance and based on the two companies "Termination Report Form," appeared to have the same employee insurance benefits.[40]   Ex. 29, Alex Neer Declaration; Ex. 4, Corp Rep Villareal Depo, p. 22, line 7 – p. 23, line 6.

The connections between Tubal Cain Hydraulics and the other Tubal Cain entities go further beyond those noted in *EEOC v. Teleservices*.   Tubal Cain Industries employees, including Debbie Villarreal, provided human resources support to Tubal Cain Hydraulics, including sharing and using the same employee hiring and termination forms, employee discipline and counseling forms.   Tubal Cain Hydraulics consulted with Industries on human resources matters beyond payroll, such as potential terminations, employee compensation, and the level of authority and

---

[40] Contrary to President Alex Neer, corporate representative Agnew testified that Tubal Cain Industries did not provide any assistance to Tubal Cain Hydraulics in the area of insurance. Ex. 21, Corp Rep Agnew Depo, p. 152, line 25 – 153, line 2.

43

duties of supervisors.  Tubal Cain Industries also provided IT support to Tubal Cain Hydraulics, including using the same email address, sharing the same website, and sharing the same email server.  Tubal Cain Industries collected and reviewed mail of Tubal Cain Hydraulics.  Tubal Cain Hydraulics shared and presented business plans and sensitive, confidential business information to Tubal Cain Industries and Tubal Cain Marine employees, officers and directors with absolutely no legal relationship to Tubal Cain Hydraulics.  These included the members of the Van Huis family, who had ownership interests and served as officers and board members in the various Tubal Cain entities.

Some cases in the Fifth Circuit have stated that "courts have focused almost exclusively on one question: which entity made the final decisions regarding employment matters relating to the person claiming discrimination?" *Skidmore v. Precision Printing & Packaging Inc*., 188 F.3d 606, 617 (5th Cir. 1999).  While no one factor is controlling and all criteria need not be met, the facts in this case completely support an integrated enterprise when this question is asked.  Plaintiff's case is based upon a constructive termination because of a racially hostile work environment that was created, allowed to fester, and grow due to a lack of concern, oversight, and inadequate human resource policies and practices.  Tubal Cain Industries established Tubal Cain Hydraulics' policies and practices.  Tubal Cain Industries provided Hydraulics with its employee policies and forms for discipline and termination.  Tubal Cain Industries' officer and employee Debbie Van Huis was involved and participated in Tubal Cain Hydraulics weekly/bi-weekly management meetings about human resources matters.  She was advised of and involved on at least one occasion in the potential termination of a Tubal Cain Hydraulics employee.  Ex. 42, Potential Termination Email.

Moreover, at and around the very time of the "Seneca" lynching drawings, Debbie Van Huis, Timothy Van Huis, Jonathon Van Huis, and/or Eddie Van Huis, *none of whom were Tubal*

*Cain Hydraulics employees*, were involved in and advised of Hydraulics business plans and HR matters including employee compensation, how the performance and conduct of Hydraulics is evaluated and reviewed, and how Hydraulics determines the responsibilities and duties of its supervisors. Exhibit 34, L'Auberge Meeting Emails, Ex. 47, DVH HR Questions Email. At and around the very time of the "Seneca" lynching drawings, at Mrs. Van Huis' prompting, COO Villarreal told her he would send her any changes he made in the Tubal Cain Hydraulics employee handbook for her review. Ex. 46, Emails Re Updating Handbook. Ms. Van Huis actually provided advice to Tubal Cain COO Villarreal specifically about responding to Mr. Jones' statements that he had been discriminated against in his application for unemployment. Ex. 48, DVH Jones Unemployment Email. She also was included by Tubal Cain Hydraulics employees in communications with the EEOC about Mr. Jones' charge of discrimination. Ex. 35, EEOC Response Second.

As the Supreme Court noted in *Vance*, *"*an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment. . . . Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant." *Vance*, 133 S. Ct. at 2452, 2453. The uncontested evidence and internal documents establish that the Tubal Cain entities acted together as an integrated enterprise, and had oversight, the ability to review, and to provide direction to Tubal Cain Hydraulics. Thus, Plaintiff's motion for summary judgment should be granted.

**E.**     **Defendants' Failure to Mitigate Affirmative Defense Must Be Dismissed Because There Is No Evidence Of An Essential Element That Substantially Equivalent Employment Was Available.**

A plaintiff suing under Title VII (and the Age Discrimination in Employment Act) has a duty to mitigate her damages by using reasonable diligence to obtain "substantially equivalent employment." *Migis v. Pearle Vision Inc*., 135 F.3d 1041, 1045 (5th Cir. 1998).  However, the employer has the burden to plead and prove the affirmative defense of failure to mitigate.  *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990) *cert. denied*, 498 U.S. 987 (1990); *Sparks v. Griffin*, 460 F.2d 433, 443 (5th Cir. 1972) (*citing Hegler v. Bd of Educ.*, 447 F.2d 1078, 1081 (8th Cir. 1971) ("The overwhelming authority places the burden on the wrongdoer to produce evidence showing what the applicant could have earned to mitigate damages."))  "Substantially equivalent employment" is defined as "'employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the [plaintiff was] discriminatorily terminated.'"  *Vaughn v. Sabine Cty.*, 104 F. App'x 980, 984 (5th Cir. 2004). *Sellers,* 902 F.2d at 1193.

In *Sparks,* the Fifth Circuit held that the employer in a discrimination case must establish *both* of the two elements of the affirmative defense of failure to mitigate.  The employer must show "not only that the plaintiff-appellant failed to use reasonable care and diligence, but that there were jobs available which appellant could have discovered and for which she was qualified." *Id.*  While several subsequent Fifth Circuit decisions, including *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003) have held that the employer need not show the availability of other substantially equivalent jobs if the employee does not prove she exercised reasonable diligence, those decisions conflict with the earlier *Sparks* decision.

"One appellate panel may not overrule a decision of a prior panel; panel decisions may

only be overruled by *en banc* reconsideration or a contrary decision by the Supreme Court."
*Garcia v. Harris County*, No. H-16-2134, 2019 U.S. Dist. LEXIS 3144, at *4 (S.D. Tex.
2019) (Miller, J.) (citing *United States v. Dial*, 542 F.3d 1059, 1059 (5th Cir. 2008); *Huffman v.
City of Conroe*, No. H-07-1964, 2009 U.S. Dist. LEXIS 10040, 2009 WL 361413, at *13 n.37
(S.D. Tex. Feb. 11, 2009) (Atlas, J.).)  "Courts have specifically acknowledged that, in the failure
to mitigate context, the *Sparks* decision controls over *West* and other later conflicting decisions."
*Id.* (*Citing Buckingham v. Booz Allen Hamilton, Inc.*, 64 F. Supp. 3d 981, 984-85 (S.D. Tex.
2014) (Ellison, J.); *Huffman*, 2009 U.S. Dist. LEXIS 10040, 2009 WL 361413, at *13 n.37.).

Thus, numerous courts have held that a plaintiff in a discrimination case is entitled to
summary judgment on the failure to mitigate affirmative defense when the employer has not
presented evidence that substantially equivalent employment was available.  *Id., Buckingham,* 64
F. Supp. 3d at 984-85; *Huffman*, 2009 U.S. Dist. LEXIS 10040 at *444-48. *See also Storr v. Alcorn
State Univ.,* No. 3:15-CV-618-DPJ-FKB, 2017 U.S. Dist. LEXIS 128079, at *12 (S.D. Miss. 2017)
(granting motion in limine precluding failure to mitigate evidence at trial where employer could
not identify any "substantially equivalent" work plaintiff failed to seek); *Paulissen v. MEI
Technologies, Inc.*, 942 F. Supp. 2d 658, 677 (S.D. Tex. 2013) (following *Sparks* and denying
defendant's motion for summary judgment on failure to mitigate); *Little v. Tech. Specialty Prods.
LLC*, No. 4:11-CV-717, 2014 U.S. Dist. LEXIS 34839, at *6-7 (E.D. Tex. 2014) (denying motion
for new trial on failure to mitigate, noting "*this Court is bound to apply the two-part test articulated
by the Fifth Circuit in Sparks*." (Emphasis added.))

In the case at hand, Defendants' designated corporate representative on this topic testified
that he, as the corporate representative for Defendants, had no evidence of jobs Mr. Jones should
or could have applied for or obtained that were substantially equivalent to the job he had at Tubal

47

Cain. Ex. 21, Corp Rep Agnew Depo, p. 187, line 10 – p. 188, line 25.  "I'm unaware of what he would have done or what the hydraulic market was for jobs."  *Id.*  Accordingly, Plaintiff respectfully moves for summary judgment on Defendants' affirmative defense of failure to mitigate damages.  Dismissing this defense is required under Fifth Circuit case law and also helps clear away extraneous issues so the parties can focus on any remaining issues at trial.

## VIII.  CONCLUSION

Plaintiff has presented evidence from Defendants' own internal records, testimony of Defendants' designated representatives and employees, and other uncontested evidence which establishes as a matter of law that: (1) Defendants subjected him to outrageous and illegal race discrimination; (2) Defendants constructively terminated his employment and/or subjected him to a hostile work environment; (3) Defendants' *Ellerth/Faragher* affirmative defense is inapplicable and/or fails as a matter of law; (4) Defendants operated as an "integrated enterprise/joint employers" and are jointly liable for the illegal actions in this case; and (5) Defendants' affirmative defense that Plaintiff did not mitigate his damages fails because Defendants have no evidence to support the required element that substantially equivalent employment was available. Accordingly, Plaintiff respectfully moves for partial summary judgment on these issues, with the remaining issues of Plaintiff's damages and attorneys fees to be tried to and determined by the Court.

## EXHIBITS

**Exhibit 1,** Jones Employment Documents

**Exhibit 2,** Funderburke/Ferguson Termination Documents

**Exhibit 3,** EEOC Response First

**Exhibit 4**, David Villarreal Corporate Representative Deposition

**Exhibit 5,** Mark Martinez Deposition

**Exhibit 6,** Mark Martinez Declaration.

**Exhibit 7,** Brown Disciplinary Documents

**Exhibit 8,** Jones Declaration

**Exhibit 9,** Seneca Jones Deposition

**Exhibit 10,** Matt Hoffman Deposition

**Exhibit 11**, "Seneca" Lynching Drawing

**Exhibit 12**, Edward Van Huis III Deposition

**Exhibit 13**, Debbie Van Huis Deposition

**Exhibit 14**, Dimmick EEO Report

**Exhibit 15**, Hulsey Termination Report

**Exhibit 16**, Boddie Termination Report

**Exhibit 17**, Hulsey Disciplinary Documents

**Exhibit 18**, Tire Photo

**Exhibit 19**, Martinez Odessa Documents

**Exhibit 20**, EEOC Determination

**Exhibit 21**, David Agnew Corporate Representative Deposition

**Exhibit 22**, Second Amended Corporate Rep Depo Notice

**Exhibit 23**, Notice of First Charge

**Exhibit 24,** Notice of Amended Charge

**Exhibit 25,** EEOC Defensive Use of Emails

**Exhibit 26,** Hydraulics Employee Handbook

**Exhibit 27,** Industries Profile

**Exhibit 28,** Tubal Cain Org Charts

**Exhibit 29**, Alex Neer Declaration

**Exhibit 30**, Tubal Cain Entities SOS Records

49

**Exhibit 31**, Email re TCHS Board of Directors Meeting

**Exhibit 32**, TC Employee List

**Exhibit 33,** Emails to DVH Re Business Meeting

**Exhibit 34**, L'Auberge Meeting Emails

**Exhibit 35,** EEOC Response Second

**Exhibit 36,** TCHS Sales Presentation

**Exhibit 37**, Debbie Van Huis Email re Handbook

**Exhibit 38**, Industries Employee Handbook

**Exhibit 39,** TCI Delegation Procedures

**Exhibit 40**, TCI New Hire Packet

**Exhibit 41**, TCI Termination Report

**Exhibit 42**, Potential Termination Email

**Exhibit 43**, Email Re Lisa Neer Performance

**Exhibit 44**, Email re Exodus/Forms

**Exhibit 45**, Tubal Cain Entity Officers

**Exhibit 46**, Emails Re Updating Handbook

**Exhibit 47,** DVH HR "Questions" Email

**Exhibit 48**, DVH Jones Unemployment Email

**Exhibit 49**, Marine Employee Handbook

**Exhibit 50**, *Casiano* Flow Chart

**Exhibit 51,** Hydraulics Employee Lists

**Exhibit 52**, Industries Counseling Form

**Exhibit 53**, Hulsey Rehire

**Exhibit 54,** Jones Charge of Discrimination

**Exhibit 55**, Defendant's Supplemental Interrogatory Responses

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify on September 23, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing in accordance with the Federal Rules of Civil Procedure to the following counsel representing Defendants in this action:

Randall C. Ownes
Wright & Close, LLP
One Riverway, Suite 2200
Houston, TX 77056

By: _____ /s/ Robert W. Schmidt