IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **SENECA JONES** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:16-CV-1282** |
| | § | |
| **TUBAL-CAIN HYDRAULIC** | § | |
| **SOLUTIONS, INC., TUBAL CAIN** | § | |
| **INDUSTRIES, INC., TUBAL-CAIN** | § | |
| **HOLDINGS, LLC, TUBAL-CAIN** | § | |
| **MARINE SERVICES, INC., TUBAL-** | § | |
| **CAIN INDUSTRIAL SERVICES, INC.,** | § | |
| **TUBAL-CAIN GAS FREE SERVICES,** | § | |
| **INC., TUBAL-CAIN RENTALS, INC.,** | § | |
| **TUBAL-CAIN MARINE SERVICES-** | § | |
| **DEVALL FLEET, INC., AND TUBAL-** | § | |
| **CAIN GAS FREE SERVICES-DEVALL** | § | |
| **FLEET, INC.** | § | |
| *Defendants.* | § | |

---

**APPENDIX TO OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY
JUDGMENT**

---

**TABLE OF CONTENTS**

| TAB | DOCUMENT | PAGES |
|---|---|---|
| TAB 1 - | Amended Exhibit 2 of Defendants' Motion for Summary Judgment – Edward Van Huis' Deposition | 4-21 |
| TAB 2 - | Amended Exhibit 14 of Defendants' Motion for Summary Judgment – David Villarreal's Deposition | 22-50 |
| TAB 3 - | Amended Exhibit 16 of Defendants' Motion for Summary Judgment – Seneca Jones' Deposition | 51-78 |

Respectfully Submitted,

WRIGHT, CLOSE & BARGER, LLP

/s/ Randall C. Owens
Randall C. Owens
State Bar No. 15380700
owens@wrightclosebarger.com
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Telecopier: (713) 572-4320

**ATTORNEYS FOR DEFENDANTS**

OF COUNSEL:

Raffi Melkonian
State Bar No. 24090587
Ronald L. Flack
State Bar No. 24095655
WRIGHT, CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056
713-572-4321
713-572-4320 (fax)
melkonian@wrightclosebarger.com
flack@wrightclosebarger.com

## **CERTIFICATE OF SERVICE**

This is to confirm that a copy of the foregoing document has been served on Plaintiffs by electronic filing on October 22, 2019.

Robert W. Schmidt
Joe K. Crews
CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
    *Attorneys for Plaintiff*

Ron Estefan
THE ESTEFAN FIRM, P.C.
2306 Mason Street
Houston, Texas 77006
    *Attorneys for Plaintiff*

                                 */s/ Randall C. Owens*
                                 Randall C. Owens

# AMENDED EXHIBIT 2
# OF DEFENDANTS' MOTION
# FOR SUMMARY
# JUDGMENT

**EDWARD VAN HUIS - May 30, 2019**

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                   HOUSTON DIVISION
SENECA JONES                  *
                              *
VS.                           *   CIVIL ACTION NO.
                              *   4:16-cv-01282
TUBAL-CAIN HYDRAULIC          *
SOLUTIONS, INC. ET AL         *




*********************************************************
           ORAL AND VIDEOTAPED DEPOSITION OF
                   EDWARD VAN HUIS
                   MAY 30, 2019
*********************************************************



        ORAL AND VIDEOTAPED DEPOSITION of EDWARD VAN
HUIS, produced as a witness at the instance of the
Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on the 30th day of May,
2019, from 10:17 a.m. to 1:07 p.m., before me, Jodi
Wells, CSR, in and for the State of Texas, reported by
machine shorthand, at the offices of Wright & Close,
LLP, One Riverway, Suite 2200, Houston, Texas 77056,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record attached hereto.
```

EDWARD VAN HUIS  -  May 30, 2019

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4            Robert W. Schmidt
             Crews Law Firm, P.C.
 5            701 Brazos, Suite 900
             Austin, Texas 78701
 6            Telephone:  512-346-7077
             Facsimile:  512-342-0007
 7            Email:  Schmidt@crewsfirm.com
 8            Ron Estefan
             The Estefan Firm, P.C.
 9            2306 Mason Street
             Houston, Texas 77006
10            Telephone:  713-333-1100
             Facsimile:  713-333-1101
11
12   FOR THE DEFENDANTS:
13            Randall C. Owens
             Wright & Close, LLP
14            One Riverway, Suite 2200
             Houston, Texas 77056
15            Telephone:  713-572-4321
             Facsimile:  713-572-4320
16            Email:  Owens@wrightclose.com
17
18
19
20
21
22
23
24
25
```

EDWARD VAN HUIS - May 30, 2019

```
1                   EXAMINATION INDEX
2                                               PAGE
3  EDWARD VAN HUIS
4       Examination by Mr. Schmidt                  4
5
6  REPORTER'S CERTIFICATION                       128
7
8                     EXHIBIT INDEX
9                                               PAGE
10 EXHIBIT NO. 1                                   38
       Tubal-Cain Industries Employee Handbook,
11     April 1, 2012
12 EXHIBIT NO. 2                                   48
       Hydraulic Solutions, A Tubal-Cain Company,
13     Employee Handbook, March 1, 2010
14 EXHIBIT NO. 3                                   58
       Tubal-Cain Marine Services, Inc. Employee
15     Handbook Revised January 1, 2015
16 EXHIBIT NO. 4                                   87
       Email from Matthew Hofmann to Lisa Neer
17     Dated September 9, 2013 Re: Response to
       EEOC Charge No. 460-2012-03042 (Amended)
18     and Attachments
19 EXHIBIT NO. 5                                  113
       Tubal-Cain Industries Professional Fees
20
   EXHIBIT NO. 6                                  119
21     Tubal-Cain Industries Contact Us Web Page
22
23
24
25
```

**EDWARD VAN HUIS - May 30, 2019**

```
 1              (Federal read-on waived)
 2              MR. SCHMIDT:  Okay.  It is 10:17 on
 3   Thursday, May 30th, and we're here for the depo --
 4   deposition of Edward Van Huis in the case of Seneca
 5   Jones vs. Tubal-Cain Hydraulic Solutions, et al.
 6              (Witness sworn)
 7              MR. ESTEFAN:  And we're reserving
 8   objections except as to form and responsiveness of the
 9   answer?
10              MR. SCHMIDT:  Yes.
11              MR. OWENS:  Yes.
12                   EDWARD VAN HUIS,
13   having been duly sworn, testified as follows:
14                      EXAMINATION
15   BY MR. SCHMIDT:
16      Q.   Can you please tell us your name?
17      A.   Ed Van Huis.
18      Q.   Mr. Van Huis, do you understand that you're
19   here today giving a deposition in a federal court case,
20   correct?
21      A.   Yes, sir.
22      Q.   And you've just been sworn to tell the truth,
23   the whole truth and nothing but the truth.
24      A.   Nothing but the truth.
25      Q.   Okay.  And you understand or do you understand
```

EDWARD VAN HUIS - May 30, 2019

```
1   going to your lake house you said?
2      A.   Yes, sir.
3      Q.   Okay.  And, so, how much time would you guys
4   spend there at Tubal-Cain Hydraulics?
5      A.   Normal, I would say looking back would be two
6   to three hours.
7      Q.   Okay.  And describe to me what that would --
8   just take me through what would happen when you stopped
9   by Tubal-Cain Hydraulic Solutions on your Fridays.
10     A.   Well, walk in the front door, the greetings,
11  you know, people, just employees, you get to know the
12  employees and shaking hands and how is it going.  You
13  know, at some point, we would usually migrate to -- I
14  still remember a round table, literally a round table.
15     Q.   Uh-huh.
16     A.   And the one that usually led the discussions
17  was David Villareal, the Operations Manager.  He was
18  pretty sharp.
19     Q.   Okay.
20     A.   And he would tell us the week or two just the
21  latest news and what's going on, anybody hired, number
22  of employees or what -- how many people we had in the
23  field, you know, just general discussion.
24     Q.   Okay.  The round table, is this in a conference
25  or --
```

EDWARD VAN HUIS - May 30, 2019

```
1  to get out of there at that point, and that was it.
2      Q.   Okay.  Do you recall -- how much did you buy
3  him out for?
4      A.   $10,000.
5      Q.   Okay.  And after you bought him out, did you
6  still try to keep the company going?
7      A.   I did.
8      Q.   Did you hire somebody to replace him?
9      A.   I did.
10     Q.   Who was that?
11     A.   Matt.  I don't remember --
12     Q.   Okay.
13     A.   -- his last name.  His name was Matt.
14     Q.   How long did that go on?
15     A.   About six months.
16     Q.   Okay.
17     A.   And it was just too far gone.
18     Q.   Okay.  After that, what happened?
19     A.   We just sold off assets to pay the vendors, to
20  pay the bills and got with the landlord.  He let us out
21  of our lease six months early, and that was it.
22     Q.   Okay.  Did -- did you ever oversee the
23  accounting at Tubal-Cain Hydraulics and the transfers
24  of money, those kinds of things?
25     A.   Yeah.  Yeah.  Anything involving money I was
```

EDWARD VAN HUIS - May 30, 2019

```
 1  interested in.  So they paid us a fee.  I think it was
 2  $6,000 a month for accounting services just like Marine
 3  Services or Gas Free would pay Industries because we
 4  had the accounting people at the time.  And that's the
 5  only reason was Industries was the company that had the
 6  employees to perform those functions.
 7           So anything in the area of paying the bills,
 8  payroll, paying the taxes, making sure the rent was
 9  paid we had -- I was very interested in seeing that
10  that was done.  They had their own post office box, and
11  we would collect the mail every day and --
12      Q.   You'd collect the mail every day for Tubal-Cain
13  Hydraulics?
14      A.   For all --
15      Q.   All?
16      A.   -- all the companies.  They all had their own
17  separate post office boxes.
18      Q.   Okay.
19      A.   And just bring it back to the office.  They
20  would process it and any checks were deposited and any
21  of the bills were just entered for its payables.
22      Q.   Okay.
23      A.   We would generate payroll and then either
24  overnight it, but if we were in a position to get there
25  early enough, we would hand carry the payroll and the
```

EDWARD VAN HUIS - May 30, 2019

```
 1     Q.    Right.
 2     A.    So it was a shared services --
 3     Q.    Right.
 4     A.    -- is all it was and I had control over it
 5  making sure all those things were taken care of.
 6     Q.    And I'm just trying to figure out what all
 7  those things are.  So, again, paying bills, correct?
 8              MR. OWENS:  Objection; form.
 9     Q.    (By Mr. Schmidt)  Is that right?
10     A.    Yeah.  With the money that was available, we
11  would pay vendors --
12     Q.    Okay.
13     A.    -- or make payroll.
14     Q.    Okay.  And then you'd keep ledgers, I assume,
15  keep records of that?
16     A.    By all means.
17     Q.    Okay.  And then on payroll, what would you do
18  with payroll?
19     A.    Well, they -- Hydraulics had their own payroll
20  account just like they had their own general account.
21  They had a payroll bank account.  And from the service
22  that we provide by the fee they were paying us, we
23  would generate payroll just like ADP or one of them.
24  We were just putting together the checks and --
25     Q.    So you --
```

**EDWARD VAN HUIS - May 30, 2019**

1    A.    -- sign them and just get them to the men.  We

2  made sure that all the deposits were made for taxes in

3  a timely fashion.  You know, they had their own set of

4  financials and everything.

5    Q.    Would you -- like on payroll, would they give

6  you, like, the hours that the employee worked and

7  then --

8    A.    Yes.  Yes.

9    Q.    And, so, then you would calculate what the

10  proper amount is to pay them?

11    A.    Yes, sir.

12    Q.    Okay.  And then you-all would cut the checks?

13    A.    Yes.

14    Q.    Did you handle employee benefits as well?

15    A.    We were aware.  They kind of went out on their

16  own and got their own insurance and we were rather

17  dismayed about that.  They weren't receiving any of our

18  input or recommending.  They got their own insurance

19  companies.

20        And when it came to those, like, employee paid

21  benefits -- I think there was, like, vision and hearing

22  and disability and things like that -- they had a

23  company and we would just be aware of those.  We made

24  sure they were payroll deducted if it was an employee

25  paid option --

**EDWARD VAN HUIS - May 30, 2019**

1    Q.    Okay.

2    A.    -- optional insurance.

3    Q.    So you'd make sure the employee's payroll was

4    deducted?

5    A.    Yes, and that that vendor was paid.

6    Q.    Okay.

7    A.    Yeah.

8    Q.    And they paid the employee share plus your

9    share --

10   A.    Yes.

11   Q.    -- the company share?

12   A.    Yeah.  Very good.

13   Q.    Okay.  Other aspects of -- would you-all -- for

14   example, with employees, would you help in any other

15   way, like, for example, monitor their start dates, keep

16   records of who the employees are?

17   A.    No.  It was all handled there by Hydraulics.

18   Q.    Okay.  Did you have -- keep files at all for

19   any of the employees for payroll purposes or any kind

20   of purposes for Hydraulic employees at Tubal-Cain

21   Industries?

22   A.    If they were related to us cutting checks and

23   they affected the financials, it's -- I'm sure it's

24   filed away.

25   Q.    Okay.  So you'd keep -- and, I mean, I'm not

**EDWARD VAN HUIS - May 30, 2019**

1  that -- a common email address, that's certainly

2  possible?

3      A.   It's possible.

4      Q.   Okay.

5      A.   But I don't know for sure.

6      Q.   Okay.

7              MR. OWENS:  Whenever you get to a

8  breaking point.

9              MR. SCHMIDT:  I'm very close maybe to --

10  you know, getting close.  Yeah.

11              MR. OWENS:  Okay.  Great.

12              MR. SCHMIDT:  Let me -- let me plug on a

13  little bit more.

14              THE WITNESS:  She's glad.

15      Q.   (By Mr. Schmidt)  Besides IT -- besides the

16  things that we've been talking about so far, IT,

17  possibly email, mail, these accounting services,

18  payroll services, Industries provided those to

19  Hydraulic Solutions?

20      A.   Yes.

21      Q.   Did they also do the same things for the other

22  Tubal-Cain entities?

23      A.   Yes.

24      Q.   And which other entities were in place at that

25  time?  Marine?

EDWARD VAN HUIS - May 30, 2019

1    Q.    Okay.   Okay.

2              (Exhibit No. 5 marked)

3    Q.    I've handed you what's been marked as Exhibit

4    5.  Have you seen that document before?

5    A.    No.

6    Q.    I'll just explain to you that this is a

7    document that's been given to us produced in this

8    lawsuit from Tubal-Cain.  It's titled "Tubal-Cain

9    Industries Professional Fees."  Do you see that?

10   A.    Yes, sir.

11   Q.    Do you believe that that is a record of the

12   payments that you were talking about for these

13   professional services?

14   A.    It looks like it.

15   Q.    Okay.  And I just want to draw your attention

16   to a couple things.  So the rate starts out at $3,000,

17   it looks like, and then in 2011 it looks like it goes

18   up to $5,000 and then to $5,400 and then it looks like

19   in July of 2012 it goes up -- or, actually, August of

20   two -- I can't tell my lines here -- July of 2012 it

21   goes up to $8,500.

22              Again, do you have any explanation for why the

23   increases?

24   A.    Well, I already explained it to you.  It just

25   was all based on the number of transactions.

EDWARD VAN HUIS - May 30, 2019

```
1    Q.    Got it.
2    A.    As the company grew and the more employees and
3  more payroll was generated and more bills to pay --
4    Q.    Okay.
5    A.    -- you know, it just -- it got more complex.
6    Q.    Did Tubal-Cain Industries ever provide any sort
7  of legal services -- legal representation services for
8  Tubal-Cain Hydraulics?
9    A.    No.
10   Q.    What about in this lawsuit?
11   A.    Did we ever provide legal services?
12   Q.    Yeah.  Who is paying the bills in represent --
13  for Tubal-Cain Hydraulic Solutions in this lawsuit?
14   A.    Well, Hydraulics paid them until I shut the
15  company down.  Then you sued me.  And, so, right now
16  using the same, you know, rationale, each of the
17  companies is helping pay Randy --
18   Q.    Okay.  Okay.
19   A.    -- you know, because you've sued us.
20   Q.    Right.  So Industries is helping pay the legal
21  fees.  And are the other entities also?
22   A.    Industries, Gas Free and the Marine Services.
23   Q.    Okay.
24   A.    The three companies that -- well, you've sued
25  all the companies, but there weren't -- some companies
```

EDWARD VAN HUIS - May 30, 2019

1   all that, you know, for me personally, but the debt --
2   the debt was me.  I'm the one that caught all the debt
3   on this.
4       Q.   That's what I was going to ask you.  The debt
5   wasn't with third party --
6       A.   All the vendors were paid.  I made sure all my
7   suppliers were paid, but the money that I loaned -- I
8   had a company that had the cash available when we were
9   having tough times at Hydraulics.  So I would pull
10  money out of one of the companies and loaned it to
11  Hydraulics and probably 95 percent of it was never
12  repaid.  So that was debt that we've written off.
13      Q.   What was the company that you pulled the money
14  out of?
15      A.   Tubal-Cain Gas Free Services.
16      Q.   Okay.
17      A.   And then I had -- I supplied the line of credit
18  to the company.  I think it was $750,000.  It might
19  have been 700.  And I used a piece of industrial real
20  estate as collateral for that line.
21      Q.   Who owned the industrial real estate?
22      A.   I did.
23      Q.   In your personal capacity?
24      A.   Yes.
25      Q.   Okay.

### EDWARD VAN HUIS - May 30, 2019

1  it was just fine to make Debbie secretary.

2      Q.    Why did you make her secretary?

3      A.    Because I did.  I mean, it's just --

4      Q.    Okay.

5      A.    Why is the sky blue?

6      Q.    Okay.  It's just an obvious choice?

7      A.    Yeah.  Yeah.

8      Q.    Okay.  Have you ever paid any of Tubal-Cain

9  Hydraulic Solutions' debts yourself personally?

10      A.    No.

11      Q.    Have you ever paid any of their expenses, you

12  know, while they were functioning or now personally?

13      A.    The only thing I paid for personally was the

14  bankruptcy.  I paid the lawyer personally to do that.

15      Q.    Okay.  Has Tubal-Cain Industries ever paid any

16  expenses for Tubal-Cain Hydraulic Solutions?

17      A.    No.  No.

18      Q.    Okay.  Have they -- has Tubal-Cain Industries

19  ever paid any debts for Tubal-Cain Hydraulic Solutions?

20      A.    No.

21      Q.    Okay.  And you had mentioned one exception to

22  that is the attorneys' fees, correct?

23             MR. OWENS:  Objection; form.

24      A.    No.  I paid those --

25      Q.    (By Mr. Schmidt)  Well, the attorneys --

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 HOUSTON DIVISION
 3   SENECA JONES              *
                               *
 4   VS.                       *   CIVIL ACTION NO.
                               *   4:16-cv-01282
 5   TUBAL-CAIN HYDRAULIC      *
     SOLUTIONS, INC. ET AL     *
 6
 7           REPORTER'S CERTIFICATION OF
                ORAL DEPOSITION OF
                 EDWARD VAN HUIS
 8                MAY 30, 2019
 9        I, JODI WELLS, Certified Shorthand Reporter,
10   hereby certify to the following:
11        That the witness, EDWARD VAN HUIS, was duly
12   sworn by the officer and that the transcript of the
13   oral deposition is a true record of the testimony
14   given by the witness;
15        That the original deposition was delivered to
16   ROBERT W. SCHMIDT;
17        That a copy of this certificate was served on
18   all parties and/or the witness shown herein on
19   _____.
20        I further certify that pursuant to FRCP Rule
21   30(f)(1) that the signature of the deponent:
22        _____ was requested by the deponent or a party
23   before the completion of the deposition and that the
24   signature is to be before any notary public and
25   returned within 30 days from date of receipt of the
```

EDWARD VAN HUIS  -  May 30, 2019

```
 1  transcript.  If returned, the attached Changes and
 2  Signature Page contains any changes and the reasons
 3  therefor;
 4        __X___ was not requested by the deponent or a
 5  party before the completion of the deposition.
 6        I further certify that I am neither counsel
 7  for, related to, nor employed by any of the parties or
 8  attorneys in the action in which this proceeding was
 9  taken, and further that I am not financially or
10  otherwise interested in the outcome of the action.
11        Certified to by me on this, the 18th day of
12  June, 2019.
13
14
15                    Jodi Wells
16  _____
          JODI WELLS, TEXAS CSR NO. 6769
17        Expiration Date:  December 31, 2019
          ANC Court Reporting
18        Firm Registration No. 62
          1225 North Loop West, Suite 327
19        Houston, Texas 77008
          Telephone:  (713)626-2629
20
21
22
23
24
25
```

# AMENDED EXHIBIT 14 OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DAVID VILLARREAL - May 29, 2019

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SENECA JONES                    :
                                :
VS.                             :C.A. NO. 4:16 cv 01282
                                :
TUBAL-CAIN HYDRAULIC            :
SOLUTIONS, INC., ET AL          :


*****************************************
ORAL AND VIDEOTAPED DEPOSITION OF
DAVID VILLARREAL
May 29, 2019
*****************************************


      ORAL AND VIDEOTAPED DEPOSITION of DAVID
VILLARREAL, produced as a witness at the instance of
the Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on May 29, 2019, from
1:15 p.m. to 5:41 p.m., before JUDY H. GALLO, CSR in
and for the State of Texas, reported by Machine
shorthand, at the offices of Wright & Close, LLP, One
Riverway, Suite 2200, Houston, Texas 77056, pursuant
to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto;
that the deposition shall be read and signed before
any notary public.

DAVID VILLARREAL  -  May 29, 2019

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF(S):

             Mr. Robert W. Schmidt

 4           Crews Law Firm, P.C.

             701 Brazos, Suite 900

 5           Austin, Texas 78701

             schmidt@crewsfirm.com

 6           512.346.7077

                      and

 7           Mr. Ron Estefan

             THE ESTEFAN FIRM, P.C.

 8           2306 Mason Street

             Houston, Texas 77006

 9           ron@ronestefanlaw.com

             713.333.1100

10

11   FOR THE DEFENDANT(S):

             Mr. Randall C. Owens

12           Wright & Close, LLP

             One Riverway, Suite 2200

13           Houston, Texas 77056

             owens@wrightclose.com

14           713.572.4321

15

16

17

18

19

20

21

22

23

24

25
```

DAVID VILLARREAL  -  May 29, 2019

```
1                  EXAMINATION INDEX
              WITNESS:      DAVID VILLARREAL
2  DIRECT EXAMINATION                          PAGE
3       By Mr. Robert W. Schmidt                  4
4
   CROSS EXAMINATION
5       By Mr. Randall C. Owens                 182
6
   REDIRECT EXAMINATION
7       By Mr. Robert W. Schmidt                182
8
   SIGNATURE REQUESTED                          184
9
10 REPORTER'S CERTIFICATION                     185
11
   EXHIBITS MARKED FOR IDENTIFICATION
12 Exhibit 1 - (Notice of Deposition)            4
   Exhibit 2 - (Matt Hofmann email EEOC)        44
13 Exhibit 3 - (Tubal-Cain Industries Professional
   Fees)                                        47
14 Exhibit 4 - (TCI Purchase Order)             50
   Exhibit 5 - (Purchase Order 4 large/4 small hydraulic
15 cylinders)                                   50
   Exhibit 6 - (Employee Handbook)             58
16 Exhibit 7 - (303 Payroll Deductions)         61
   Exhibit 8 - (Hydraulic Solutions, New Hire Packet) 64
17 Exhibit 9 - (Acknowledgment Of Receipt)      66
   Exhibit 10 - (Hydraulic Solutions, Inc. New Hire
18 Packet)                                      67
   Exhibit 11 - (Aaron Funderburke)             74
19 Exhibit 12 - (Ian Brown)                     74
   Exhibit 13 - (Jeremy Ferguson)               74
20 Exhibit 14 - (Employee Termination Report)   94
   Exhibit 15 - (Ian Brown)                    101
21 Exhibit 16 - (8-7-12 letter - EEOC Response) 145
   Exhibit 17 - (Timeline)                     148
22 Exhibit 18 - (11-16-12 letter - TWFC)       155
   Exhibit 19 - (Tim Dimmick letter)           156
23
24
25
```

CRC for ANC COURT REPORTING
(713) 626-2629

DAVID VILLARREAL - May 29, 2019

1    MR. SCHMIDT: Okay.  We are recording.
2  Thank you.  It -- it is 1:15 p.m., Wednesday, May
3  29th, and we are here for the 30(b)(6) corporate rep
4  deposition in the case of Seneca Jones versus
5  Tubal-Cain Hydraulic Solutions, et al. Got to get you
6  to swear in the witness.
7                    DAVID VILLAREAL,
8  having been first duly sworn, testified as follows:
9                    DIRECT EXAMINATION
10    Q.   (By Mr. Schmidt: Can you --
11    MR. OWENS: And before we get started.
12  We're reserving objections except for form and
13  responsiveness?
14    MR. SCHMIDT: Yes. Yes.
15    Q.   (By Mr. Schmidt) Can you state your name?
16    A.   Yes. David E. Villareal.
17    (Exhibit 1 was marked.)
18    Q.   Okay.  Mr. Villareal, thank you for being
19  here today.  I'm going to hand you what's been marked
20  as Exhibit 1, and ask you to take a look at that.  And
21  I'm just going to ask you some broad questions about
22  this.
23    A.   (Nodding.)
24    Q.   Have you seen that document before?
25    A.   I have.

**DAVID VILLARREAL - May 29, 2019**

1  employment at Tubal-Cain.

2      A.    Okay.

3      Q.    When did you work for Tubal-Cain?

4      A.    And -- and, actually, I -- I worked for

5  Tubal-Cain Hydraulic Solutions.

6      Q.    Okay.

7      A.    Just to be clear.

8      Q.    Absolutely. Yeah.

9      A.    But I left in February of 2013.

10     Q.    And when did you start?

11     A.    In June of 2011.

12     Q.    And what was your job?

13     A.    I was chief operating officer.

14     Q.    And tell me about your -- well, as far as

15  being hired.  Who hired you?

16     A.    So I was hired by both Ed and -- and Alex.

17  They both interviewed me and -- and hired me.

18     Q.    Okay.  Anyone else interview you?

19     A.    No.

20     Q.    Okay.  And had you known either one of them

21  from before your --

22     A.    I knew Alex.

23     Q.    Okay.

24     A.    Yeah.

25     Q.    How did you know him?

DAVID VILLARREAL - May 29, 2019

1    A.    He had done -- Tubal-Cain Hydraulic Solutions

2  had done some work for us and my previous employer.

3    Q.    Okay.  Okay.  And so tell me about your --

4  your job duties.  What did you do as COO for

5  Tubal-Cain?

6    A.    Well, I was basically responsible for all

7  operations.  For managing personnel, finances,

8  projects, field services.  I basically ran all

9  operations.  Well, we had out -- outside -- we

10 actually had sales, as well.

11   Q.    You -- you were over sales, or you had sales?

12   A.    I -- I -- yes.  I had basically control over

13 all the operations.

14   Q.    Okay.  Ultimately, over the actual -- what

15 were the services that Tubal-Cain Hydraulic --

16   A.    Yeah.

17   Q.    -- Solutions provides?

18   A.    Yes.

19   Q.    Oh. And what is that? What do they do?

20   A.    Well, so, at the time, we were building -- we

21 provided hydraulic services primarily to the oil and

22 gas industry.  Our forte was providing walking

23 systems, hydraulic power units.  We also had a hose

24 line.  Hydraulic hoses, vibrating hoses that we

25 provided to our customers.

DAVID VILLARREAL - May 29, 2019

1    A.    Oh, I would say it would be very infrequent.

2  Because typically what I needed to convey to him, I

3  could convey to him in person when -- yeah.

4    Q.    Okay.  Okay.  When you were talking about

5  personnel issues.  Would you talk with Ed about -- you

6  mentioned staffing and personnel issues.  Did you ever

7  talk with Ed about hiring new employees?

8    A.    Um, from the standpoint of letting him know

9  that we hired new folks.  Yes.

10    Q.    Okay.  What about terminating employees?

11  Would you ever let him know that you terminated

12  employees?

13    A.    Yes. I would -- if we terminated people, I

14  would -- I would mention that.

15    Q.    And why would you mention that?

16    A.    Just to let him know, I mean, what was going

17  on.

18    Q.    That's something he'd want to know?

19    A.    Um, he never said he didn't want to know.

20    Q.    Okay.

21    A.    Yeah.

22    Q.    Um, and what -- what would -- when you told

23  him about firing an employee.  What kind of

24  discussions would come around about that?

25    A.    Um, I -- I can't remember specifics.  I mean,

DAVID VILLARREAL - May 29, 2019

1  um, I think Ed relied on me to use my best judgment

2  when it came to personnel issues.  And so, I don't

3  recall any specific conversations.

4      Q.   My question was very broad and vague.  So I

5  apologize.  But would he ask you questions, hey, so

6  what happened?  Have -- you tell him, hey, we fired

7  this person.  Here's what happened.  Would he ever ask

8  questions?  Kind of just want to know about it a

9  little -- in that general sense?

10     A.   Um, perhaps.  Ah, ah, yeah.  Again, I don't

11 remember specific conversations.

12     Q.   But does that sound accurate as to how you'd

13 characterize those conversations?

14     A.   Out of general interest, I think, yes.

15     Q.   Okay.  Any other -- we were talking about

16 Tubal-Cain Industries.  Any other interactions between

17 Tubal-Cain Industries and Tubal-Cain Hydraulic

18 Solutions if you remember?

19          MR. OWENS: Objection.

20     A.   You --

21          MR. OWENS: Objection.  Form.

22     Q.   (By Mr. Schmidt) You can answer.

23     A.   So can you repeat the question?

24     Q.   Yeah. Were there any other interactions that

25 we haven't discussed already between Tubal-Cain

DAVID VILLARREAL - May 29, 2019

1  Hydraulic Solutions and Tubal-Cain Industries?

2          MR. OWENS: Objection.  Form.

3      A.   The only interaction would be them as a

4  supplier.

5      Q.   (By Mr. Schmidt) Okay.

6      A.   They were a supplier of fabrication.  For

7  fabrication and for -- we also used them in the -- for

8  their -- their machine shop.  And we sold them items,

9  and they provided support services for us.

10          So those are the only other interactions I

11  can think of.

12      Q.   Okay.  Any other kinds of transactions?  I'm

13  speaking broadly.

14      A.   No.  I mean, they -- the office services they

15  provided for us were accounting and IT.

16      Q.   Okay.  Is --

17      A.   Yeah.

18      Q.   That was part of the transactions that you

19  did with them?

20      A.   Well, transactions were separate.

21      Q.   Oh!

22      A.   So we were -- yeah.  If we were purchasing

23  something from them, we would send over a purchase

24  order for something to be fabricated or something to

25  be machined.  So -- and if they were purchasing an

**DAVID VILLARREAL - May 29, 2019**

1  item from us, they would send us a purchase order.

2      Q.   Okay. And -- and -- and I understand that.

3           But you mentioned IT and accounting.

4      A.   (Nodding.)

5      Q.   Are those interactions, transactions, however

6  you want to describe it.

7      A.   Right.

8      Q.   Did you have -- did Tubal-Cain Hydraulic

9  Solutions have any other kinds of dealings with

10  Tubal-Cain Industries?

11           MR. OWENS: Objection.  Form.

12      A.   I don't -- I'm not aware of any dealings. The

13  support they provided for accounting and -- and IT,

14  we paid for.

15      Q.   Okay.  Let's talk about that support.

16      A.   Okay.

17      Q.   What kind of support did they provide?

18      A.   Um, so on the accounting side.  It was the

19  general ledger.  We -- they also helped us with

20  accounts receivable.  So it was accounting support on

21  that side.  On the IT side, they -- we had our email

22  server. It was their exchange ser -- email server, and

23  they helped set up a server for us there that we used

24  to save all of our documents and that sort of thing

25  on.  And so, it was technical support --

DAVID VILLARREAL - May 29, 2019

1        Q.    Okay.

2        A.    -- on the IT side.

3        Q.    And then on accounting.  What functions did

4    they do for you on accounting?

5        A.    Well, it was the -- it was accounts payable,

6    accounts receivable, and the general ledger.

7        Q.    Anything else?

8        A.    Um, no.

9        Q.    Okay.  Um --

10       A.    Oh, yes.  I'm sorry.  Payroll, you can

11   include in that list.

12       Q.    Okay.  What did they do for you on payroll?

13       A.    So Lisa Neer was our admin assistant.  She

14   worked the outer office.  We had put in a time system

15   for the crews to check in, check out their time.  And

16   she provided that time data to accounting for payroll.

17       Q.    Any other functions as it relates to

18   payroll?

19       A.    No.

20       Q.    Any other -- any human resources -- first of

21   all, do you consider payroll to be part of human

22   resources or a human resources function?

23       A.    Um, in this particular case, no.  I -- I

24   consider it more an accounting function, based on what

25   -- the service that they were providing us.  We didn't

DAVID VILLARREAL - May 29, 2019

1  have an HR manager.  I pretty much did that aspect of
2  it, and Lisa helped me with that.  So she had all the
3  hiring forms and the -- you know, to check in folks
4  and that sort of the thing.  She hired -- maintained
5  all of that?
6      Q.   Okay.  So did Tubal-Cain Industries provide
7  any support to Tubal-Cain Hydraulic Solutions in the
8  area of human resources, HR, other than payroll and
9  even if that counts as --
10     A.   No.
11     Q.   Okay.
12     A.   No.
13     Q.   I'm just going to repeat my question because
14  it was kind of bad at the end there.
15     A.   Hum.
16     Q.   But they didn't -- Tubal-Cain Industries
17  didn't provide any other HR support to Tubal-Cain
18  Hydraulic Solutions, other than payroll?
19          MR. OWENS: Objection.  Form.
20     Q.   (By Mr. Schmidt) Assuming that payroll is a
21  HR function?
22     A.   If --if you assume that, then what you just
23  said is accurate.
24     Q.   Okay.  And aside from payroll, no other -- no
25  HR functions?

DAVID VILLARREAL - May 29, 2019

1     A.   No.  Not while I was there.

2     Q.   Okay.  No HR support?

3     A.   No H -- I'm mean, no.  Not that I'm aware of

4  any -- any HR support.

5     Q.   Okay.

6     A.   No.

7     Q.   This agreement to provide support, I think is

8  what you called it.

9     A.   Uh-huh.

10    Q.   Was that -- what kind of agreement was it?

11 Was it in writing?

12    A.   I don't ever recall seeing anything in

13 writing.  I think it was the way Ed and Alex set up

14 the business when they first started the business, you

15 know.

16    Q.   Okay.

17    A.   And it just continued, you know.

18    Q.   Did you have any understanding of the things

19 that you could ask for support from Tubal-Cain

20 Industries on that was part of that agreement, other

21 than what we discussed?

22    A.   Yes.  I mean, when I first checked in, I made

23 a trip to Vidor, and I met with the accountant, and

24 she explained the services they provided.  And, um --

25 um, so that was -- yeah.  That was it.

DAVID VILLARREAL - May 29, 2019

1     Q.    Okay.   Did Tubal-Cain Hydraulic Solutions pay

2  money to Tubal-Cain Industries for this support?

3     A.    Yes.

4     Q.    How much did they pay?

5     A.    Um, I -- I don't remember off the top of my

6  head.   Um, it -- it was something like $4,500.00 or

7  six -- $6,500.00.   I'm speculating now.   I don't have

8  the --

9     Q.    Right.

10    A.    -- accurate figure, but I do know it was a

11 monthly fee that we paid.

12    Q.    How was that set?

13    A.    Uh, what do you mean?

14    Q.    How -- how was the amount set?

15    A.    Um, I'm not sure.   That was the amount

16 that -- that was in place when I got there, and we

17 just carried on with it.

18    Q.    Did it ever change?

19    A.    Um, not that I can remember.

20    Q.    Okay.

21    A.    Yeah.

22    Q.    And you don't know how that amount was set?

23    A.    No.

24    Q.    Did it vary if you used them more for one

25 month or less than one month?   If you had more IT

DAVID VILLARREAL - May 29, 2019

```
1          MR. OWENS: Objection.  Form.
2     A.   Um, yeah.  So we had a -- well, if you're --
3  if you're asking me if I did an audit?  Is that the
4  question?
5     Q.   (By Mr. Schmidt) I'm just asking if you know
6  if -- if funds were ever transferred -- do you have
7  any evidence, did you ever look at to see if funds
8  were actually transferred between the two entities
9  beyond getting your -- your monthly statement?
10    A.   The only thing I had to go off was the
11 balance sheet.
12    Q.   Okay. I think you indicated that you were --
13 well, who did the human resources for Tubal-Cain
14 Hydraulic Solutions?
15    A.   Well, if you're asking -- if you -- if you --
16 if you look at what the HR functions are like hiring
17 and firing.  Is that what you're asking?
18    Q.   Yes.
19    A.   Then I would have done that.  Yes.
20    Q.   Okay.  Do you have any training in human
21 resources?
22    A.   Well, in the Marine Corps, I was an
23 administrative and personnel officer for a large
24 training squadron of approximately four to a
25 hundred -- 400 to 600 personnel.  And so we dealt with
```

DAVID VILLARREAL - May 29, 2019

1  recall him coming in to talk to me.

2       Q.    (By Mr. Schmidt) Okay.

3       A.    No.

4       Q.    When did you first learn about the situation

5  involving Seneca Jones?  Let me ask you:  Did you ever

6  hear about any sort of issues relating to Seneca Jones

7  and race?

8       A.    Did I ever before the incident?

9       Q.    Yes.  Well, let's just -- when did you first

10 hear about any situations involving Seneca Jones and

11 race?

12      A.    When -- when he made it know to Tim Dimmick

13 and Tim Dimmick came to inform me.

14      Q.    Okay. And tell me what happened.

15      A.    Um, so Tim Dimmick came to inform me that --

16 that Seneca Jones had told him about the hangman game

17 that had been done with his name that he had seen a

18 picture of.  And so I asked him -- Tim was the

19 director of technical services out in the shop, and so

20 I asked him to -- to go out and in -- and investigate

21 and find out what actually happened.  What was the

22 situation.  And then, you know, bring that back to me,

23 so.

24      Q.    Okay.  Did -- um, what did -- what did --

25 I'll break it down a little bit more.  But what

1  would have had.

2      Q.   Any training that he ever had on

3  investigating something that might you -- you know, a

4  -- a reference or a joke to lynching a black person?

5  Did he have any training on that?

6      A.   I -- I -- I don't know that he had any

7  specific training.

8      Q.   Okay.  So you tell him to go do an

9  investigation?

10     A.   Sure.

11     Q.   And what happens then?

12     A.   So he comes back, and he informs me that he

13  found out that two individuals were in the back

14  working in a truck.  We were doing inventory, I

15  believe, on the truck at the time.  And there was a

16  white board we had inside these trucks, and that they

17  had played the game on this white board and taken a

18  picture of it.  So there was Ian Brown and Boddie is

19  the other individual. Um, they took a picture of it,

20  and I guess shared it around the shop.  And then Mark

21  Martinez was the one who received the text with the

22  photograph, and showed it to Seneca.  And -- and so it

23  was reported to Brent, who was then our shop

24  supervisor, and he didn't deal with it appropriately.

25  He tried to explain the -- explain the -- the game.

DAVID VILLARREAL - May 29, 2019

1 Tried to kind of, you know, sweep it under the --
2 minimize the -- the significance of it, or how Seneca
3 was feeling about it.  And -- and just kind of let it
4 go. Didn't report it to -- in this case Tim. Didn't
5 report it to me. And so, Tim brought that to me.  And
6 we felt that not only was the -- the game
7 inappropriate and the behavior was not what we would
8 tolerate in the organization.  We decided to let the
9 individuals go.  But one of them actually resigned
10 ahead of us actually letting him go.  And then, we
11 thought that the way that Brent dealt with the
12 situation was inappropriate as a supervisor.  And --
13 and he was, in fact, sort of condoning that sort of
14 joking and behavior, and we weren't going to tolerate
15 that.  So we dealt with rapidly and as harshly as we
16 could, I think under the circumstances. And so on the
17 27th, we let go of Brent and Ian Brown.  Boddie has
18 already resigned.  But we put a -- a "do not hire" on
19 his -- in his personnel record.  No rehire.  I'm
20 sorry. No rehire eligible. And we brought in Seneca to
21 let him know what we had done.  To explain to him that
22 we -- well, I apologized.  I said, that's not behavior
23 that we're condoning here.  That's not what we will
24 tolerate.  It -- it's against our -- our policy.  And
25 we went out -- Tim Dimmick and I had a discussion with

DAVID VILLARREAL - May 29, 2019

1  everyone in the shop.  We told everyone that it was

2  unacceptable behavior.  That's not -- it wasn't going

3  to be tolerated and dealt -- and it was going to be

4  dealt with harshly.  It needed to stop if that's what

5  anybody else had mind of -- of doing.

6           So when we told Seneca about what we had

7  done.  He acknowledged the fact that we had let the

8  individuals go.  He was -- he was satisfied with the

9  action we had taken.  We -- I told him -- and I told

10 him that if there was any other future behavior, that

11 type of behavior, that he is to come to us right away.

12 Report it to Tim, his immediate supervisor there in

13 the back, and/or to come to me.  My office was open.

14 For him to come and let us know, but that we weren't

15 going to tolerate that -- that sort of behavior.

16     Q.    Okay.

17     A.    Yeah.

18     Q.    I'm going to ask you, you know, to break down

19 a little bit more --

20     A.    That is fine.

21     Q.    -- and ask you some questions about it.  But

22 is there anything else that you can remember that you

23 did or said regarding this situation?  Did you do

24 anything else that we haven't discussed right now?

25     A.    Did I anything else?  Um, no.  I think I -- I

DAVID VILLARREAL - May 29, 2019

```
 1        A.    Yes. In the conference room.
 2        Q.    In the conference room.  And who was present
 3   for that?
 4        A.    Tim Dimmick.
 5        Q.    And, at that, you -- tell me again what took
 6   place in that conversation.
 7        A.    Yeah.  So -- so we told him that we were
 8   sorry that this had happened.  This is not the type of
 9   work environment, and that we want to promote, it's
10   against company policy.  It's not tolerated.  We -- as
11   a result, we've let people go. That we want him to be
12   successful as an employee.  We did talk to him about
13   his absenteeism and asked him if he would make a -- a
14   -- a stronger effort to show up for work.  But we did
15   tell him that, listen.  This is not tolerated, and if
16   you -- if it happens again, we can't do anything about
17   it if we don't know about it.  And we didn't know
18   anything like this had been going on.  And so we said,
19   if anything in the future happened along these lines,
20   for -- and that he was to let us know immediately. Tim
21   in the back or to come see me in my office.
22        Q.    Okay.
23        A.    And he acknowledged that, and he thanked us.
24   And, um, we -- he came back to work the next couple of
25   days, and then he was gone.
```

DAVID VILLARREAL - May 29, 2019

```
1      Q.    Okay.

2      A.    Yeah.

3      Q.    Why did you bring up his absenteeism and talk

4   to him about?

5      A.    Yeah.  Well, --

6      Q.    In that meeting?

7      A.    -- it was an -- an -- an opportunity.  I

8   mean, we -- he was -- we were talking.  And when I

9   hired -- I hired him on Mark Martinez's

10  recommendation.  They were lead hydraulics men, and we

11  really needed their expertise in the company. Seneca

12  had a lot of personal issues, uh, along the way.  You

13  know, we gave them training.  We -- we -- we needed

14  his expertise.  We really needed him to show up for

15  work.  And, you know, maybe it was an inappropriate

16  time to bring it up, looking back.  But, at the time,

17  I just -- I made the -- you know, just asked him if he

18  could, you know, make an effort to -- to show up.

19     Q.    Had you ever called him in -- in the

20  conference room and had a discussion about his

21  absenteeism prior to that time?

22     A.    No.  He had been counseled before.  Brent's

23  talked -- had talked to him.  Tim had talked to him as

24  well.  Um, um, but, um, I'm not sure that I had before

25  then.
```

DAVID VILLARREAL - May 29, 2019

1  application and come see us.  So he did.  And I

2  interviewed him, and -- and he was -- he's kind --

3  kind of quiet and shy.  Kind of reserve, but -- but

4  seemed knowledgeable.  And, um, uh, he did mention he

5  had some personal, um, um, um, problems and that may

6  have led to him wanting to leave NOV, but that's what

7  I recall from the interview.  But I was -- we were

8  excited to have him onboard because of his knowledge

9  and experience.  And the fact -- I mean, we actually

10  had another lead who had that ex -- you know,

11  experience.

12      Q.   Was there anybody else involved in hiring

13  Seneca besides yourself?

14      A.   No.  I -- again, I did all the hiring and --

15  and firing.

16      Q.   Okay.

17      A.   No.

18      Q.   Was Brent Hulsey involved in hiring or

19  firing?

20      A.   The only thing that he was involved with is

21  when Lisa would do the paperwork, we needed a

22  supervisor's signature on the -- on the paperwork.  He

23  would sign to complete the paperwork.  But I'm the one

24  who gave the -- the green light to hire.

25      Q.   Why would -- why would -- why did you have

DAVID VILLARREAL - May 29, 2019

1    A.    Yeah.

2    Q.    Did Tim Dimmick ever talk to you about

3  another hangman drawing being drawn?

4    A.    No.

5    Q.    Or that other racial comments, things of that

6  nature were made?  Did he ever raise any concerns?

7    A.    No.

8    Q.    Did you ever talk to him about whether that

9  had occurred?  If he didn't raise it, did you ever ask

10  him directly, did that occur?

11    A.    No.  I didn't have any reason to.  I mean,

12  again, we were pretty emphatic about not accepting

13  that kind of behavior.

14    Q.    When did you first -- when was Seneca

15  terminated, and why?

16    A.    So we term -- terminated him in July the

17  18th, I think, because -- well, I am sorry.  I am

18  trying to remember the exact date.  It was -- it was

19  approximately two weeks after.

20    Q.    Okay.

21    A.    Because no call, no show.  I had Lisa try to

22  get in touch with him about returning -- if -- if --

23  to find out if he was quitting or not.  Because it

24  wasn't unlike him to disappear for a week or two to be

25  gone from work without letting us know.  So I wanted

DAVID VILLARREAL - May 29, 2019

1  to make sure that if he was quitting, that we knew

2  that, and we could terminate him.  And that if he was

3  not coming back, that he -- if he would please return

4  his uniforms that he had been provided.

5      Q.   So did Lisa call him?

6      A.   She tried to, and -- and she -- I am not sure

7  that she reached him.  I think she left messages for

8  him.  I think I talked to Mark Martinez to ask him

9  about, hey, do you know where Seneca is and that sort

10 of thing.  And I seem to recall he said no.  He didn't

11 know where he was.  And I said, well, if you do talk

12 to him, please let him know that we need to know if he

13 is -- he needs to tell us if he is still working here

14 or if he is not.  And if he is not, if he can return

15 the uniforms.

16     Q.   Okay.  Anything else that you told to Mark

17 about that or --

18     A.   Um, no.

19     Q.   Okay.  And do you know if anybody else

20 besides Lisa tried to contact him?

21     A.   Um, no.  Lisa would have been the one to --

22 to call.  Tim may have tried, but I am not sure about

23 that.

24     Q.   Okay.  Before we leave the topic and get into

25 the charge of discrimination.  I wanted to ask you

**DAVID VILLARREAL - May 29, 2019**

1    A.    Yes.  I mean, he would task them out to do

2  the various tasks that were required.

3    Q.    Okay.  Any other job duties that he had

4  besides tasking out those folks?

5    A.    No.  But implied is shop safety, you know,

6  making sure they are working safe and that sort of

7  thing.

8    Q.    Okay.  And as a supervisor, did he -- I know

9  you said that he did not have the ability to fire.  Is

10  that your testimony?

11    A.    That's right.

12    Q.    And is it also your testimony he didn't have

13  the ability to hire folks?

14    A.    That's right.

15    Q.    Did he have the ability to give somebody a

16  write up, a disciplinary write up?

17    A.    Yes.  And -- and he did so on several

18  occasions.

19    Q.    Okay.  And if he felt like they, you know,

20  needed to be suspended for a few days.  Did he have

21  the authority to do that?

22    A.    Um, not -- not outright.  He would come and

23  talk to me about it.

24    Q.    Okay.

25    A.    And then -- and then with my consent, he --

DAVID VILLARREAL - May 29, 2019

1  The lead then tried to explain the picture to BJ.

2      A.    Uh-huh.

3      Q.    The explanation was a bit bizarre and was

4  overheard by a member of our staff and reported to

5  me.

6      A.    Uh-huh.

7      Q.    Who overheard the explanation that the lead

8  gave?

9      A.    I don't know.

10     Q.    And who then reported it to Tim Dimmick -- or

11  I am sorry -- to -- to David -- I guess to Tim

12  Dimmick.  He is the one who is writing this.

13     A.    Yeah.    A member of our staff reported to me.

14  So it was -- so a member of the staff, who reported it

15  to him.  It would have been Mark and BJ that -- that

16  told Tim about the -- about the incident.  But who

17  overheard the actual conversation, I don't know who

18  that was.

19     Q.    Okay.

20     A.    No.

21     Q.    And who overheard the explanation being a bit

22  bizarre and reported it to him?

23     A.    Yeah.    That I -- I don't know who that was.

24     Q.    Okay.  And do you know when that was reported

25  to him?

DAVID VILLARREAL - May 29, 2019

1      A.    So this was a result of his investigation.
2  So that would have been when he -- we found out -- he
3  found out on the 25th.  So on the 27th and the 28th is
4  when he was doing, um, um, the investigation -- no.  I
5  am sorry.  His dates are a bit wrong on here, it looks
6  like.  Because Seneca brought -- brought it to his
7  attention on the 25th.  Not the 27th as it states
8  here.
9      Q.    Okay.
10     A.    Okay.  So it was the 27th when we let Brent
11 and the other individual go.  So, yeah.  The dates are
12 off in his -- in his statement.
13     Q.    Okay.  And, again, without -- as you sit here
14 today, you can't testify who he is referring to about
15 the member of the staff?
16     A.    No.  I -- I don't know exactly who that would
17 be.
18     Q.    Okay.  And the explanation being a bit
19 bizarre.  Is that -- do you think he' referring to the
20 fact that Brent Hulsey told Seneca Jones to just -- I
21 don't want to use the words.  What were the words you
22 used?
23     A.    Well, I mean, you know, what he said was, you
24 know, to suck it up or -- or to -- you know, don't let
25 it bother you.

DAVID VILLARREAL - May 29, 2019

```
1                    C E R T I F I C A T E

2

   STATE OF TEXAS      )

3                      )

   COUNTY OF HARRIS    )

4

5

6

7

8

9        I, JUDY H. GALLO, Certified Shorthand Reporter

10  in and for the State of Texas, duly commissioned and

11  qualified, do hereby certify that the foregoing is a

12  true, correct, and complete transcript of the

13  proceedings in the foregoing captioned matter taken by

14  me and transcribed from my stenographic notes.

15       The original deposition and exhibits were

16  delivered to Mr. Ron Estefan, Custodial Attorney.

17       IN WITNESS WHEREOF, I have hereunto set my

18  hand and affixed my seal of office at Houston, Texas,

19  this the 14th day of June, 2019.

20

21  _____

         JUDY H. GALLO

22       Texas CSR No. 794

         Expiration Date: 12-31-20

23

         ANC REPORTING

24       1225 N. Loop West, Suite 327

         Houston, Texas 77008

25       Firm Registration No. 62
```

CRC for ANC COURT REPORTING
(713) 626-2629

# AMENDED EXHIBIT 16
# OF DEFENDANTS' MOTION
# FOR SUMMARY
# JUDGMENT

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
               SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION

 3 SENECA JONES                      )
        Plaintiff,                   )
 4                                   )
   V.                                ) C.A. NO. 4:16-CV-1282
 5                                   )
                                     )  JURY TRIAL DEMANDED
 6 TUBAL-CAIN HYDRAULIC              )
   SOLUTIONS, INC., TUBAL-CAIN       )
 7 INDUSTRIES, INC., TUBAL-CAIN      )
   HOLDINGS, LLC, TUBAL-CAIN         )
 8 MARINE SERVICES, INC.,            )
   TUBAL-CAIN INDUSTRIAL             )
 9 SERVICES, INC., TUBAL-CAIN        )
   GAS FREE SERVICES, INC.,          )
10 TUBAL-CAIN RENTALS, INC.,         )
   TUBAL-CAIN MARINE                 )
11 SERVICES-DEVALL FLEET, INC.,      )
   AND TUBAL-CAIN GAS FREE           )
12 SERVICES-DEVALL FLEET, INC.       )
        Defendants.                  )
13

14        *****************************************

15           ORAL AND VIDEOTAPED DEPOSITION OF

16                    SENECA JONES

17                    MAY 31, 2019

18        *****************************************

19
   ORAL AND VIDEOTAPED DEPOSITION of SENECA JONES, produced
20 as a witness at the instance of the Defendants, and duly
   sworn, was taken in the above-styled and numbered cause
21 on the 31st of May, 2019, from 10:01 a.m. to 2:22 p.m.,
   before Wendi Broberg, CSR in and for the State of Texas,
22 reported by machine shorthand, at the Law Offices of The
   Estefan Firm, P.C., 2306 Mason Street, Houston, Texas
23 77006, pursuant to the Federal Rules of Civil Procedure.

24

25
```

2

```
 1                   A P P E A R A N C E S
 2
   FOR THE PLAINTIFF:
 3
 4     MR. ROBERT W. SCHMIDT
       CREWS LAW FIRM, P.C.
 5     701 Brazos
       Suite 900
 6     Austin, Texas  78701
       Ph. (512) 346-7077
 7     Fax (512) 342-0007
       E-mail:  crews@crewsfirm.com
 8
 9
   FOR THE DEFENDANTS:
10
11     MR. RANDALL C. OWENS
       WRIGHT CLOSE & BARGER, L.L.P.
12     One Riverway
       Suite 2200
13     Houston, Texas  77056
       Ph. (713) 572-4321
14     Fax (713) 572-4320
       E-mail:  owens@wrightclosebarger.com
15
16
   ALSO PRESENT:
17
       Mr. Peter Jennings - Videographer
18
19
   REPORTED BY:
20
       WENDI BROBERG, CSR 7091
21     Contracted by:
       Discovery Resource
22     1511 West 34th Street
       Houston, Texas  77018
23     Ph. (713) 223-3300
       Fax (713) 228-3311
24
25
```

3

```
 1                        INDEX

 2  Appearances ...................................2

 3  Index .........................................3

 4  SENECA JONES

 5        Examination by Mr. Owens .................4

 6        Examination by Mr. Schmidt .............135

 7        Further Examination by Mr. Owens .......136

 8  Signature of Witness .........................138

 9  Reporter's Certification .....................139

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          **THE VIDEOGRAPHER:**  Today is Friday,

2 May 31st, 2019.  The time is 10:01 a.m.  We're on the

3 record, beginning Media No. 1.

4          (Witness sworn)

5          **THE WITNESS:**  Yes, ma'am.

6               SENECA JONES,

7 having been first duly sworn, testified as follows:

8               EXAMINATION

9 **BY MR. OWENS:**

10    Q    Would you please senate your full name.

11    **A    Seneca Jones.**

12    Q    Mr. Jones, we had a little bit of a

13 conversation before the deposition started, and I asked

14 you if it was all right if I refer to you as -- as

15 Seneca.  So is that okay if I call you Seneca today?

16    **A    Yes, sir.**

17    Q    All right.  I don't want to be disrespectful.

18          So -- and you and I have met once before.

19 Do you recall that?

20    **A    Yeah.**

21    Q    Barely?

22    **A    Barely.**

23    Q    Barely.  All right.  But even though we've met

24 before, you understand that I represent the defendants

25 in a lawsuit that you have brought and that just

42

1 **and Mark sat at our own table.**

2     Q     Okay.  Well, do you -- do you -- do you

3 remember there was an accident after -- after that event

4 at Tailgators, somebody being involved in an accident?

5     **A     Yes, yes, I do.**

6     Q     And who -- who was involved in the accident?

7     **A     Brent.**

8     Q     And -- and did you help Brent?

9     **A     I sure -- I did.**

10     Q     Okay.  And what kind of help did you give to

11 Brent?

12     **A     Excuse me.  At the -- at the event when we**

13 **was -- we was there they was drinking a lot and I can**

14 **see that he was -- you know, he was getting real drunk**

15 **and at one point he walked to our table where me and**

16 **Mark was sitting and I knew he was drunk.  He had took**

17 **off his shirt.  Then he started, you know, calling me**

18 **the "N" word like, you know, what's up, you know, nigger**

19 **and stuff like that.  So I -- I knew he was -- you know,**

20 **he wasn't in his -- in his right mind frame, and I just**

21 **asked him just to -- even though he was so -- be so rude**

22 **to me I was still concerned about his -- his well-being.**

23 **So I asked him was he all right, do I need to bring him**

24 **home or do I need to follow you or, you know, stuff like**

25 **that, and he was like, no, he have it.  But when he got**

52

1     Q    You don't remember Jeremy Ferguson?

2     **A    I don't.**

3     Q    How about Ian Brand -- Ian Brown, did you know

4  Ian Brown?

5     **A    Yeah, I know Ian.  He was one -- he was another**

6  **one.  So all -- yeah, I -- I -- I know the ones that did**

7  **all the horrible things to me.  That's the ones I know.**

8     Q    All right.  And so -- so Ian, tell me about Ian

9  then.

10    **A    What -- he was -- he was horrible.**

11         **MR. SCHMIDT:**  Objection, form, by the way.

12         Go ahead.

13    **A    He was -- he was just another guy that would**

14 **just do all the racial jokes and do -- just say -- just**

15 **say bad things, horrible things.**

16    Q    (By Mr. Owens)  And when you say "say" -- "say

17 bad things," he would --

18    **A    Use --**

19    Q    -- use the "N" word?

20    **A    A lot.**

21    Q    And -- and did he do that in a derogatory way

22 or joking around or some combination?

23    **A    There's no such thing as joking around when**

24 **it -- when it come down to that.**

25    Q    I -- and -- and I agree with you.  Okay?

Discovery Resource
713-223-3300

53

1          But did -- as far as his demeanor, was he

2 doing it being ugly or with a -- with a smile on his

3 face, or do you recall anything about that?

4          **MR. SCHMIDT:**  Objection.  Form.

5     **A    No, not -- he just -- they just would use it,**

6 **you know.  No -- no matter they was joking, laughing or**

7 **whatever, it -- it always came -- it always was brought**

8 **up in the shop.**

9     Q    (By Mr. Owens)  Did -- did Ian use it in a way

10 where it seemed like he was trying to be familiar with

11 you?

12          **MR. SCHMIDT:**  Objection.  Form.

13    **A    There's no such thing as being -- you know, I**

14 **mean, let me say something.  That -- that -- that word**

15 **there is -- I don't even allow it in my house.  My kids**

16 **say that, I -- you know, I -- I -- I come across they --**

17 **they mouth.  And I'm just being -- I know y'all are**

18 **recording and all that.  That's what I do because I hate**

19 **it.  I don't allow it in my house.  So I know I don't**

20 **allow no one else to walk up to me and use that word in**

21 **joking, you know, whatever they call each other doing.**

22 **I just don't allow it, and I don't think that's a joke.**

23 **I -- I just really don't think it's -- it's -- it's a**

24 **joke to me.**

25    Q    (By Mr. Owens)  And I -- I'm going to tell you

58

1 was -- talking about Mr. Martinez, was he ever

2 disciplined for anything?

3     **A     No, not that I can recall.**

4     Q     We've been talking some about the use of the

5 "N" word, those remarks that were made.  I think you

6 mentioned that -- that Brent was one person who would --

7 who would do that; is that right?

8     **A     Yes.**

9     Q     Brent and Ian --

10     **A     Yes.**

11     Q     -- correct?

12     **A     Yes.**

13     Q     Did you say Aaron or not?

14     **A     Yes, everyone.  I mean, they all did.  It**

15 **was -- they all used it.**

16     Q     Well, not -- not all.  I mean, in fairness, you

17 know not all of them did.  Just tell me who you can

18 remember.

19     **A     I'm -- I'm -- I'm telling you.**

20     Q     Okay.

21     **A     They used it.  It was -- it was -- it was --**

22 **they used that word every day all day in that shop when**

23 **we was there.**

24     Q     Okay.  I thought you told me earlier that Chuck

25 Reddy didn't use it?

59

| | | |
|---|---|---|
| 1 | **A** | **Chuck wasn't there all the time.** |
| 2 | Q | Okay. |
| 3 | **A** | **Chuck was over -- he was overseas a lot.** |
| 4 | Q | Okay.  So just tell me who you remember. |
| 5 | **A** | **Okay.  The guys that you said.** |
| 6 | Q | Brent, Ian.  Anybody else? |
| 7 | **A** | **That's -- that's all I can remember.** |
| 8 | Q | Okay.  And -- and was anything said besides |

9 using the "N" word in -- in your presence or directing

10 it to you?

| | | |
|---|---|---|
| 11 | **A** | **Racial jokes.** |
| 12 | Q | And there have been a couple that -- that have |

13 been talked about here and I'm not going to -- I'm not

14 going to repeat them, but do you remember who -- who

15 told racial jokes?

| | | |
|---|---|---|
| 16 | **A** | **Brent, Aaron, you know.** |
| 17 | Q | Okay. |
| 18 | **A** | **Ian.** |
| 19 | Q | Who? |
| 20 | **A** | **Ian.** |
| 21 | Q | Ian? |
| 22 | **A** | **Ian, right.** |
| 23 | Q | Got it. |
| 24 | **A** | **That's -- that's basically it.  That basically** |

25 **was -- was the guys.**

60

1     Q     And then -- and did -- was that a situation
2  where they were telling them to you or they were telling
3  them in front of you or you overheard them?  Do you
4  remember those circumstances?

5     **A     Basically all the ways you said.  You know,**
6  **sometime they will say it in front of me, say it among**
7  **they self or sometime they'll -- they tell me.**

8     Q     And about how many -- how many times do you
9  recall hearing somebody use the "N" word or -- or
10 telling a joke?  If you -- if you put it all together,
11 how many -- how many times would you say that happened?

12             **MR. SCHMIDT:**  Objection.  Form.

13    **A     I -- I -- I can't tell you that.  It happened**
14 **often.**

15    Q     (By Mr. Owens)  Do you ever recall telling
16 anybody that happened like 20 to 30 times?  Do you
17 remember using those numbers at all?

18    **A     No.**

19    Q     Does that sound about right?

20    **A     I'm --**

21             **MR. SCHMIDT:**  Objection.  Form.

22    **A     -- not too sure.  It was --**

23    Q     (By Mr. Owens)  You're not sure?

24    **A     It was used a lot, though.**

25    Q     Okay.  So it might have been 20 to 30 times?

Discovery Resource
713-223-3300

61

1          **MR. SCHMIDT:**  Objection.  Form.

2     **A    What, a day are you saying?  What's you saying?**

3     Q    (By Mr. Owens)  No, I'm talking about total.

4     **A    Oh, I -- I can't recall.**

5     Q    Okay.  But you think it might have been 20 to

6  30 times?

7          **MR. SCHMIDT:**  Objection.  Form.

8     **A    Can't recall.**

9     Q    (By Mr. Owens)  Well, if -- if the guys that

10  were using the "N" word and telling jokes and you've

11  mentioned Brent and Aaron and Ian, if -- if they had

12  been fired as a result of that, would -- would that have

13  been a satisfactory result for you?

14         **MR. SCHMIDT:**  Objection.  Form.

15    **A    No.**

16    Q    (By Mr. Owens)  No?  You think it would have

17  been -- taken more than firing them to -- to satisfy you

18  for their conduct?

19    **A    Yes.**

20    Q    Okay.  Like what -- what else?

21         **MR. SCHMIDT:**  Objection.  Form.

22    **A    I mean, I feel that they -- it needs -- you**

23  **know, they need to be taught a lesson.  I mean, they**

24  **need to -- that's just how I feel.**

25    Q    (By Mr. Owens)  Okay.

62

| | | |
|---|---|---|
| 1 | **A** | **You know, maybe, you know --** |
| 2 | Q | Something -- |
| 3 | **A** | **-- something else.** |
| 4 | Q | Something more than being fired? |
| 5 | **A** | **Right.** |
| 6 | Q | Okay.  Did -- did you ever ask anybody like |

7 David Villarreal or Alex Neer to -- to get involved and

8 to stop all this going on?

| | | |
|---|---|---|
| 9 | **A** | **No.** |
| 10 | Q | We'll switch gears a little bit.  Okay? |
| 11 | **A** | **Okay.** |
| 12 | Q | All right.  I want to talk about -- you've -- |

13 you've talked about some other companies that are

14 defendants in this lawsuit and -- and that -- that you

15 may have done some work for some other -- other

16 companies and -- and -- that are defendants in the

17 lawsuit.  So let me -- let me just go through these and

18 just get your best evidence, your best testimony

19 about -- about them.

20            Do you -- your employer was Hy -- was

21 Hydraulic Solutions, Tubal-Cain Hydraulic Solutions,

22 Inc.; is that right?

| | | |
|---|---|---|
| 23 | | **MR. SCHMIDT:**  Objection.  Form. |
| 24 | **A** | **Pretty sure.** |
| 25 | Q | (By Mr. Owens)  Yes?  Is that a yes? |

63

1    **A    Yes.**

2    Q    Okay.  And that's -- that's where you got your

3 paycheck or that's who you got your paycheck from?

4    **A    Yes.**

5    Q    Did you actually get a paycheck, or was it

6 direct deposit?

7    **A    Direct deposit.**

8    Q    All right.  At the end of the year in 2012

9 or -- or 2013, did you get like an income tax record

10 that showed that it was Tubal-Cain Hydraulic Solutions?

11 Do you recall?

12   **A    I can't -- I can't recall.**

13   Q    Okay.  How about Tubal-Cain Industries, do you

14 recall if you ever had any involvement with Tubal-Cain

15 Industries?

16        **MR. SCHMIDT:**  Objection.  Form.

17   **A    I can't recall.**

18   Q    (By Mr. Owens)  Okay.  How about Tubal-Cain

19 Holdings, does that --

20        **MR. SCHMIDT:**  Object --

21   Q    (By Mr. Owens)  -- name ring a bell?

22        **MR. SCHMIDT:**  Objection.  Form.

23   **A    No, sir.**

24   Q    (By Mr. Owens)  Okay.  How about Tubal-Cain

25 Marine Services?

69

1    Q    That's when you got written up?

2    **A    Yes, correct.**

3    Q    Okay.  And that's the only -- only time you got

4 written up for being -- being late or absent?

5    **A    Yes, that I remember.**

6    Q    All right.  And then whenever -- did -- did you

7 get paid based -- based on the hours you worked?

8    **A    Meaning?**

9    Q    What was your rate of pay?

10   **A    20, 21.**

11   Q    Okay.

12   **A    22, something like that.**

13   Q    Let's just say it's $21 an hour.

14   **A    Okay.**

15   Q    Did you clock in and out?

16   **A    Yes.**

17   Q    And then -- and then you got paid based on

18 the -- the time you were clocked in?  Is that the way it

19 worked?

20   **A    Correct.**

21   Q    All right.  Did you ever complain to anybody

22 that you were being short changed because they

23 weren't -- they weren't accounting for your hours right?

24   **A    No.**

25   Q    Did -- did -- did the folks there at Hydraulic

Discovery Resource
713-223-3300

70

1  Solutions, were they -- did they seem to be tolerant of

2  the number of your -- your absences besides when you got

3  written up?  I mean, as long as you called in and you

4  had a reason for not being there, did they seem to

5  accept that and try to accommodate that?

6      **A    Yes.**

7      Q    Do you -- do you have a passport?

8      **A    No.**

9      Q    Have you ever applied for a passport?

10     **A    Yes.**

11     Q    When did you apply for a passport?

12     **A    Downtown Houston.**

13     Q    At what -- when?

14     **A    I can't recall.  I don't remember.  It's been**

15  **awhile, been years.**

16     Q    All right.  Did you ever apply for a passport

17  when you were at Hydraulic Solutions?

18     **A    Yes.**

19     Q    Okay.  Is that the time you're talking about

20  when you went downtown?

21     **A    Yes.**

22     Q    And -- and you went through the -- the whole

23  application process?

24     **A    Yes.**

25     Q    And you didn't get a passport?

Discovery Resource
713-223-3300

78

1 box truck and you -- you saw the drawing?

2    **A    Morning.   It was morning.**

3    Q    Okay.  And I think you said "we were doing

4 inventory."  Who -- who was we?  Who was doing the

5 inventory with you?

6    **A    Mark Martinez.**

7    Q    So you and Mr. Martinez were doing inventory on

8 a particular box truck for a few days and one morning

9 you get to work and there's a hangman, you see a hangman

10 drawing in the box truck; is that right?

11    **A    Yes.**

12    Q    And then -- and then just describe that to me,

13 the -- the circumstances?

14    **A    Basically, it was we got in that morning and we**

15 **started working and we noticed that they had a drawing**

16 **on the board and, you know, it was a hang -- it was a**

17 **hangman with my name at the bottom.**

18    Q    Okay.  And when you say "a drawing at the

19 board," you're talking about there's a white board

20 inside the -- the trucks?

21    **A    Yes.**

22    Q    And there's a white board inside that truck?

23    **A    Yes.**

24    Q    And do you remember anything about this

25 particular drawing whether it had -- what color ink it

81

1    Q    You don't?

2    **A    Huh-uh.  No, I don't have that phone anymore.**

3    Q    Okay.  And did you -- did you give that photo

4  to -- to somebody else who might have it?

5    **A    No.**

6    Q    You just -- it just got deleted off your phone

7  at some point?

8    **A    Well, I got rid of the phone.**

9    Q    When did you get rid of the phone?

10    **A    Years, man.  Years ago.**

11    Q    So you didn't make a copy of that photo

12  anywhere?

13    **A    When I -- I brought it to -- when I went to the**

14  **EEOC, they did -- they seen it.  They made a copy of it.**

15    Q    So they made -- they made a copy of that photo

16  that we're talking about here when you and Mr. Martinez

17  first saw a hangman drawing?

18    **A    Yes.**

19    Q    Okay.  So do you remember what supervisor you

20  showed the photo to?

21    **A    Brent.**

22    Q    And then was anybody with you when you showed

23  it to Brent?

24    **A    Mark.**

25    Q    And then what was Brent's reaction?

Discovery Resource
713-223-3300

82

1      **A      Laughed.**

2      Q    And then did he -- did he say anything besides

3 laughing?

4      **A      A joke.  It's a joke.  Just he said -- he**

5 **tell -- his words was it's -- it's just -- it's a joke.**

6      Q    All right.  Do you remember any -- do you

7 remember anymore that -- that conversation, anything you

8 said or --

9      **A      No.**

10      Q    -- did?

11            And then given Mr. Hulsey's response, did

12 you do anything else to call it to somebody else's

13 attention?

14      **A      Yes.**

15      Q    And who was that?

16      **A      Tim.**

17      Q    Tim.  Is it Tim Dimmick?

18      **A      Dimmick, yes.**

19      Q    And why would you think to show it to Tim

20 Dimmick?

21      **A      Because Brent and he wasn't taking care of it.**

22 **I mean, it was a -- it was a joke to him, a laughing**

23 **matter, so I wanted to bring it to another supervisor's**

24 **attention.**

25      Q    All right.  And was that -- was that your idea,

83

1 or was it somebody else's idea to go to Tim?

2    **A      It was my idea.**

3    Q    Okay.  So you go to -- you go to Mr. Dimmick,

4 and what was his response?

5    **A      That he was going to look into it and**

6 **investigate it.**

7    Q    Okay.  Did he -- anything else?  Did he tell

8 you take a day off while he's -- he investigate it or --

9 or anything like that?

10    **A      Yes.**

11    Q    He did?  Okay.

12           So make sure I got this right.  You

13 weren't satisfied with Mr. Hulsey's response so you had

14 the idea to take it to -- to Mr. Dimmick?

15    **A      Correct.**

16    Q    And Mr. Dimmick looked at it.  He said he'd

17 look into it and -- but meanwhile you could take some

18 time off under the -- was it because of the

19 circumstances, because of the situation he felt like you

20 might want to take --

21    **A      Yes.**

22    Q    -- some time off?

23           And -- and then what, that he would follow

24 up and let you know what happened?

25    **A      Yes, we're -- we're to -- we're to have a**

84

1 **meeting the next day.**

2    Q    Okay.  Was it the next day or could it have

3 been two days later?

4    **A    Two days later, something like that.**

5    Q    Okay.  All right.  After he had a chance to

6 look into it?

7    **A    Yes.**

8    Q    Did he tell you that -- that he was going to

9 look into it and do something about it or just that he

10 was going to look into it?

11   **A    He was going to look into it.**

12   Q    Okay.  All right.  So -- so when's the --

13 when's the -- the -- the next time you spoke to anybody

14 about the -- about the hangman drawing?

15            MR. SCHMIDT:  Objection.  Form.  But go

16 ahead.

17   Q    (By Mr. Owens)  That may be a bad question.

18 Let me ask you this:  Did you have any con -- did

19 anybody there in the shop that day -- and I'm just going

20 to say the 25th, okay, for a frame of reference.  So if

21 I talk about another day, we can keep them distinct.

22 Okay?

23            So did you talk to anybody else that day

24 on the 25th about that hangman drawing?

25            MR. SCHMIDT:  Objection.  Form.

86

1      Q     And Ms. Fontenot, she's in Louisiana?

2      **A     She's in Alabama.**

3      Q     In Alabama?

4      **A     Yes.**

5      Q     Where in Alabama?

6      **A     Huntsville.**

7      Q     And so what did -- what did Ms. Fontenot tell

8 you?

9      **A     She was just concerned that -- that, you know,**

10 **she -- it's just she was just concerned about my**

11 **well-being.**

12     Q     And so at -- at -- at some point did you hear

13 back from Mr. Dimmick or somebody else at Hydraulic

14 Solutions to come back in?

15     **A     Yes.  Well, I -- yes.**

16     Q     Okay.  All right.  And so you -- you had a

17 meeting with Mr. Dimmick on the 27th?

18           **MR. SCHMIDT:**  Objection.  Form.

19     Q     (By Mr. Owens)  Does that sound right?

20     **A     I -- I don't -- I can't remember the actual**

21 **date, but we did have a meeting.**

22     Q     Okay.  So a couple of days after you first saw

23 that hangman drawing, you -- you came back to the shop

24 and you met with Mr. Dimmick?

25     **A     Right.**

110

1    Q    Your mom?

2    **A    Yeah.**

3    Q    Did you tell anybody at Hydraulic Solutions

4  about the tire?

5    **A    No.**

6    Q    And I'm talking about that day.  How about

7  after the 29th, did you -- you know, did you call back,

8  you know, like on Monday or -- or Tuesday the next week

9  and -- and tell somebody that -- you know, about the

10  flat tire or to follow up to see if they found out who

11  did the hangman drawing or anything like that?

12        **MR. SCHMIDT:**  Form.

13    **A    No.**

14    Q    (By Mr. Owens)  Okay.  And if -- and if my math

15  is right, this -- let's just say the -- that Friday was

16  June 29th, then the Monday would have been July 2nd, so

17  just to keep that in mind.  So from the July 2nd on

18  that -- that next week -- and I realize that was a

19  holiday week, but you didn't call anybody to follow up

20  and -- and see what was going on with the investigation

21  or what they were doing?

22    **A    No, no.  And my reason for that was when I seen**

23  **my tire and the second hangman, I just didn't want to be**

24  **around it anymore.  I felt, you know, for my life**

25  **because they kept -- the hangman situation, I know what**

1 **that mean, you know.  And the cutting -- the slashing of**

2 **my tire, so I just didn't want to be -- I just wanted to**

3 **just remove all that away from me.**

4    Q    Okay.  And when you say they -- you knew what

5 they mean with the hangman drawing, what -- what do

6 you -- what are you thinking?

7    **A    That's, like, lynching somebody.  Like, that's**

8 **like a -- someone, you know, like they -- they want to**

9 **hurt me or something.**

10    Q    All right.

11    **A    That's -- that's what I was feeling.**

12    Q    All right.  So, but you didn't think they were

13 actually going to lynch you; you just -- I'm sorry.

14 I'll let you finish.

15    **A    I -- I don't know, you know, because -- you**

16 **know, I don't know what they was thinking or what --**

17 **what they were capable of -- of doing.  So I don't -- I**

18 **just didn't trust it.**

19    Q    Okay.  Were you aware of any -- any type of

20 violent conduct by any of the employees at -- at

21 Hydraulic Solutions while -- while you were there?

22    **A    Not that I remember.**

23    Q    Did you -- did you follow up -- and I'm just

24 going to pull a name out.  Okay?  Did you ever follow up

25 with somebody that you felt support from at Hydraulic

131

1    A    He con -- he was considered one of the bosses

2 too, and I didn't think he -- he -- I didn't feel that

3 was -- that was good when he agreed to what Brent said

4 in front of me.

5    Q    And do you remember what was said?

6    A    It was something about -- I can't remember

7 the -- the exact joke.  It was about why

8 African-Americans, nig -- well, niggers have a big nose

9 or some -- some stuff like that.  And he said it and

10 Matt agreed to it and then that -- that was it.

11    Q    Was it -- were they -- well, was Brent saying

12 that to you or in front of you?

13    A    Yes, he -- he was saying it to me and Matt was

14 walking by and he asked -- and he asked Matt -- well,

15 Matt, him and Matt was -- was talking and I was -- I was

16 walking by and he brought it -- he brought it to my

17 attention.  And he said it, and then Matt agreed to it.

18 You can tell he -- you really can tell he didn't want to

19 answer, but he answered anyway and just walked -- and he

20 walked off.  But he still had -- he -- he still had a

21 part of it.

22    Q    Is it possible that he didn't hear what --

23 what --

24    A    Oh, he heard.

25    Q    -- Brent was saying?

Discovery Resource
713-223-3300

133

1 you left Tubal-Cain Hydraulic Solutions, do you remember

2 any places where you went to -- to look for work?

3      **A     Different places.  I don't know right off the**

4 **top of my head, I mean, the companies or anything like**

5 **that, but I did.**

6      Q     What kind of jobs were you looking for?

7      **A     Oil field work.**

8      Q     And you don't remember the names of any of the

9 companies where you checked?

10      **A     No, it's been like six years, man.  I don't**

11 **remember that.**

12      Q     Okay.  Did you fill out applications?

13      **A     Yes.**

14      Q     Did -- did you -- did you ask for any

15 references or anything from anybody at Tubal-Cain

16 Hydraulic Solutions?

17      **A     No.**

18      Q     At some point did -- did Alex Neer give you a

19 letter of recommendation for -- for employment?

20      **A     Yes.**

21      Q     Okay.  Do you remember who that was to?

22      **A     No.**

23      Q     All right.  Did -- did you follow up on that

24 and -- and -- and use that letter of recommendation to

25 try to get a job?

135

1          **MR. SCHMIDT:** I'll just ask one question.

2                    EXAMINATION

3 **BY MR. SCHMIDT:**

4     Q    You were talking earlier about -- remember when

5 Mr. Jones was asking questions -- about a joke between

6 or comments, a joke with -- that you were -- heard or

7 was involved with with Matt Hoffmann and Brent Hulsey.

8 Do you remember when he was asking you questions about

9 that?

10     **A    Yes.**

11     Q    Do you remember the exact words that were said

12 in that situation, or what do you remember about that?

13     **A    I remember they -- he used African-American.**

14 **I'm not too sure about the -- the nigger word.**

15          **MR. SCHMIDT:** Okay. Okay. Thank you.

16          **MR. OWENS:** I'm sorry? What was that?

17 What was that again? I just didn't hear.

18          **MR. SCHMIDT:** He said that he thinks they

19 used the word African-American. He's not sure if they

20 used the -- the "N" word.

21          **MR. OWENS:** Okay.

22          **MR. SCHMIDT:** I don't have any further

23 questions.

24                         *

25                         *

139

1 STATE OF TEXAS       )

2 COUNTY OF HARRIS   )

3

4        I, Wendi Broberg, Texas CSR No. 7091, do hereby

5 certify:

6        That the foregoing deposition of SENECA JONES was

7 taken before me at the time and place herein set forth,

8 at which time the witness was put under oath by me;

9        That the testimony of the witness and all

10 objections made at the time of the examination were

11 recorded stenographically by me, were thereafter

12 transcribed under my direction and supervision and that

13 the foregoing is a true record of same.

14        I further certify that I am neither counsel for nor

15 related to any party to said action, nor in any way

16 interested in the outcome thereof.

17        In witness whereof, I have subscribed my name this

18 7th day of June, 2019.

19

20

21

22        _____
         WENDI BROBERG, CSR 7091
         Expiration Date:  12/31/19
23       Discovery Resource
         1511 West 34th Street
24       Houston, Texas  77018
         Ph. (713) 223-3300
25       Fax (713) 228-3311