IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SENECA JONES, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-1282 |
| | § | |
| TUBAL-CAIN HYDRAULIC SOLUTIONS, | § | |
| INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

The Parties and their counsel appeared before this Court for a bench trial for the determination of their claims in the above-styled and numbered case. Each side presented evidence during trial, produced briefing, made their respective arguments as to the effects of the evidence, and filed proposed findings of fact and conclusions of law (Doc. Nos. 101 & 102). The Court hereby issues its findings of fact and conclusions of law.

## I.  Introduction

Plaintiff, Seneca Jones, is a former employee of Tubal-Cain Hydraulics Solutions ("Hydraulic Solutions") bringing suit against it and Tubal-Cain Industries ("Industries") alleging racial harassment and discrimination claims under both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").

## II.  Findings of Fact[1]

### A. Plaintiff Seneca Jones

The Plaintiff, Seneca Jones, is African American. Prior to his stint at Hydraulic Solutions, Jones worked as a hydraulic mechanic at National Oil Varco ("NOV"). At the recommendation

---

[1] With the exception of the instances where the Court notes a factual dispute, all facts set out herein constitute factual findings.

of a previous NOV co-worker, Mark Martinez, Hydraulic Solutions hired Jones as a leadman

hydraulic mechanic in February of 2012. Jones's new hire paperwork indicates that Brent Hulsey

authorized Jones's hiring, but credible testimony by David Villarreal showed that Villarreal

actually authorized the hiring and Hulsey merely executed the paperwork. As a part of his

onboarding paperwork, Jones received a copy of Hydraulic Solutions' employee handbook. In his

role as leadman, Jones was responsible for leading small teams to do hydraulics works at oil rigs.

At the time of his hiring and throughout his employment, Jones was a highly valued employee.

Jones's time at Hydraulic Solutions (and after) was marred by incidents that cast some

doubt on his reliability as a witness. Early in his time at the company, Jones called in to work

asking for time off claiming his brother was killed in a drive-by shooting. In reality, it was a close

friend who had died, and he died not by shooting but by car accident. In mid-June, Jones again

called in to work asking for time off, this time stating his two children had been in a car accident.

In reality, only one of his children had been in the car accident, as the second passenger was his

nephew. In both situations, Jones's actions can be characterized as a stretching of the truth to

engender sympathy.

Jones's testimony during this lawsuit followed a familiar habit of either not telling or

stretching the truth. Even, Jones admitted multiple times that he had lied under oath.[2] Further,

Jones appeared unwilling to admit even the simplest of facts that may have cast a negative light

on his case. For example, following Jones's call reporting his children were in an accident,

management at Hydraulic Solutions circulated an email to the effect that Jones would be taking

---

[2] *See* Tr. Day 2 AM 84:22–25 (Testimony of Seneca Jones) ("**Q.** Seneca, before we move on from this topic, you just heard everything that we were just talking about. You lied on your deposition, didn't you? **A.** Yes."); *compare id.* at 121:6–8 ("**Q.** And the folks at Hydraulic Solutions were very accommodating of those kind of things, weren't they? **A.** No.") *with* Deposition of Seneca Jones 69:25–70:6 (Doc. No. 68-2) ("**Q.** Did -- did -- did the folks there at Hydraulic Solutions, were they -- did they seem to be tolerant of the number of your -- your absences besides when you got written up? I mean, as long as you called in and you had a reason for not being there, did they seem to accept that and try to accommodate that? **A.** Yes.").

time off. In response to the e-mail, Matt Hoffman, the Director of Quality at Hydraulic Solutions, expressed sympathy for the Jones, stating "Can't this guy catch a break." During his testimony, Jones was asked about the e-mails and adamantly denied that the e-mail expressed any compassion towards him. Indeed, Jones's counsel recognized the flaws in his testimony stating on the record: "I acknowledge and we all acknowledge Mr. Jones is not perfect and he lied on some stupid stuff." Tr. Day 5 PM 37:11–13.

Jones's credibility, or lack thereof, places the Court in a somewhat tenuous position. Many of the untruthful statements by Jones relate to inconsequential matters. As suggested by his own counsel, the maxim "he told a lie when the truth would do better" is particularly salient here. While many of the important facts here have been corroborated in some manner or another, the Court must note that, given this history, his many uncorroborated claims must be viewed with a wary eye.

**B. Defendants Tubal-Cain Hydraulic Solutions and Tubal-Cain Industries**

Defendants are Tubal-Cain Hydraulic Solutions and Tubal-Cain Industries. Defendant Tubal-Cain Industries ("Industries") was founded by Ed Van Huis III ("Ed Van Huis") in 1981. At the time of the relevant conduct, Industries was wholly owned by Ed Van Huis. In 2012, Industries' board of directors consisted of only Ed Van Huis. Debbie Van Huis, the wife of Ed Van Huis, was the Vice President of Industries and had, at all relevant times, the official title of Purchasing Manager, although she later became the head of human resources.

Defendant Tubal-Cain Hydraulic Solutions was founded by Ed Van Huis and Alex Neer in 2010. At the time of the harassment, Hydraulic Solutions was jointly owned by Ed Van Huis and Alex Neer who held eighty and twenty percent of the shares respectively. At all times pertinent to this lawsuit, Alex Neer served as its President. In 2013, Hydraulic Solutions fell victim to the

declining oil market and began laying off employees. In 2015, it succumbed to the failing market and filed for bankruptcy. The bankruptcy stay was lifted so that this lawsuit could proceed. *See* Dec. 4, 2018 Minute Order.

### C. Harassment of Jones

Over the few months Jones worked at Hydraulic Solutions, he was subjected to a range of acts that most certainly equate to harassment. Testimony at trial showed that Jones's co-workers repeatedly used the "N"-word, referred to him as "boy" invoking rhetoric used by former slaveholders, and disregarded his authority as a leadman due to his race. The harassment reached its apex in late June of 2012 when Jones discovered a depiction of a stick figure being hung from a noose drawn in the style of the children's game "hangman." The figure was drawn on a white board in one of Hydraulic Solutions' box trucks. Beneath the figure, Jones's given name— "Seneca"—was spelled out. All the parties (and the Court) agree that the hangman incident as well as the other incidents were reprehensible, as they were a repulsive call-back to post-slavery lynchings of African Americans.

Jones informally reported many of the early incidents to Brent Hulsey. (While Hulsey's name is at the center of many issues in the case, he was never called to testify at trial.) Jones alleges Hulsey was his supervisor at all times during the period in question. Hulsey's supervisor status is discussed below. Regardless of any purported status, Hulsey did nothing in response to these reports. When it came to the above-referenced hangman incident, Jones initially reported the incident to Hulsey. Seeing that Hulsey would not take action, Jones chose to go above Hulsey's head and report the incident to Tim Dimmick, Hydraulic Solutions' Technical Services Director.

Dimmick immediately investigated the hangman incident. In response to the act, Dimmick took action against three employees. Upon finding Ian Brown and Aaron Boddie were involved

in drawing the hangman, Dimmick fired Brown and re-designated Boddie—who had quit just days before—as not eligible for rehire.[3] Dimmick also fired Hulsey for his failure to report or act upon the racist acts. While the company was taking steps to remedy the situation, Jones was given two days of unpaid leave. Upon returning to work, Jones was informed of the actions the company had taken action against Boddie, Brown, and Hulsey.

What happened next is subject to some factual dispute between the parties. Plaintiff alleges that upon returning to work on June 29, 2012 a second hangman drawing appeared in a box truck at Hydraulic Solutions and that he informed Hydraulic Solutions of its presence. Additionally, Plaintiff alleges that at the time he left work his tire was slashed. Defendants deny both allegations. No one else witnessed these events and Jones did not initially tell anyone, including the EEOC, about them. They were raised for the first time in a follow-up letter to the EEOC written by Jones. Defendants question whether the tire was slashed or merely punctured via normal wear and tear. Given Jones' credibility problems, the Court harbors serious doubts as to the accuracy of this testimony. Nevertheless, it is undisputed that following June 29th, Jones never returned to Hydraulic Solutions. Jones cites fear for his safety as the reason. He did not resign, nor did he inform Hydraulic Solutions of this decision; he just never returned to work. Hydraulic Solutions disputes Jones' characterization of the workplace at that time as it argues that it immediately fired the culprits so that the work environment was free from discrimination.

Assuming a second hangman drawing did appear in the box truck or elsewhere, it is unknown who drew it. Similarly, it is unknown who may have allegedly slashed Jones's tires. The only testimony presented at trial was speculation by Jones that Hulsey may have been the

---

[3] Ian Brown was the nephew of Hydraulic Solutions' president, Alex Neer. Dimmick fired Brown for his role in this event without ever consulting his uncle. When Neer was informed of the incident, he supported the action taken by Dimmick

culpable party. Testimony from trial did suggest that Hulsey was present at Hydraulic Solutions on June 29th to return his work uniforms. If Jones's speculation is correct, the Court notes that Hydraulic Solutions cannot be blamed for these latter actions, as Hulsey had already been fired by the date in question.

In its entirety, the Court finds that the harassment of Jones was inexcusable. The uses of the "N"-word and the hangman incident affected the terms, conditions, or privileges of his employment. Nevertheless, the Court does not believe that the harassment was so severe and pervasive as to create a work atmosphere in which a reasonable party in his shoes would have felt compelled to resign, given the immediate actions taken by Hydraulic Solutions. Indeed, all actions by Hydraulic Solutions demonstrate that Jones was a highly valued employee and that they not only took immediate action but also were willing to take appropriate action to root out any racial harassment.

### D. Brent Hulsey

Brent Hulsey is a central figure in this case. According to Jones and former Hydraulic Solutions leadman Mark Martinez, Hulsey was amongst Jones's harassers, using the "N"-word multiple times in Jones's presence. When Plaintiff began working at the company, Hulsey was a shop supervisor at Hydraulic Solutions. While Hulsey's name appeared on both termination (not regarding Jones) and hiring (including Jones) forms and while he gave recommendations to management on hiring and firing decisions, this Court finds that he did not actually have the individual autonomy to hire or fire employees.

Moreover, Hulsey was demoted once during Plaintiff's short tenure at the company. In late May, he was demoted to lead man for wrecking a company truck. Defendants' Ex. 23. The demotion not only carried a loss of title, but also a pay reduction, and in his new role, Hulsey had

fewer, if any, managerial responsibilities. Apparently, he still retained the ability to set hours and assign tasks.

On June 27, 2012, following the first hangman incident, Hulsey was fired for his failure to report racial harassment up the chain of command. Hulsey was eventually re-hired to an outside sales position by Hydraulic Solutions in late August of 2013 with no supervisory duties, more than a year after the first hangman incident and long after Jones had left the company.

### E. Mark Martinez

Mark Martinez was a fellow leadman at Hydraulic Solutions. Martinez is Mexican American, and evidence at trial showed Martinez was similarly subjected to racist acts at the hands of Hydraulic Solutions employees.[4] While Jones was still at Hydraulic Solutions, employees subjected Martinez to derogatory racial slurs. Further, Martinez's hard hat was vandalized one day at work with racial remarks and sexual symbols. Without any replacement hats, Martinez was forced to wear the vandalized hard hat on the job. Those responsible were fired. About six months after Jones left Hydraulic Solutions, Martinez had his room at a worksite raided by Hydraulic Solutions employees. The employees stole some of Martinez's possessions, urinated on others, and left the remaining possessions strewn around the room and outdoor area. These actions occurred on account of Martinez's status as a minority. The employees who were involved in the incident quit that same night before they could be fired. Despite these occurrences, Martinez stayed at the company until June of 2013 when he was laid off amidst Hydraulic Solutions' diminishing financial situation. He was the final leadman laid off.

---

[4] Although Martinez and Plaintiff are different races, the Fifth Circuit has held that "cross-category discrimination could be relevant [to a Title VII discrimination claim] when there is a sufficient correlation between the kind of discrimination claimed by a plaintiff and that directed at others." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 653 (5th Cir. 2012). Here, Martinez and Plaintiff were the only two minorities working in the field for Hydraulic Solutions and received similar types of harassment from their co-workers. Thus the Court finds his exposure to be relevant.

### F. The Tubal-Cain Companies, the Van Huis Family, and Plaintiff's Integrated Enterprise Theory

One of the most contested issues at trial was whether Hydraulic Solutions and Industries were an integrated enterprise. If so, Industries could be held jointly and severally liable for the actions of Hydraulic Solutions' employees. The Court makes the following factual findings as to the integrated enterprise theory.

As mentioned above, at all relevant times, Ed Van Huis wholly owned Industries. In 2010, Ed Van Huis, along with Alex Neer, launched Hydraulic Solutions. Ed Van Huis had an eighty percent ownership stake. To help Hydraulic Solutions get its feet off the ground, Ed Van Huis provided it with various templates, including Industries' employee manual and other employment forms. These collective employment documents were prepared by an attorney, Elizabeth Pratt, for his other companies. Rather than re-invent the wheel, Ed Van Huis provided the forms to Hydraulic Solutions and told Alex Neer that he could modify them as needed. Ed Van Huis asked that substantive changes be run by him. While the employment manual was edited in some places, such as replacing Industries' name with "Hydraulic Solutions," at the time of the harassment, most of the manual remained unchanged.[5] With respect to the manual, the Court finds Hydraulic Solutions made its decisions free from the control of Industries.

Industries also provided accounting services, IT services, and occasional safety consultations to Hydraulic Solutions. Among the duties Industries undertook for Hydraulic Solutions on this front included collecting accounts receivable and performing tasks related to

---

[5] The Court notes that many changes were made to the manual in December 1, 2013, approximately a year and a half after the alleged harassment. While some of these changes were in process at the time of the harassment, they reflect later decisions that are not relevant to the current inquiry.

payroll.[6] At all times, Hydraulic Solutions paid arms-length prices for these services. Indeed, Ed Van Huis intentionally "up-charged" Hydraulic Solutions to ensure as much.

Debbie Van Huis is a also central character to Plaintiff's integrated enterprise allegations. Debbie Van Huis is the wife of Ed Van Huis. She did not directly own any shares of Hydraulic Solutions or Industries. Testimony at trial revealed many ways in which Debbie Van Huis participated in Hydraulic Solutions' employment practices including:

- Sending an e-mail with the template employee manual to Hydraulic Solutions;
- Participating in some of the meetings where her husband was routinely briefed on the weekly ins-and-outs of Hydraulic Solutions;
- Bringing an EEOC deadline (contained on an unopened certified mail envelope) to the attention of Hydraulic Solutions, after incidentally finding a copy of an unopened EEOC notice at Hydraulic Solutions while her husband was in a meeting;
- Being copied to a response sent to the EEOC after she brought the deadline to the company's attention;
- Suggesting keeping records and getting statements related to the EEOC Complaint filed by Jones;
- Participating in the accounting services provided by Industries;
- Being copied on an e-mail criticizing the performance, pay, and capabilities of a Hydraulic Solutions Employee;
- Having access to Hydraulic Solutions' computer server;
- Permitting a Hydraulic Solutions employee to use her criminal background check account and password to perform a background check on Jones;
- Certifying to the Texas Workforce Commission that she was authorized by Hydraulic Solutions to submit verification of employment and salary information about Jones shortly after he was hired.

At all relevant times, and still to this day, Debbie Van Huis was the wife of Ed Van Huis, the principal shareholder of Hydraulic Solutions.

The Court finds that the activities discussed above, including those undertaken by Debbie Van Huis, do not support a finding that Hydraulic Solutions and Industries were an integrated enterprise. A large majority of the activities that Plaintiff claims blurred the lines between the two

---

[6] At times, the preparation of the payroll required communications from Hydraulic Solutions to Industries related to hirings and terminations of Hydraulic Solutions employees. To the extent the task of payroll was outsourced, this exchange of e-mails was necessary to effectuate that outsourcing, and thus not convincing evidence that supports Plaintiff's integrated enterprise theory.

companies are more accurately characterized as supportive actions taken by the spouse of the principal shareholder than labor control functions taken by another corporation's employee. Importantly, neither Debbie Van Huis nor Ed Van Huis are defendants. The remaining acts were taken pursuant to the agreement between Industries and Hydraulic Solutions to provide various services in exchange for payment. Neither category justifies potentially imposing liability to Industries for the working environment at Hydraulic Solutions.

On the other hand, ample evidence shows Hydraulic Solutions acted independently of Industries. Importantly, evidence at trial showed that Hydraulic Solutions exercised exclusive control over hiring and firing. Further, with regard to Hydraulic Solutions, Industries did not set hours, control benefits, control rate of pay, have the ability to discipline, or have the ability to take tangible employment actions against any Hydraulic Solutions employees. Hydraulic Solutions hired and fired its own employees, controlled its own employees' terms and conditions of employment, and ran its business separately from Industries. Hydraulic Solutions adhered to corporate formalities and separated its operations from Industries. As to operations, Hydraulic Solutions maintained separate servers, separate health and liability insurances, separate physical and mailing addresses, and separate bank accounts from Industries.

## III.   Conclusions of Law

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In *Meritor Sav. Bank, FSB. v. Vinson*, 477 U.S. 57, 66–67 (1986), the Supreme Court held that in certain cases harassment because of a protected trait may be actionable under Title VII where it is "sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotations and citations deleted).

In the Fifth Circuit, the elements of a harassment suit may depend on whether the alleged harassment comes at the hands of a "supervisor." To be a "supervisor," the employer must have empowered the employee to make decisions about Plaintiff that "effect a significant change in his work status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or decisions causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013). Where a supervisor does not participate in the harassment, the Plaintiff must prove by a preponderance of the evidence that:

> (1) [he/]she belongs to a protected group;
> (2) [he/]she was subjected to unwelcome harassment;
> (3) the harassment complained of was based on race;
> (4) the harassment complained of [was sufficiently severe or pervasive to] affect[] a term, condition, or privilege of employment [and create a hostile work environment]; [and]
> (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*See Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). In those instances in which a supervisor actually participates in the harassment, the Plaintiff need not prove the fifth element. *See EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 441, 453 (5th Cir. 2013) (en banc).

Consistent with the text of Title VII above, a Plaintiff may bring a claim against an employer for unlawful discrimination that results in an adverse employment action. "A resignation may...constitute an adverse employment action if the resignation qualifies as a constructive discharge." *Brown v. Liberty Mut. Grp., Inco.*, 616 F. App'x 654, 657 (5th Cir. 2015) (internal citation and quotation omitted). A constructive discharge occurs where "an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to

resign." *Green v. Brennan*, 136 S.Ct. 1769, 1776 (2016). Further, a Plaintiff "must also show that

he actually resigned." *Id.* at 1777. Therefore, to prove his unlawful discrimination claim, Plaintiff

must prove by a preponderance of the evidence that:

(1) Because of Plaintiff's race, working conditions were so intolerable that a reasonable person in the employee's position would have felt compelled to resign;
(2) Plaintiff actually resigned; and
(3) Plaintiff would not have been constructively discharged in the absence of—in other words, but for—his race.

*See* 5TH CIR. PATTERN JURY INSTRUCTIONS 11.1 & 11.6. Courts in the Fifth Circuit conduct a

multi-factor test to determine whether a reasonable party in the employee's shoes would have felt

compelled to resign, considering:

(1) demotion;
(2) reduction in salary;
(3) reduction in job responsibilities;
(4) reassignment to menial or degrading work;
(5) reassignment to work under a younger supervisor;
(6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or
(7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (alteration and citation omitted).

The Fifth Circuit has recognized that "[c]onstructive discharge requires a greater degree of

harassment than that required to establish a hostile work environment claim." *Matherne v. Ruba*

*Mgmt.*, 624 F. App'x 835, 841 (5th Cir. 2015).

While the remedies spawning from liability are somewhat different under the two statutes,

the Fifth Circuit has held that the elements of racial discrimination claims under Title VII and

Section 1981 are identical. *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284 n.7 (5th

Cir. 1994). "Therefore, [the Court] employ[s] only one analysis in evaluating the plaintiff['s] Title

VII and § 1981 claims." *Id.*

While Defendant Hydraulic Solutions was Plaintiff's actual employer, Plaintiff claims Defendant Industries should be jointly and severally liable for the alleged Title VII and Section 1981 violations because the Defendants constituted one integrated enterprise. The test for whether distinct entities constitute a single, integrated enterprise, is the same under Title VII and Section 1981. *Cf. Johnson v. Crown Enterprises, Inc.*, 398 F.3d 339 (5th Cir. 2005). To make this determination, Courts consider four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Trevino v. Celanese Corp.*, 701 F.2d 397, 403 (5th Cir. 1983). "Courts applying this four-part standard in Title VII and related cases have focused on the second factor: centralized control of labor relations." *Id.* "This criterion has been further refined to the point that '[t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Id.*

This case is somewhat unusual in that the Defendants agree with Plaintiff on many of the underlying facts, including that some of the conduct was racially motivated and improper in the workplace (or anywhere else). The core contested issues at this point boil down to a few key questions: (1) whether one of Plaintiff's harassers was his "supervisor"; (2) whether the pervasiveness or severity of the harassment of Plaintiff rose to the level of a hostile work environment; (3) whether Jones was constructively discharged; and (4) whether Hydraulic Solutions and Industries were an integrated enterprise, which, if found, would provide for liability against Industries as an "employer" of Plaintiff.

### A. Is Tubal-Cain Hydraulic Solutions Liable Under Title VII and 42 U.S.C. § 1981?

#### 1. Was Plaintiff Subjected to Unlawful Harassment?

In the Fifth Circuit, the elements of an unlawful harassment suit depend on whether the alleged harassment comes at the hands of a "supervisor." Where a supervisor does not participate in the harassment, the plaintiff must show that:

> (1) [he/]she belongs to a protected group;
> (2) [he/]she was subjected to unwelcome harassment;
> (3) the harassment complained of was based on race;
> (4) the harassment complained of affected a term, condition, or privilege of employment; [and]
> (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). Where, as here, a supervisor actually participates in the harassment, the plaintiff need not prove the fifth element. *See EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 441, 453 (5th Cir. 2013) (en banc).

The evidence supports, and the Court hereby finds, that the elements (1), (2), and (3) are satisfied by the facts set out above. Indeed, the Defendants conceded as much at trial. The dispute centers around elements (4) and (5).

#### a. Did the harassment affect a term, condition, or privilege of his employment?

To satisfy the fourth element of an unlawful harassment claim, the harassment in question must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey*, 286 F.3d at 268). To determine whether the conduct rises to a level that altered the terms or conditions of Plaintiff's employment, all of the circumstances should be considered, including: the frequency of the conduct; its severity; whether it is physically threatening, or a mere offensive utterance; and whether it unreasonably interferes with Plaintiff's

work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); 5th CIR. PATTERN JURY INSTRUCTIONS § 11.2. Harassment may include extremely insensitive conduct based on race. *Id.* Simple teasing, offhand comments, sporadic use of offensive language, occasional jokes related to race, and isolated incidents (unless extremely serious) will generally not amount to discriminatory changes in the terms and conditions of employment. *Id.* But discriminatory intimidation, ridicule, or other verbal or physical conduct because of Plaintiff's race may be sufficiently extreme to alter the terms and conditions of employment. *Id.*

In determining whether a hostile work environment existed, the Court must consider the evidence from both the Plaintiff's perspective and from the perspective of a reasonable person. *Id.* First, Plaintiff must actually find the conduct offensive. *Id.* Next, the Court must look at the evidence from the perspective of a reasonable person's reaction to a similar environment under similar circumstances. *Id.* The evidence cannot be viewed from the perspective of an overly sensitive person. *Id.* Nor can it be viewed from the perspective of someone who is never offended. *Id.*

After reviewing the relevant evidence and testimony, the Court finds the racial harassment of Plaintiff affected a term, condition, or privilege of employment. Jones was subjected to peristent racial epithets. Further, testimony at trial showed that Jones' authority was disregarded on account of his race, thus preventing him from carrying out his daily workplace duties. Those facts, combined with the hangman incident (which certainly could have been construed as physically threatening), establish that the harassment affected the terms, conditions, or privileges of his employment. Therefore, the Court finds Plaintiff has satisfied element (4).

### b. Was Brent Hulsey a supervisor?

To be a "supervisor," the employer must have empowered the employee to make decisions about Plaintiff that effect "a significant change in his work status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or decisions causing a significant change in benefits." *See Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013); 5th CIR. PATTERN JURY INSTRUCTIONS 11.2. A person with this type of authority is to be distinguised from "those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree." *See Vance*, 570 U.S. at 432.

The Court finds Hulsey falls into the latter category. While Hulsey maintained some nebulous degree of authority at Hydraulic Solutions, he was never truly empowered by the company to effect a significant change in any employee's work status. Further, while an employer who limits decision-making authority to a few individuals who in turn rely on recommendations by other workers who interact with the employee may be held to have effectively delegated the power to take tangible employment action to the worker on whose recommendation it relies, that is not the case here. *See id.* at 447. The relevant evidence and testimony from trial show that David Villarreal possessed and exercised independent judgment over the information Hulsey reported to him.

Therefore, after reviewing the relevant evidence and testimony, the Court finds Brent Hulsey was not a supervisor.

### c. Did Defendants know or should they have known about the harassment and fail to take prompt remedial action?

Where, as here, no supervisor was involved in the harassment, Plaintiff must prove by a preponderance of the evidence that Defendants knew or should have known of the harassment in question and failed to take prompt remedial action. *Ramsey*, 286 F.3d at 268. "Prompt remedial

action" is conduct by the employer that is reasonably calculated to end the harassment and remedy the situation. *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009); *see also* 5TH CIR. PATTERN JURY INSTRUCTIONS 11.4. Whether the actions were prompt and remedial depends on the facts. *See* 5TH CIR. PATTERN JURY INSTRUCTIONS 11.4. "The proper focus of inquiry is the employer's remedial action in addressing the employee's complaints *in the first instance*." *Stewart*, 586 F.3d at 328. (emphasis added). While "[a] subsequent act can be relevant to this inquiry," it is only so "when it casts doubt on the reasonableness of the remedial action in the context of the employer's policies and practices." *Id.*

After reviewing the relevant evidence and testimony, the Court finds Plaintiff did not show that Defendants knew, or should have known, of the harassment in question and failed to take prompt remedial action. As Hulsey was not a supervisor, management at Hydraulic Solutions could not have been expected to know about the racism in the workplace. The alleged harassment took place over a five-month period. During this time, Jones was absent for many days. Further, the harassment did not reach its apex until late June. Once the harassment was brought to Hydraulic Solutions' attention, the company took swift and harsh action in response to the perpetrators. While Plaintiff stresses that Hulsey was re-hired thirteen months later, that subsequent act does not cast any doubt on the reasonableness of the remedial action considering his change of role to outside salesman and that Jones was no longer an employee for the company. *See Stewart*, 586 F.3d at 328 (re-assigning an employee to again serve under their alleged harasser did not negate the remedial effect of the initial transfer sixteen months prior).

Therefore, the Court finds Plaintiff cannot prove element (5) of his racial harassment claim, and thus, the Defendants are not liable for unlawful harassment under Title VII and Section 1981.

## 2. Can Plaintiff Prove His Unlawful Discrimination Claim?

To prove an unlawful discrimination claim arising from constructive discharge, Plaintiff must prove by a preponderance of the evidence that:

(1) Plaintiff's working conditions were so intolerable that a reasonable person in the employee's position would have felt compelled to resign;

(2) Plaintiff actually resigned; and

(3) Plaintiff would not have been constructively discharged in the absence of—in other words, but for—his race.

*See Green v. Brennan*, 136 S.Ct. 1769, 1776 (2016); 5TH CIR. PATTERN JURY INSTRUCTIONS 11.1 & 11.6. Courts in the Fifth Circuit conduct a multi-factor test to determine whether a reasonable party in the employee's shoes would have felt compelled to resign, considering:

(1) demotion;

(2) reduction in salary;

(3) reduction in job responsibilities;

(4) reassignment to menial or degrading work;

(5) reassignment to work under a younger supervisor;

(6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or

(7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (alteration and citation omitted). The Fifth Circuit has recognized that "[c]onstructive discharge requires a greater degree of harassment than that required to establish a hostile work environment claim." *Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 841 (5th Cir. 2015). Further, "[c]ourts have found that the severe and pervasive use of the ["N"-word], continuing after complaints, supports finding constructive discharge." *Vital v. Nat'l Oilwell Varco*, No. CIV.A. H-12-1357, 2014 WL 4983485, at *27 (S.D. Tex. Sept. 30, 2014) (collecting cases).

While it is a close call, after reviewing the relevant evidence and testimony, the Court finds Plaintiff was not constructively discharged. As an initial matter, six of the seven factors are

noticeably missing from this case. Therefore, Plaintiff is tied to proving his case under the sixth factor—"badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." While the harassment of Jones would be improper in any workplace, it does not rise to the high standard required by this Circuit to prove constructive discharge. Importantly, the Court does not believe Plaintiff has shown that Hydraulic Solutions created a work atmosphere in which a reasonable party in Plaintiff's shoes would have felt compelled to resign, much less one that was "calculated to encourage [his] resignation." *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 167 (5th Cir. 2007) (finding no constructive discharge where Plaintiff "offered evidence only of harassment, and there [was] no evidence that the harassment was calculated to encourage her resignation, nor [was] there evidence of any aggravating factors, such as an employer's invidious intent to create or perpetuate the intolerable conditions compelling resignation") (internal citation and quotation omitted). Indeed, all of the actions by Hydraulic Solutions demonstrate that Jones was a highly valued employee and that they not only took immediate action but also were willing to take appropriate action to root out any racial harassment. *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 481 (5th Cir. 2008) (finding "part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast" and that failure to give employer opportunity to improve plaintiff's situation was fatal to her constructive discharge claim).

Moreover, even if Plaintiff could show that a reasonable person in his position would have felt compelled to leave, it is unquestionable that he has failed to prove that he ever resigned. After the hangman incident and Plaintiff's subsequent meeting with Dimmick, Plaintiff never filed any paperwork resigning his position or gave notice that he was quitting. He never said anything to anyone; he simply stopped showing up to work. Considering the attendance issues Plaintiff had

in the past, Hydraulic Solutions eventually terminated his employment. As the Supreme Court has held, a Plaintiff in a constructive discharge case "must actually resign." *Green v. Brennan*, 136 S.Ct. at 1776. Plaintiff never did and, thus, cannot prove his discrimination claim.

Therefore, while the Court finds the conduct in question to be discriminatory, it must find that Defendant Tubal-Cain Hydraulic Solutions is not liable for unlawful discrimination under Title VII and Section 1981.

### B. Even if Plaintiff Proved His Title VII and Section 1981 Claims, Could Tubal-Cain Industries Be Held Jointly and Severally Liable as a Single, Integrated Enterprise with Tubal-Cain Hydraulic Solutions?

"The term 'employer' as used in Title VII of the Civil Rights Act was meant to be liberally construed." *Trevino v. Celanese Corp.*, 701 F.2d 397, 403 (5th Cir. 1983).[7] Consistent with this, "superficially distinct entities may be exposed to liability upon a finding that they represent a single, integrated enterprise: a single employer." *Id.* In determining whether distinct entities constitute a single, integrated enterprise, courts consider four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* "Courts applying this four-part standard in Title VII and related cases have focused on the second factor: centralized control of labor relations." *Id.* "This criterion has been further refined to the point that '[t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Id.*

After reviewing the relevant evidence and testimony, the Court finds Tubal-Cain Industries and Tubal-Cain Hydraulic Solutions were not integrated entities. As discussed in prior sections,

---

[7] Both the parties and this Court agree that the *Trevino* test provides the proper rubric for analyzing whether Tubal-Cain Industries and Tubal-Cain Hydraulic Solutions were an integrated enterprise for not only Plaintiff's Title VII claims but also his § 1981 claims. *Cf. Johnson v. Crown Enterprises, Inc.*, 398 F.3d 339 (5th Cir. 2005).

Hydraulic Solutions and Industries attempted to honor the corporate form, keeping their businesses largely separate. Plaintiffs argue that three core categories of information show that, despite the separate corporate forms, the companies acted as an integrated enterprise: (1) the alleged control of employment operations, including the employment handbook; (2) the alleged interrelation of operations; and (3) the actions of Debbie Van Huis, a purchasing manager at Industries. The Court does not believe these to be sufficient to find Industries is jointly and severally liable with Hydraulic Solutions for Title VII or Section 1981 violations. First, the Court finds that Hydraulic Solutions acted free from the control of Industries with respect to employment decisions. As an example, at the time Ian Brown was fired by Dimmick, not only was Industries not consulted, but even his uncle who was president of Hydraulic Solutions was not consulted. Hydraulic Solutions exercised complete control over hiring and firing. Admittedly it did use the Industries employment manual as a template provided by their principal shareholder but this did not affect its ability to make all final decisions. Second, the Court finds that the alleged interrelation of operations arose from the services Industries provided to Hydraulic Solutions. Hydraulic Solutions paid arms-length prices for these services, and thus they cannot support a finding that the companies were an integrated enterprise. Thus, while there were any number of emails and contracts covering various employment matters between the two companies, the overwhelming majority involved payroll or accounting matters which Hydraulics was paying industries to handle. Third, the Court finds that the actions by Debbie Van Huis were taken either as a supportive spouse of the principal shareholder or pursuant to the services agreement between Industries and Hydraulic Solutions. None of these categories open Industries to liability for any of the purported violations by Hydraulic Solutions.

Therefore, even had the Court found Tubal-Cain Hydraulic Solutions to be liable under Title VII and Section 1981, Tubal-Cain Industries would not be held jointly and severally liable.

## IV.    Conclusion

Having considered the Parties' arguments, the testimony of all of the witnesses, and exhibits, the Court hereby finds that Defendants are not liable under Title VII and Section 1981 for harassment or discrimination.[8]

It is so ordered.

Signed at Houston, Texas, this _3_ day of January, 2020.

Andrew S. Hanen
United States District Judge

---

[8] Plaintiff filed a Second Amended Proposed Findings of Fact and Conclusions of Law (Doc. No. 103) two days after the Court's deadline. Defendants subsequently filed a Motion to Strike. (Doc. No. 104). After review, the Court **DENIES** Defendants' Motion to Strike.